IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPLE, INC.,

                                     OPINION and ORDER

                  Plaintiff,

                                    11-cv-178-bbc

         v.

MOTOROLA MOBILITY, INC.,

                  Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

This case originated in the International Trade Commission, where defendant Motorola, Inc. filed an infringement action against plaintiff Apple, Inc. and is seeking an exclusion order that would prevent Apple from selling its allegedly infringing products in the United States.  After the case had been pending for a few months in the Commission, Apple filed 13 counterclaims against Motorola and removed the case to this court under 19 U.S.C. § 1337(c).  In its counterclaims, Apple alleges that Motorola has engaged in a pattern of unfair, deceptive and anticompetitive conduct by failing to timely disclose ownership of patents that it now declares are essential to technological standards that have been adopted by the industry and by failing to offer licenses to those patents on fair, reasonable and nondiscriminatory terms.

Now before the court is Motorola's motion to dismiss Apple's claims for lack of

1

ripeness and for failure to state claims upon which relief may be granted.  Dkt. #33.  Also before the court is Motorola's motion to sever the claims in this case and consolidate them with the claims in two other cases that are pending before this court.  Dkt. #39.

I conclude that Apple's claims are ripe and that they are pleaded sufficiently.  Thus, I will deny Motorola's motion to dismiss, with the exception of its motion to dismiss Apple's claim of waiver because waiver is an affirmative defense, not a cause of action.  I also conclude that severing this case would create inordinate complications and would not promote judicial economy or efficiency.  Accordingly, I will deny Motorola's motion to sever and consolidate the case.

I draw the following facts from plaintiff Apple's counterclaims.  (Although Apple is named as the plaintiff in this action, Apple's claims are technically "counterclaims" because it was the respondent in the International Trade Commission where it first filed these counterclaims against Motorola.)

BACKGROUND

A.  Wireless Communication Industry and Standards Setting Organizations

Plaintiff Apple Inc. and defendant Motorola Mobility, Inc. are competitors in the wireless communication industry.  Motorola is the owner of several patents that it has declared as being "essential patents" with respect to various technological standards set by international standards setting organizations relevant to wireless communication devices.

2

Standards setting organizations play a significant role in the wireless technology market by allowing companies to agree on common technological standards so that all compliant products will work together.  Standards lower costs by increasing product manufacturing volume and they increase price competition by eliminating "switching costs" for consumers who desire to switch from products manufactured by one firm to those manufactured by another.

One complication with standards is that it may be necessary to use patented technology in order to practice them.  If a patent claims technology selected by a standards setting organization, the patent is called an "essential patent."  In order to reduce the likelihood that owners of essential patents will abuse their market power, many standards setting organizations have adopted rules related to the disclosure and licensing of essential patents.  The policies often require or encourage members of the standards setting organization to identify patents that are essential to a proposed standard and to agree to license their standard essential patents on fair, reasonable and non-discriminatory terms to anyone who requests a license.  (These terms are often referred to by the acronyms FRAND or RAND.)  Such rules help to insure that standards do not allow essential patent owners to extort their competitors or prevent them from entering the marketplace.

There are four standards setting organizations relevant to this case:  The European Telecommunications Standards Institute; the 3rd Generation Partnership Project, known as 3G; the Telecommunications Standards Institute; and the Institute of Electrical and

Electronics Engineers.  As discussed in more detail below, each of these standards setting organizations have intellectual property rights policies that address disclosure and licensing of patents essential to standards being considered or being adopted by the organizations. At all relevant times, Motorola has been a member of several standards setting organizations, including those relevant to this case.

B.  Motorola's Declarations of Essential Patents and

Commitments to License those Patents

During the course of its participation in developing standards for the European Telecommunications Standards Institute and the 3G Project, Motorola submitted "declarations," declaring that the '697, '559, '230 and '898 patents were essential or potentially essential to the European Telecommunications Standards Institute's standards, including the Global System for Mobile Communications (known as the GSM standard), Universal Mobile Telecommunications System (known as the UMTS standard) and 3G Project standards.  Motorola also declared that those four patents were essential to standards that had already been adopted by the Institute and 3G Project.  Motorola represented to the Institute and the 3G Project that it would "grant irrevocable licences under the [intellectual property rights] on terms and conditions which are in accordance with . . . the [Institute's] [intellectual property rights] Policy."  Apple's Cpt., dkt. #1, ¶¶ 71-75.

Additionally, Motorola declared the '223 patent essential to the 802.11 standard and

4

submitted an Intellectual Property Statement to the Institute of Electrical and Electronics Engineers, stating that Motorola agreed to license any patents essential to the 802.11 standard on a non-discriminatory basis offering fair and commercially reasonable terms. In a Letter of Assurance for Essential Patent Claims dated June 14, 2007, Motorola declared that the '712 patent and the '193 patent were essential to the practice of the 802.16e standard. The 802.16e Letter of Assurance stated that Motorola was prepared to grant licenses to an "unrestricted number of applicants on a worldwide, non-discriminatory basis with reasonable terms and conditions." Id. at ¶ 88.

Finally, in a "Statement from the Patent Holder" to the Telecommunication Industry Association, Motorola declared that the '697, '712 and '193 patents were essential to the CDMA2000 standard. Motorola stated that it would make a license available for any declared-essential patent "under reasonable terms and conditions that are demonstrably free of any unfair discrimination" Id. at ¶ 99.

C. Negotiations for Licensing between Apple and Motorola

Apple's original iPhone went on sale in June 2007. Apple's original iPhone contained an Infineon baseband chipset, which incorporated technology covered by patents that Motorola has declared as essential. Apple purchased the Infineon baseband chipset through a manufacturing agreement with Chi Mei Corporation, which manufactured the Infineon baseband chipset under a licensing agreement with Motorola. On August 4, 2007, Motorola

5

gave Chi Mei a 60-day suspension notice on its licensing agreement.

In September 2007, representatives of Apple and Motorola met to discuss a licensing agreement regarding Motorola's declared-essential patents. At the meeting, Motorola demanded a royalty rate based on the total revenue of the covered devices. Apple believes the rate is unreasonably high and that the value and contribution of the declared-essential patents is disproportionate to the revenue received by Apple for sales of its products. In addition, the demanded rate was higher than the rate Motorola has offered to other competitors. The parties have negotiated on and off for three years but have been unable to agree on licensing terms.

### D. Motorola's Termination of the Qualcomm License

On December 16, 2009, Apple and Qualcomm entered into a contract whereby Apple would purchase chipsets from Qualcomm that were compliant with the CDMA2000 standard. The chipsets incorporated technology that Qualcomm licensed from Motorola. On January 11, 2011, on the day Apple announced the Verizon iPhone 4, Motorola notified Qualcomm of its intent to terminate any and all license covenant rights with respect to Qualcomm's business with Apple, effective February 10, 2011.

## PROCEDURAL HISTORY

### A. Related Cases

6

Three pending actions relate to the present case.  First, there is the investigation pending in the International Trade Commission that defendant Motorola initiated on October 6, 2010.  In the Matter of Certain Wireless Communication Devices, Portable Music and Data Processing Devices, Computers and Components Thereof, ITC Investigation No. 337-TA-745.  In that case, Motorola is seeking an exclusion order and a permanent cease and desist order as a result of plaintiff Apple's alleged infringement of United States Patent Nos. 6,272,333 (the '333 patent), 6,246,862 (the '862 patent), 5,359,317 (the '317 patent), 7,751,826 (the '826 patent), 6,246,697 (the '697 patent), and 5,636,223 (the '223 patent).  As an affirmative defense to infringement, Apple contends that Motorola's license terms for its essential patent portfolio are not fair, reasonable and non-discriminatory.  The case is scheduled for a hearing in July 2011.  The Commission has set a target date of March 8, 2012, at which time the Commission expects to complete its final review of the matter.

The other two related cases are pending in this court.  Plaintiff Apple filed case number 10-cv-661-bbc on October 29, 2010, asserting patent infringement claims against Motorola.  On November 9, 2010, Motorola filed counterclaims in the '661 action alleging infringement of the '317 patent, the '223 patent, the '697 patent, the '862 patent, the '333 patent and the '826 patent.  These are the same patents at issue in the International Trade Commission's 337-TA-745 investigation.  On December 2, 2010, this court granted the parties' joint motion to stay the '661 case in favor of the proceedings in the Commission.

Also on October 29, 2010, plaintiff Apple filed case number 10-cv-662-bbc, asserting

7

patent infringement claims against Motorola.   On November 9, 2010, Motorola filed counterclaims against Apple for infringement of United States patent Nos. 5,311,516 (the '516 patent), 5,319,712 (the '712 patent), 5,490,230 (the '230 patent), 5,572,193 (the '193 patent), 6,175,559 (the '559 patent) and 6,359,898 (the '898 patent), all of which Motorola has declared essential to certain standards.   In that case, Apple contests whether the patents are essential to standards it is practicing and contests the validity of the patents.   One of Apple's affirmative defenses in that case is that Motorola's license offer was not consistent with its obligations to license the patents on fair, reasonable and non-discriminatory terms. The '662 case is not stayed.

## B.  The Case at Issue (11-cv-178-bbc)

In this case, Apple alleges that Motorola has engaged in a pattern of unfair, deceptive and anticompetitive conduct by failing to timely disclose ownership of patents that it now declares are essential to standards that have been adopted by the industry.  The patents that Motorola has declared essential are the '223, '697, '712, '230, '193, '559 and '898 patents. Additionally, Apple contends that Motorola's refusal to negotiate a license in good faith with Apple for those declared-essential patents constitutes a breach of commitments Motorola made to several standards setting organizations to license essential patents on fair, reasonable and non-discriminatory terms.   Apple also asserts claims against Motorola under the theory of estoppel and waiver.   Apple contends that by making commitments to the standards

8

setting organizations, Motorola promised potential licensees that it would license its essential patents on fair, reasonable and non-discriminatory terms.   Because wireless device companies, like Apple, relied on its promise, Motorola is estopped to deny it.

Also, Apple brings causes of action for tortious interference with a contract, unfair competition and unlawful business practices and violation of Section 2 of the Sherman Act for Motorola's refusal to license fairly, its failure to disclose essential patents and its interference with the contract between Apple and Qualcomm.  Finally, Apple brings three declaratory judgment claims, seeking declarations that (1) Motorola's offers have not been on fair, reasonable and non-discriminatory terms; (2) Motorola is not entitled to injunctive relief in the event it prevails on any of its patent infringement claims; and (3) Motorola has misused its patents.

Shortly after Apple removed this case to federal court, it moved for preliminary injunctive relief, seeking an order that would have enjoined Motorola from (1) proceeding as a party in the 337-TA-745 investigation in the International Trade Commission with respect to the '223 and '697 patents; (2) proceeding with its counterclaims filed in case number 10-cv-662-bbc in this court with respect to the '712, '230, '193, '559 and '898 patents; and (3) selectively terminating its patent license agreement with Qualcomm as to Apple.  A hearing was held on the motion on April 26, 2011.  At the conclusion of the hearing, I denied Apple's motion for a preliminary injunction because I did not see a likelihood of success on the merits of its claims, did not think it appropriate to interfere with

an International Trade Commission proceeding under the circumstances, did not think that Apple had shown any irreparable harm and found that the public interest would be served by allowing the International Trade Commission to proceed with its investigation and trial.

While the parties were briefing Apple's motion for a preliminary injunction, Motorola filed a motion to dismiss Apple's counterclaims, contending that certain of Apple's claims are not ripe and that all of Apple's claims suffer from pleading problems. Dkt. #33. Also, Motorola filed a motion to sever and consolidate the claims in this action with the '661 and '662 cases. Dkt. #39.


OPINION

A. <u>Motion to Dismiss</u>

1. <u>Ripeness</u>

With the exception of its tortious interference claim, all of Apple's counterclaims focus on Motorola's alleged commitments to license its essential patents to Apple on fair, reasonable and non-discriminatory terms and its failure to do so. Motorola contends that all of Apple's counterclaims should be dismissed under Fed. R. Civ. P. 12(b)(1) because they will not be ripe until the parties' patent infringement disputes are resolved.

Ripeness is essentially a question of timing, and depends on whether the plaintiff's threatened injury is sufficiently imminent to warrant judicial action. <u>Regional Rail Reorganization Act Cases</u>, 419 U.S. 102, 143 (1974). To establish ripeness, plaintiffs must

10

demonstrate both (1) the fitness of the issues for judicial decision and (2) the "hardship to the parties of withholding court consideration." Abbott Laboratories v. Gardner, 387 U.S. 136, 149 (1967); Metropolitan Milwaukee Association of Commerce v. Milwaukee County, 325 F.3d 879, 882 (7th Cir. 2003).

The fitness for judicial decision inquiry guards against judicial review of hypothetical or speculative disputes. Babbitt v. United Farm Workers National Union, 442 U.S. 289, 297 (1979). Legal issues that require little if any further factual development are fit for review. Wisconsin Central, Ltd. v. Shannon, 539 F.3d 751, 759 (7th Cir. 2008). Motorola argues that Apple's counterclaims are not fit for judicial decision because the policies and commitments to the standards setting organizations upon which Apple seeks relief require Motorola to license only those patents that are *actually* essential to the respective standards at issue in the commitments. Thus, Motorola's obligation to grant Apple a license will be triggered only if there is an agreement between the parties or a determination that Motorola's patents are "essential" to standards that Apple is implementing in its products. In other words, Motorola must prove in the patent infringement case, or Apple must concede in this case, that Apple has infringed Motorola's patents before Apple is entitled to a license from Motorola. Motorola reasons that because Apple denies that its products practice any of the asserted claims of the Motorola patents, Apple's Cpt., dkt. #1, ¶ 15, n.2, any opinion by the court regarding Motorola's licensing obligations would be an advisory one.

The problem with Motorola's ripeness argument is that Motorola points to nothing

11

in Apple's complaint, the relevant intellectual property rights policies at issue or any case law to support its argument that it had no obligation to make a reasonable offer unless and until infringement or essentiality is established.  According to Apple's complaint, Motorola is obligated to offer a fair, reasonable and non-discriminatory license to its declared-essential patents regardless whether the patents have been proven in court to be essential *in fact* to the standards adopted by the standards setting organizations or applied in Apple's products.

In particular, Apple alleges in its complaint that Motorola declared certain patents as essential or potentially essential and stated that it would grant fair, reasonable and non-discriminatory licenses to those patents.  Apple's Cpt., dkt. #1, ¶¶ 71, 89, 99.  Neither the language of the intellectual property policies at issue nor Motorola's assurances under those policies suggest that Motorola's obligation to offer licenses to its patents was contingent upon the outcome of patent litigation.  This makes sense.  The policies of the standards setting organizations become far less useful or effective if a company who has declared its patents as essential, thereby encouraging the organization to adopt the standard, can then refuse a fair, reasonable and non-discriminatory license until essentiality is proven, either through patent infringement litigation or otherwise.

At least two courts to consider the issue have concluded that claims based on fair, reasonable and non-discriminatory licensing obligations are not contingent upon the results of patent infringement suits regarding the same patents.  In Nokia Corp. v. Qualcomm, Inc., 2006 WL 2521328, *1-2 (D. Del. Aug. 29. 2006), the court granted the plaintiff's motion

to remand a case seeking declaratory relief and specific performance of a fair, reasonable and non-discriminatory licensing obligation. The issue in the case was whether the plaintiff's suit presented a substantial question of federal patent law such that it could proceed in federal court. The court reviewed the allegations and concluded that the case presented no substantial question of federal patent law. In particular, the court concluded that it was not necessary "to determine whether the patents at issue are in fact 'essential' because Defendant has already voluntarily declared them essential. Rather, Plaintiff merely seeks an interpretation of Defendant's obligations arising after declaring certain patents essential." The court granted the motion to remand the case to state court.

Similarly in <u>Ericsson Inc. v. Samsung Electronics Co.</u>, Ltd., 2007 WL 1202728, *2-3 (E.D. Tex. Apr. 20, 2007), the court concluded that the plaintiff's contract claim related to a dispute regarding the defendant's obligation to offer a reasonable and non-discriminatory license was separable from the claims for patent infringement. The court stayed resolution of the patent infringement claims until the breach of contract claim was resolved. Motorola has cited no cases in which the court concluded that contractual or antitrust claims related to licensing obligations cannot be resolved before resolution of related patent infringement suits.

In this case, the parties dispute whether Motorola is required by contract to make fair, reasonable and non-discriminatory offers to Apple and whether Motorola has done so. Apple's claims are not based on "hypothetical, speculative or illusory disputes," <u>Wisconsin</u>

13

Central, Ltd. v. Shannon, 539 F.3d 751, 759 (7th Cir. 2008); rather, they are based on allegations of concrete and ongoing injuries that are sufficiently imminent to warrant judicial action.  Regional Rail Reorganization Act Cases, 419 U.S. at 143.

      In addition, Apple may suffer hardship if the court withholds consideration of the issues presented.  Hardship may be found when there may be a "substantial immediate impact" on the interests of plaintiff as a result of the challenged action.  Hinrichs v. Whitburn, 975 F.2d 1329, 1335-36 (7th Cir. 1992).  Apple alleges that it invested significant money and other resources into developing products that are compliant with the standards adopted by the various standards setting organizations, relying on Motorola's commitments that it would license patents that it had declared essential to those standards on fair, reasonable and non-discriminatory terms.  Apple alleges that because Motorola has refused to offer licenses on fair, reasonable and non-discriminatory terms, Apple is involved in multiple patent infringement suits, risks losing the ability to sell its products in the market and is threatened by high royalty rates.  These allegations imply that Apple would suffer hardship if the court dismisses its licensing claims at this time.  In sum, at this stage I cannot conclude that no present dispute exists and that Apple would not be subject to hardship if its claims were dismissed.  Therefore, I will deny Motorola's motion to dismiss Apple's complaint for lack of ripeness.

2.  Adequacy of pleading

Motorola also moves to dismiss each of Apple's counterclaims under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief may be granted.  A claim should be dismissed under Rule 12(b)(6) when the allegations in the complaint, however true, could not raise a plausible claim of entitlement to relief.  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009); Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 558 (2007).  In ruling on a motion to dismiss, courts must construe all of the plaintiff's factual allegations as true and draw all reasonable inferences in the plaintiff's favor.  Savory v. Lyons, 469 F.3d 667, 670 (7th Cir. 2006).  However, courts are not required to accept as true a legal conclusion presented as a factual allegation.  Iqbal, 129 S. Ct. At 1949-50.


a.  Breach of contract

Apple has asserted six separate breach of contract counterclaims, alleging that Motorola breached the contracts it made with the European Telecommunications Standards Institute, the Institute of Electrical and Electronics Engineers, the 3G Project and the Telecommunication Industry Association  to license its patents on fair, reasonable and non-discriminatory terms.  Motorola contends that these breach of contract claims should be dismissed because Apple has failed to plead any of the elements of a breach of contract claim adequately.

The initial question is which law applies to the alleged contracts at issue.  Apple (a

15

California company) is suing Motorola (an Illinois company) for violation of commitments to the European Telecommunications Standards Institute (which is based in France), the Institute of Electrical and Electronics Engineers (based in New York) and the Telecommunication Industry Association (based on Virginia).  Neither party undertakes a choice-of-law analysis.  Although Motorola denies that the contracts are governed by Wisconsin law, it addresses only Wisconsin law.  Thus, I also apply Wisconsin law.  FutureSource LLC v. Reuters Ltd., 312 F.3d 281, 283 (7th Cir. 2002) (in absence of any discussion of choice of law issues by parties, court applies law of forum state).

To state a claim for breach of contract under Wisconsin law, Apple must plead (1) the existence of a contract creating obligations flowing from Motorola to Apple; (2) a breach of those obligations; and (3) damages arising from the breach.  Northwest Motor Car, Inc. v. Pope, 51 Wis. 2d 292, 296, 187 N.W.2d 200, 203 (1971); Brew City Redevelopment Group, LLC v. The Ferchill Group, 2006 WI App 39, ¶ 11, 289 Wis. 2d 795, 807, 714 N.W.2d 582, 588.

According to Apple, the intellectual property rights policies of the various standards setting organizations constitute the "offers."  These policies contain requirements concerning whether and to what extent patentees owning potentially essential patents must commit to licensing such patents on fair, reasonable and non-discriminatory terms, as well as the disclosure of patents and patent applications that may be essential to standards.  Motorola accepted the offers by becoming a member of the organizations, agreeing to abide by their

16

policies and receiving benefits by participating in the standard development process and influencing the choice of technology for the standards. The various commitments Motorola made to the organizations, including its declarations to the European Telecommunications Standards Institute and the 3G Project, its Letter of Assurance and Intellectual Property Statements to the Institute of Electrical and Electronics Engineers and its Statement from the Patent Holder to the Telecommunications Association, are consideration for those benefits. Thus, in consideration for the benefits that flowed from its membership in the standards setting organizations, Motorola provided assurances that it would timely disclose intellectual property and license essential patents on fair, reasonable and non-discriminatory terms.

Under Wisconsin law, the constitution, by-laws and resolutions of a voluntary association may form a binding contract between members of that association. Attoe v. Madison Professional Policemen's Association, 79 Wis. 2d 199, 205-6, 255 N.W.2d 489, 492 (1977). In addition, at least three courts have concluded that a member of a standards setting organization states a breach of contract claim based on a member's obligation to offer fair, reasonable and non-discriminatory licenses under the intellectual property policies of those organizations. Microsoft Corp. v. Motorola, Inc., No. 10-cv-1823-jlr, slip op. at 4-5 (W.D. Wash. May 31, 2011) (holding that Microsoft stated claim for breach of contract for Motorola's failure to offer licenses on fair, reasonable and non-discriminatory terms after promising it would do so to standards setting organization) (attached as exhibit #92-1 in this

17

case); <u>Research In Motion Ltd. v. Motorola, Inc.</u>, 644 F. Supp. 2d 788, 797 (N.D. Tex. 2008) (holding at motion to dismiss stage that plaintiff stated breach of contract claim based on defendant's failure to offer fair, reasonable and non-discriminatory terms as it had promised European Telecommunications Standards Institute and Institute of Electrical and Electronics Engineers); <u>ESS Technology, Inc. v. PC-Tel, Inc.</u>, 1999 WL 33520483, *4 (N.D. Cal. Nov. 4, 1999) (holding that third-party beneficiary of contract between standards setting organization and defendant-essential-patent holder, software manufacturer had properly stated claim for specific performance of agreement requiring defendant to license patents on non-discriminatory and reasonable terms); <u>see also</u> <u>Ericsson Inc. v. Samsung Electronics, Co.</u>, 2007 WL 1202728, *1 (E.D. Tex. Apr. 20, 2007) (plaintiff and defendant asserting claims for breach of contract agreed that licensing obligations were contractual and bound all members of standards setting organizations).

However, Motorola contends that the policies at issue in this case are too vague and indefinite to support a contractual obligation. Under Wisconsin law, contract terms must be definite enough that the basic obligations of the parties may be ascertained. <u>Goebel v. National Exchangors, Inc.</u>, 88 Wis. 2d 596, 615, 277 N.W.2d 755, 765 (1979) ("An offer must be so definite in its terms or require such definite terms in the acceptance, that the promises and performances to be rendered by each party are reasonably certain."); <u>see also</u> <u>Management Computer Services v. Hawkins, Ash, Baptie & Co.</u>, 206 Wis. 2d 158, 178, 557 N.W.2d 67, 75 (1996). A court cannot specifically enforce an agreement or award damages

for its breach when it lacks certainty.  <u>Witt v. Realist, Inc.</u>, 18 Wis. 2d 282, 297, 118 N.W.2d 85, 93 (1962).

Accepting Apple's factual allegations as true, I conclude that Apple has pleaded contractual terms definite enough to constitute enforceable agreements.  The European Telecommunications Standards Institute's intellectual property rights policy states that its members "shall use its reasonable endeavors" to inform the organization of essential patents "in a timely fashion."  Apple's Cpt., dkt. #1, ¶ 28.  In addition, all members are asked to grant licenses to essential patents on fair, reasonable and non-discriminatory terms and if they refuse, they must explain their reasons in writing.  <u>Id.</u> ¶¶ 30, 31. The Institute will not adopt a standard incorporating patented technology to which it has not received a licensing commitment from the owner.  <u>Id.</u> ¶ 32.  According to the allegations in Apple's complaint, Motorola agreed to be bound by these policies when it joined the organization.  The combination of the policies and Motorola's assurances to the Institute that it would grant fair, reasonable and non-discriminatory licenses to the '697, '898, '230 and '559 patents constitute a contractual agreement between Motorola and the European Telecommunications Standards Institute.  In addition, because the 3G Project policy requires its members to abide by the intellectual property policies of the Institute, Motorola's membership in the 3G Project created a contractual obligation among the Institute, Motorola and the 3G Project.  <u>Id.</u> ¶ 33, 34.

Under the Institute of Electrical and Electronics Engineers's policy, members are to

submit a "Letter of Assurance" to the Institute of Electrical and Electronics Engineers that includes a commitment to license essential patents under reasonable and non-discriminatory terms.  Id. ¶¶ 35, 36.  A contractual obligation between the Institute and Motorola was created by this policy, Motorola's membership in the Institute and Motorola's Letters of Assurance and Intellectual Property Statement to the Institute in which it declared the '223, '712 and '193 patents essential to certain standards and stated its willingness to license those patents on reasonable and non-discriminatory terms.  Id. ¶¶ 85-90.

Finally, the Telecommunication Industry Association's policy states that the standard setting process is "made more efficient" if the existence of essential patents is made known as early as possible.  Id. ¶ 39.  The Association policy states that companies holding any essential patents necessary for a standard adopted by the Association must assure the Association that they will (1) license those essential patents without compensation; or (2) license those essential patents "to all applicants under terms that are reasonable and non-discriminatory."  Id. ¶ 42.  A contractual relationship arose between Motorola and the Association under this policy, Motorola's membership in the Telecommunication Industry Association, its declaration that the '712, '193 and '697 patents are essential to certain standards and its assurance to the Association that it would license those patents under reasonable terms and conditions.

In sum, Apple's allegations permit a reasonable inference that these policies are binding on the members of the organizations.  Each policy indicates that it will not adopt

a standard, or at least will use alternative technology in the standard, if the owner of a declared-essential patent refuses to offer fair, reasonable and non-discriminatory licensing. Thus, the policies assume that members will agree to license essential patents on fair, reasonable and non-discriminatory terms and that once a member makes such a commitment, it is enforceable.

Turning to whether Apple has a right to enforce the contracts, Motorola contends that Apple is neither a party to the contracts nor an intended third-party beneficiary.  Becker v. Crispell-Snyder, Inc., 2009 WI App 24, ¶ 9, 316 Wis. 2d 359, 763 N.W.2d 192 (party wishing to enforce contract must either be party to contract or third-party beneficiary). However, Apple's allegations permit an inference that it has the right to enforce Motorola's contractual obligations as a third-party beneficiary.  A third-party beneficiary is one whom the contracting parties intended to "directly and primarily" benefit.  Becker, 2009 WI App 24, at ¶ 11 (citing Winnebago Homes, Inc. v. Sheldon, 29 Wis. 2d 692, 699, 139 N.W.2d 606 (1966)).  The benefit proven must be direct; an indirect benefit incidental to the primary contractual purpose is insufficient.  Id.

Apple alleges that the primary purpose of the intellectual property policies of the standards setting organizations is to protect companies that need to obtain licences to practice the adopted standards.  In other words, prospective licensees of essential patents, like Apple, are the very parties who are intended to benefit from the existence of fair, reasonable and non-discriminatory licensing obligations and other similar policies.  For

21

example, the European Telecommunications Standards Institute policy states that it is an "objective" of the Institute to "reduce the risk" of an essential patent's becoming "unavailable." Apple's Cpt., dkt. #1, at ¶ 32.  The unavailability of essential patents matters only to those who wish to practice the standards, such as Apple.  Thus, Apple is "a member of a class of beneficiaries intended by the [contracting] parties to benefit from [the contract]." Pappas v. Jack O.A. Nelson Agency, Inc., 81 Wis. 2d 363, 371-72, 260 N.W.2d 721 (1978).

The final question is whether Apple has pleaded sufficiently that Motorola breached the contracts.  Apple contends that Motorola breached the contracts by (1) failing to timely disclose patents to the European Telecommunications Standards Institute that it later claimed were essential to certain standards; and (2) failing to license its patents to Apple on fair, reasonable and nondiscriminatory terms.

With respect to the first alleged breach, Apple alleges that Motorola was involved in developing several standards with the European Telecommunications Standards Institute and the 3G Project, was aware that it had patents or patent applications relevant to the standards, but failed to disclose the patents until after the standards were adopted.  Apple alleges that if Motorola had disclosed the patents before the standards were adopted and declared the patents essential to the standards, the members of the Institute and 3G Project would have considered other viable alternative technologies or declined to incorporate the aspects of the technical specifications or standards purportedly covered by Motorola's

22

patents.  Now, companies who practice the standards must obtain licenses from Motorola to practice the standards.  These allegations state a claim that Motorola breached its commitments to the Institute and 3G Project.

With respect to the second alleged breach, Apple alleges that Motorola has made royalty demands on Apple that exceeded those made on comparable parties for use of the declared-essential patents, discriminated against Apple by terminating Qualcomm's contract with Motorola solely as to Apple, demanded a rate that was based on the total revenue base of Apple's products rather than the revenue from the components that utilize the technologies of the declared-essential patents, sought to include cross-licenses to certain of Apple's non-essential patents as a condition of a licensing agreement and sued Apple when Apple refused to accede to Motorola's demands.  At this stage of the case, these allegations are sufficient to imply that Motorola has not honored its promise to license on fair, reasonable and non-discriminatory terms.  Research in Motion Ltd., 644 F. Supp. 2d at 797 (holding that plaintiff met pleading standard for breach of contract claim by alleging that defendant "demanded of [plaintiff] terms that are unfair, unreasonable, and, on information and belief, discriminatory").

Therefore, I will deny Motorola's motion to dismiss Apple's breach of contract claims.

b.  Antitrust

Apple contends that Motorola violated the antitrust laws by making false licensing

23

commitments to standards setting organizations and by failing to disclose essential patents or applications to those organizations until after certain standards were adopted. (The parties agree that Apple's claim under the California Business and Professional Code § 17200 is subject to the same pleading requirements as Apple's claim under § 2 of the Sherman Act. I follow the parties' lead and apply the pleading standards for the federal antitrust claim to both claims.)

As an initial matter, the parties dispute what pleading standards applied to Apple's antitrust claims. At a minimum, every complaint must provide a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a), and contain "enough facts to state a claim to relief that is plausible on its face," Twombly, 550 U.S. at 570; see also Iqbal, 129 S. Ct. at 1949. However, Motorola contends that Apple's antitrust counterclaim must meet the heightened pleading standards of Fed. R. Civ. P. 9(b) because the counterclaim is premised upon a course of fraudulent conduct.

The Court of Appeals for the Seventh Circuit has stated that Rule 9(b) applies whenever a claim is grounded upon alleged fraudulent conduct. Kennedy v. Venrock Associates, 348 F.3d 584, 593-94 (7th Cir. 2003); see also Borsellino v. Goldman Sachs Group, Inc., 477 F.3d 502, 507 (7th Cir. 2007) (whether Rule 9(b) applies is fact-based inquiry that depends on nature of plaintiff's factual allegations). In this case, Apple alleges in its antitrust counterclaim that Motorola "intentionally ma[de] false and deceptive F/RAND commitments [and] failed to disclose Declared-Essential Patents in a timely

24

manner." Apple's Cpt., dkt. #1, at ¶ 165.  Apple must plead these allegations of fraudulent

conduct with particularity, identifying the "who, what, when, where and how" of the fraud.

Pirelli Armstrong Tire Corp. Retiree Medical Benefits Trust v. Walgreen Co., 631 F.3d 436,

441-42 (7th Cir. 2011).

      To plead a viable antitrust claim under § 2 of the Sherman Act, Apple must plausibly

allege (1) that Motorola has achieved monopoly power in a relevant market and (2) that it

achieved monopoly power through anti-competitive or exclusionary conduct "as

distinguished from growth or development as a consequence of a superior product, business

acumen, or historic accident."  United States v. Grinnell Corp., 384 U.S. 563, 571 (1966).

Motorola contends that Apple has not alleged that Motorola engaged in anticompetitve

conduct and has not alleged that Motorola has achieved monopoly power in a particular

market.  In addition, Motorola contends that Apple's allegations do not satisfy Rule 9(b)

because Apple has failed to identify who made the allegedly false licensing commitments or

failed to disclose essential patents, when the false commitments or untimely disclosures were

made, the method by which the allegedly false commitments were communicated or the

place the commitments were made.

      Apple's theory of antitrust liability is fairly novel and has not been considered in this

circuit.  However, Apple's allegations in this case are similar to those made by the plaintiff

in Broadcom Corp. v. Qualcomm, Inc., 501 F.3d 297 (3d Cir. 2007), a case involving two

mobile wireless telephone companies.  Broadcom filed suit against Qualcomm, alleging that

Qualcomm, a member of the European Telecommunications Standards Institute, had convinced the Institute to incorporate its technology into standards "in reliance on . . . Qualcomm's commitment to license that technology on [fair, reasonable and non-discriminatory] terms." Id. at 304.  Broadcom argued that Qualcomm had later gone back on its word, and was "witholding favorable pricing," in order to obtain a bigger market share. Id.

The court of appeals stated that "the [licensing] commitments that [standards setting organizations] required of vendors were intended as a bulwark against unlawful monopoly." Id.  Alternatively, the court stated, the organizations "might have chosen nonproprietary technologies for inclusion in the standard" or chosen other ways to prevent the use of standards from automatically granting monopoly power to essential patent holders.  Id.  The court held that "a patent holder's intentionally false promise to license essential proprietary technology on [fair, reasonable and non-discriminatory terms], . . . coupled with a [standards setting organization's] reliance on that promise . . . and the patent holder's subsequent breach of that promise, is actionable anticompetitive conduct."  Id. at 314; see also Clamp-All Corp. v. Cast Iron Soil Pipe Institute, 851 F.2d 478, 488 (1st Cir. 1988) (acknowledging possibility of antitrust claim where firms both prevented standards setting organization from adopting beneficial standard and did so through "unfair, or improper practices or procedures").

The court's reasoning in Broadcom applies to the facts alleged by Apple in support

of its antitrust counterclaim.  Apple alleges that Motorola assured the standards setting organizations that it would offer fair, reasonable and non-discriminatory licenses to all its essential patents.  In addition, Apple alleges that if Motorola had disclosed to the standards setting organizations that its patents covered the standards, but that it would not offer fair, reasonable and non-discriminatory licenses to all implementers of those standards, the organizations' members may have chosen viable alternative technologies or declined to incorporate into the standards the functions purportedly covered by Motorola's patents. Apple's Cpt., dkt. #1, ¶¶ 77-78; see also Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492, 501 (1988) (noting need for private standards setting to be free "from being biased by members with economic interests in stifling product competition").  By making false commitments that led to the establishment of worldwide standards incorporating its own patents and eliminating competing alternative technologies, Motorola has become a gatekeeper, accruing the power to harm or eliminate competition in the relevant markets if it so desires.  Apple alleges that Motorola achieved its gatekeeper status not through "growth or development as a consequence of a superior product, business acumen, or historic accident," Grinnell, 384 U.S. at 570-71, but through Motorola's false promises that it would license its patents on fair, reasonable and non-discriminatory terms.  The relevant markets include the various technologies competing to perform the functions covered by Motorola's declared-essential patents for each of the relevant standards.  These allegations imply that Motorola engaged in anticompetitive conduct and has achieved monopoly power.

27

Moreover, Apple has alleged injury to itself and the relevant market.  Apple alleges that it has suffered the threat of being forced to pay exorbitant royalties, the uncertainty created by Motorola's refusal to offer a fair, reasonable and non-discriminatory license, the expense of multiple patent infringement suits by Motorola and injury to Apple's business and property, specifically, the threat of imminent loss of profits, loss of current and potential customers and loss of goodwill and product image.  If Motorola licenses only at exorbitant rates, it will force its competitors to increase prices in the downstream market in order to make a product.  Anago, Inc. v. Tecnol Medical Products, Inc., 976 F.2d 248, 249 (5th Cir. 1992) (holding that "[t]ypical anticompetitive effects include increased prices and decreased output").   Thus, Apple's allegations permit an inference that Motorola's alleged anticompetitive conduct and refusal to grant fair, reasonable and non-discriminatory licenses may raise the costs associated with the manufacture and sale of standards compliant downstream products.  Finally, Apple's allegations satisfy the heightened pleading standards of Rule 9(b) by identifying the specific patents that Motorola allegedly failed to disclose, the specific patents for which Motorola made fair, reasonable and non-discriminatory commitments, to whom the commitments were made and the dates on which they were made.  Therefore I will deny Motorola's motion to dismiss Apple's counterclaims under § 2 of the Sherman Act and the California Business and Professional Code § 17200.

c.  Patent misuse and waiver

Apple seeks a declaratory judgment that Motorola's patents are unenforceable as a result of patent misuse and waiver.  As an initial matter, Motorola contends that Apple's patent misuse and waiver claims must be dismissed because they are not independent causes of action, but rather affirmative defenses to a charge of infringement.  However, Apple points out that the Court of Appeals for the Seventh Circuit has allowed a claim of patent misuse to proceed as an independent equitable cause of action, even before a claim for infringement has been brought.  County Materials Corp. v. Allan Block Corp., 502 F.3d 730, 733-34 (7th Cir. 2007); Rosenthal Collings Group, LLC v. Trading Technologies International, Inc., 2005 WL 3557947, *6 (N.D. Ill. Dec. 26, 2005) (allowing plaintiff to seek declaratory judgment of patent misuse as affirmative claim for injunctive relief).  Thus, I will not dismiss Apple's patent misuse claim on that ground.  However, I will dismiss Apple's waiver claim, as Apple has not cited any legal authority allowing waiver as a cause of action and I am aware of none.

To state a claim for patent misuse, Apple must allege facts showing that Motorola has employed anticompetitive practices in an effort to extend its patent grant beyond its statutory limits.  USM Corp. v. SPS Technologies, Inc., 694 F.2d 505, 510 (7th Cir. 1982); see also Princo Corp. v. International Trade Commission, 616 F.3d 1318, 1328 (Fed. Cir. 2010) ("What patent misuse is about, in short, is 'patent leverage,' i.e., the use of patent power to impose overbroad conditions on the use of the patent in suit that are not within the reach of the monopoly granted by the Government.")  As explained in the context of

29

Apple's antitrust claims above, Apple's allegations support an inference that the license Motorola seeks to impose on Apple extend beyond the reach of a lawful patent monopoly. This is sufficient to state a claim for patent misuse.

d.  Promissory estoppel

To survive a motion to dismiss on a promissory estoppel claim, Apple must plead that Motorola made a promise that it should have reasonably expected to cause Apple to change its position, and that the promise caused Apple to change position in such a manner that injustice can be avoided only by enforcing the promise.  Hoffman v. Red Owl Stores, Inc., 26 Wis. 2d 683, 693-94 133 N.W.2d 267, 273-74 (1965).  Motorola contends that Apple's promissory estoppel claim should be dismissed as inadequately pleaded because Apple has not alleged that Motorola made any promise to Apple.  I disagree.

Apple alleges that Motorola made promises to the standards setting organizations through its commitments that it would license any essential patents under fair, reasonable and non-discriminatory terms.  Apple's Cpt., dkt. #1, ¶¶ 27-45; 118.  Apple alleges that the intended purpose of Motorola's promises was to induce reliance and that Motorola "knew or should have reasonably expected that this promise would induce sellers of mobile wireless devices, like Apple, to develop products compliant with the relevant standards."  Id. ¶ 119. Apple alleges that it "invested billions of dollars in the applicable technology and developed and marketed its products and services in reliance on Motorola's (and others') promises . .

. including designing its products and services to be compliant with adopted standards." Id.
¶ 120.  Finally, Apple alleges that it has been harmed as a result of its reasonable reliance on
Motorola's promises and is threatened by loss of profits, customers, goodwill and product
image, uncertainty in business planning and uncertainty among customers and potential
customers.  These facts are sufficient to state a claim for promissory estoppel.


e.  Tortious interference with contract

Apple contends that Motorola unlawfully interfered with Apple's and Qualcomm's
contract when Motorola terminated its own contract with Qualcomm solely with respect to
Qualcomm's business with Apple.  Motorola contends that Apple's claim for tortious
interference must be dismissed because Apple has pleaded insufficient allegations regarding
the contracts at issue, the harm plaintiff suffered or whether Motorola was justified or
privileged to interfere with Apple and Qualcomm's contract.  To state a claim for tortious
interference, Apple must plead that (1) Apple had a current or prospective contractual
relationship with a third party; (2) Motorola interfered with that relationship; (3) the
interference was intentional; (4) a causal connection exists between Motorola's interference
and Apple's damages; and (5) Motorola was not justified or privileged to interfere.  Wolnak
v. Cardiovascular & Thoracic Surgeons of Central Wisconsin, 2005 WI App 217, ¶ 14, 287
Wis. 2d 560, 574, 706 N.W.2d 667, 675 (citing Duct-O-Wire Co. v. United States Crane,
Inc., 31 F.3d 506, 509 (7th Cir. 1994)).

31

Accepting Apple's allegations as true, I conclude that Apple has included sufficient facts in its complaint to state a claim for tortious interference.  Apple alleges that under a December 2009 contract, it agreed to purchase chipsets from Qualcomm incorporating technology that Qualcomm licensed from Motorola.  Apple's Cpt., dkt. #1, ¶ 46.  In addition, Apple alleges that on January 11, 2011, the same day that Apple announced the Verizon iPhone, Motorola sent a letter to Qualcomm, identifying Apple as Qualcomm's customer and stating its intent to terminate any and all license covenant rights with respect to Apple, effective February 10, 2011.  Id. ¶ 48.  These allegations allow an inference that Motorola was aware of Qualcomm's contract with Apple.  See also id. ¶ 195 ("Motorola knew of the [Apple-Qualcomm] contract and intended to interfere with the performance of this contract.")

Also, Apple alleges that it "made substantial investments in the research, design, manufacture, and marketing of wireless communication handsets . . . [including its] CDMA-2000-compliant version of its iPhone 4, which will utilize Qualcomm components" and that Motorola's selective termination of the Motorola-Qualcomm contract "will cause harm to Apple's business and/or property" and will "disadvantage Apple in relation to the other customers of Qualcomm who are Apple's competitors and are unaffected and can continue to receive their bargained for products."  Id. ¶¶ 47, 50, 51, 196.  This is sufficient to plead that Motorola's actions have harmed Apple.  Duct-O-Wire Co., 31 F.3d at 509 (holding that plaintiff had shown harm by claiming deprivation of sales by competitor-defendant);

32

<u>Magnum Radio, Inc. v. Brieske</u>, 217 Wis. 2d 130, 140, 577 N.W.2d 377, 380-81 (Ct. App. 1998) (holding that plaintiff had properly stated tortious interference claim where defendant's actions made performance of underlying contract "more expensive or burdensome").

Finally, Apple's conclusory allegation that "Motorola had no basis under its agreements with Qualcomm or otherwise for this selective, partial termination," <u>id.</u> ¶ 49, is sufficient at this stage because the ultimate burden for demonstrating privilege is on Motorola, not Apple.  <u>Wolnak</u>, 2005 WI App 217, ¶ 27 (citing WIS JI-CIVIL 2780); <u>Tele-Port, Inc. v. Ameritech Mobile Communications, Inc.</u>, 49 F. Supp. 2d 1089, 1095 (E.D. Wis. 1999) (explaining that this element "may not even need to be pled by plaintiff because defendant bears the burden on that matter"). Therefore, I will deny Motorola's motion to dismiss Apple's claim for tortious interference with contract.


B.  <u>Motorola's Motion to Sever and Consolidate</u>

Under Rule 42 of the Federal Rules of Civil Procedure, a court may bifurcate claims "for convenience, to avoid prejudice, or to expedite and economize." Fed. R. Civ. P. 42(b). In addition, courts may consolidate separate "actions involving a common question of law or fact" pending before it. Fed. R. Civ. P. 42(a). "It is within the court's broad managerial discretion to prevent 'unnecessary duplication of effort in related cases' through 34consolidation or other means."  <u>SanDisk Corp. v. Phison Electronics Corp.</u>, 538 F. Supp.

2d 1060, 1068 (W.D. Wis. 2008) (quoting E.E.O.C. v. G-K-G, Inc., 39 F.3d 740, 745 (7th Cir. 1994)).

Motorola contends that because all of the essential patents at issue in the '178 case have been asserted in the '661 and '662 infringement actions, the '178 case should be severed and consolidated with the '661 and '662 cases. In particular, Motorola contends that Apple's estoppel, waiver, breach of contract, declaratory judgment, antitrust and unfair competition claims involving the '712, '230, '193, '559 and '898 patents should be severed from the '178 case and consolidated with the '662 case in which Motorola has asserted infringement claims regarding those five patents. In addition, Apple's estoppel, waiver, breach of contract, declaratory judgment, antitrust and unfair competition claims involving the '223 and '697 declared-essential patents should be severed from the '178 case and consolidated with the '661 case in which Motorola has asserted infringement claims regarding those two patents. Apple's claims involving the '223 and '697 patents would be stayed along with the rest of the '661 case. In fact, Motorola contends that Apple's claims involving the '223 and '697 patents must be stayed because they are subject to the mandatory stay provision in 28 U.S.C. § 1659.

For its part, Apple contends that the case cannot be severed for several reasons and rather, should proceed on an accelerated schedule so that the claims in this case can be decided before the patent infringement claims in the '661 and '662 cases are resolved. According to Apple, resolution of its breach of contract claims will "alleviate the need for

34

resolution of the infringement actions related to the essential patents." Dkt. #86.  (Apple's argument assumes that it will succeed on its breach of contract claims, resulting in a license to Motorola's patents and mooting Motorola's infringement claims.)   Essentially, both parties want their own affirmative claims adjudicated first and believe that their proposed organization plan will allow them to achieve that.

As an initial matter, I am not persuaded that the mandatory stay provision in 28 U.S.C. § 1659 applies to Apple's claims in this case.  Under that provision, "at the request of a party to the civil action that is also a respondent in the proceeding before the [International Trade] Commission, the district court shall stay . . . proceedings in the civil action with respect to any claim that involves the same issues involved in the proceeding before the Commission" until the Commission's determination becomes final.  28 U.S.C. § 1659(a).  The provision does not apply in this case, for two reasons.  First, only a party that is a respondent in the Commission may seek a stay under § 1659.  Motorola is not the respondent in the Commission; Apple is.  Nno claims related to the '223 and '697 patents or any other subject are pending against Motorola in the Commission's '745 investigation.

Second, as I explained in a previous case, § 1659 was enacted to protect importers and producers from *identical* patent claims and defenses.  SanDisk Corp., 538 F. Supp. 2d at 1065.  This means that a stay is required only when parallel claims involving the same issues about the same patent are pending in the Commission and in the district court.  In this case, Apple's breach of contract and antitrust claims are pending only in this court; they are not

35

pending before the Commission.  The patent infringement claims being litigated in the Commission do not involve the same issues as Apple's non-patent counterclaims asserted in this case.  In addition, although Apple has asserted a defense in the Commission of unclean hands related to Motorola's licensing commitments to standards setting organizations, the elements of that defense are different from the issues that must be resolved with respect to Apple's breach of contract and antitrust counterclaims.  Thus, although some of the facts relevant to Apple's unclean hands defense will overlap with the claims it is asserting in this case, the legal issues are not the same.  Therefore, any decision to sever, consolidate and stay Apple's claims in this case would be based on the court's discretionary powers and Fed. R. Civ. P. 42.

Severing this case and consolidating it with the '661 and '662 cases would provide some benefits, assuming the court were willing to stay discovery and decision on Apple's non-patent counterclaims.  Although those counterclaims involve a host of issues not related to Motorola's infringement claims, discovery into these issues may ultimately be unnecessary because the resolution of Motorola's patent infringement claims could completely dispose of these counterclaims.  In addition, Apple's counterclaims have factual overlap with some of the defenses it has asserted in the patent infringement case, including its estoppel defenses based on Motorola's alleged failure to license its patents on fair, reasonable and non-discriminatory terms.

That being said, I am not convinced that severing this case will result in increased

efficiency overall.  As an initial matter, Motorola has not explained how Apple's claims can be separated cleanly into either the '661 or '662 case.  For example, Apple's claim for tortious interference seems to be unrelated to the patent infringement cases and it would make no sense to consolidate it with one of the patent infringement cases.  Thus, rather than eliminate the 11-cv-178 case, severance would merely spread Apple's claims into three cases.

In addition, I concluded in the context of the ripeness discussion above that the primary factual and legal questions necessary to resolve Apple's counterclaims are distinct from those necessary to resolve the patent infringement claims.  Further, the facts and legal issues relevant to the parties' disputes regarding whether Motorola has offered Apple a license on fair, reasonable and non-discriminatory terms cannot necessarily be separated on the basis of the particular patent at issue.  It became clear at the preliminary injunction hearing that Motorola's license offers to Apple are not based on individual patents; rather, Motorola offers to license its essential patents as a package deal.  Presumably, this package includes patents at issue in both the '661 and '662 cases.  Thus, it would be difficult to determine whether Motorola has made a fair, reasonable and non-discriminatory offer to Apple with respect to the patents in the '662 case, without considering the inclusion of the patents in the '661 case as part of the offer.  Similarly, Apple's antitrust allegations suggest that Motorola has obtained a monopoly in the relevant markets by its ownership of several declared-essential patents.  The facts relevant to the antitrust claim will necessarily include facts regarding Motorola ownership and licensing offers related to patents in both the '661

37

and '662 cases.  For these reasons, I will deny Motorola's motion to sever and consolidate this case.


ORDER

IT IS ORDERED that

1.  Defendant Motorola Mobility, Inc.'s motion to dismiss, dkt. #33, is GRANTED with respect to plaintiff Apple Inc.'s claim of waiver and DENIED in all other respects. Plaintiff's claim of waiver is DISMISSED for failure to state a claim upon which relief may be granted.

2.  Defendant's motion to sever and consolidate, dkt. #39, is DENIED.

Entered this 7th day of June, 2011.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge