IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPLE, INC.,

                                         OPINION and ORDER

                Plaintiff,

                                         11-cv-178-bbc

        v.

MOTOROLA MOBILITY, INC.,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

This case originated in the International Trade Commission, where defendant Motorola Mobility, Inc. filed an infringement action against plaintiff Apple, Inc., seeking an exclusion order that would have prevented Apple from selling its allegedly infringing products in the United States.  After the case had been pending for a few months in the Commission, Apple filed several counterclaims against Motorola and removed the counterclaims to this court under 19 U.S.C. § 1337(c).  In its counterclaims, Apple alleges that Motorola has engaged in a pattern of unfair, deceptive and anticompetitive conduct by failing to timely disclose ownership of patents that it now declares are essential to technological standards adopted by the industry and by failing to offer Apple licenses to those patents on fair, reasonable and nondiscriminatory terms.

Now before the court are the parties' cross motions for summary judgment.  Motorola has moved for summary judgment on all of Apple's claims on a variety of grounds.  Dkt.

1

#150.  Motorola contends that Apple's claims are barred by the doctrine of claim preclusion because Apple could have pursued them as defenses in the International Trade Commission. Motorola also contends that Apple's antitrust claims are barred by the applicable statute of limitations and by the Noerr-Pennington doctrine, which provides immunity from antitrust claims that are filed in response to nonfrivolous lawsuits.  Finally, Motorola contends that Apple cannot prove the necessary elements of its tortious interference claim or its claims of unfair competition under California law and cannot prove that it suffered any damages compensable as contractual damages.

Apple has moved for partial summary judgment on specific issues relevant to its claims.  Dkt. #143.  In particular, Apple seeks determinations from the court that (1) Motorola's commitments to standards-setting organizations are contractually binding; (2) Apple has the right to enforce those contracts as a third-party beneficiary; (3) Motorola was required under the policies of the European Telecommunications Standards Institute (ETSI) to disclose its patents and patent applications before ETSI adopted technical standards incorporating technology covered by the patents or applications; and (4) Motorola did not disclose certain patents or applications until after ETSI adopted the standards incorporating technology from those patents.

After reviewing the parties' arguments and the facts in the record, I conclude that Motorola's motion must be granted in part and denied in part, and Apple's motion must be granted in full.  With respect to Motorola's motion, I conclude that Apple's claims are not barred by the doctrine of claim preclusion, but that the Noerr-Pennington doctrine provides

2

Motorola immunity from Apple's antitrust and unfair competition claims premised on Motorola's patent infringement litigation and from Apple's claims for declaratory judgment, to the extent that those claims are premised on a theory of antitrust or unfair competition. Because I conclude that Noerr-Pennington immunity applies, I need not consider Motorola's statute of limitations argument.

Additionally, I conclude that Motorola is entitled to summary judgment on Apple's claim that Motorola tortiously interfered with its contract with Qualcomm, as well as Apple's claim under Cal. Bus. & Prof. Code § 17200 based on the same theory, because Apple has failed to adduce any evidence showing that it suffered damages from Motorola's actions.

However, I conclude that Motorola has failed to show that Apple's breach of contract or estoppel claims should be dismissed for Apple's failure to prove that it suffered any compensable damages. Therefore, I will deny Motorola's motion as to that issue.

With respect to Apple's motion, I conclude that Motorola has failed to show that there is any genuine dispute of material fact regarding the existence of contracts between Motorola and standards-setting organizations; Apple's status as a third-party beneficiary of those contracts; Motorola's obligations to disclose its intellectual property rights in a timely manner; and Motorola's failure to disclose its patents and applications before the adoption of standards incorporating its patents. Therefore, I am granting Apple's motion for summary judgment in full.

From the parties' proposed findings of fact and the record, I find the following facts to be material and undisputed.

UNDISPUTED FACTS

A.  Wireless Communication Industry

Plaintiff Apple, Inc. and defendant Motorola Mobility, Inc. are competitors in the wireless communication industry.  Motorola has been a player in the industry for longer than Apple and, since at least 1990, has been a member of numerous international standards-setting organizations devoted to the development of telecommunications and wireless standards.  Through the standards-setting organizations, companies agree on common technological standards so that all compliant products will work together.  Standards lower costs by increasing product manufacturing volume and increase price competition by eliminating the costs for consumers to switch between products manufactured by different firms.

Some technological standards incorporate patented technology.  If a patent claims technology selected by a standards-setting organization, the patent is called an "essential patent."  Many standards-setting organizations have adopted rules related to the disclosure and licensing of essential patents.  The policies often require or encourage members of the organization to identify patents that are essential to a proposed standard and to agree to license their essential patents on fair, reasonable and nondiscriminatory terms to anyone who requests a license.  (These terms are often referred to by the acronyms FRAND or RAND.)  Such rules help to insure that standards do not allow the owners of essential patents to abuse their market power to extort competitors or prevent them from entering the marketplace.

Two standards-setting organizations are relevant to the motions before the court:  The European Telecommunications Standards Institute, known as ETSI; and the Institute of Electrical and Electronics Engineers, known as IEEE.  At all relevant times, Motorola has been a member of these standards-setting organizations and has participated in developing technological standards for the wireless communication industry.  Both organizations have intellectual property rights policies that address disclosure and licensing of patents that are essential to standards being considered or being adopted by the organizations.  Additionally, Motorola has participated in the 3rd Generation Partnership Project, known as the 3G Project, which requires its members to abide by the intellectual property rights policies of ETSI and other standards-setting organizations.

1.  European Telecommunications Standards Institute (ETSI)

ETSI is a standards-setting organization located in France that creates technological standards for the telecommunications industry.  It has an intellectual property rights policy set forth in Annex 6 of its Rules of Procedure to govern the disclosure of intellectual property rights that are essential to standards being considered by ETSI.  Dkt. #148-22.  The policy defines "intellectual property right" as "any intellectual property right conferred by statute law including applications therefor. . . [but not] rights relating to . . . confidential information, trade secrets or the like."  Id. § 15- 7.  Since 1997, ETSI's policy has required members to disclose intellectual property that may be essential to standards.  With minor variations, it has stated:

[E]ach MEMBER shall use its reasonable endeavours, in particular during the

5

> development of a STANDARD or TECHNICAL SPECIFICATION where it
> participates, to inform ETSI of ESSENTIAL [intellectual property rights] in
> a timely fashion. In particular, a MEMBER submitting a technical proposal for
> a STANDARD or TECHNICAL SPECIFICATION shall, on a bona fide basis,
> draw the attention of ETSI to any of that MEMBER's [intellectual property
> rights] which might be ESSENTIAL if that proposal is adopted.

Id. § 4.1.  The policy does not define "reasonable endeavours" or "bona fide basis."

However, it is generally understood that members of ETSI should disclose intellectual

property rights that they know are relevant to potential standards while the standard is being

discussed and before the standard is adopted.   Generally, the engineers working on the

standards in working groups or technical meetings do not formally disclose intellectual

property rights at those meetings.   Whinnett Dep., dkt. #142, at 101;  Brown Dep., dkt.

#136 at 291; Smolinske Dep., dkt. #140, at 72-73.   Rather, the owner of the intellectual

property right files a formal disclosure with ETSI.

ETSI's intellectual property rights policy also addresses the availability of licenses to

essential intellectual property rights.   The policy requires the Director-General of ETSI to

ask owners of essential patents to agree to "grant irrevocable licences on fair, reasonable and

non-discriminatory terms and conditions."   Id. § 6.1.  Under ETSI's "Guide on Intellectual

Property Rights," the owner of the intellectual property right should notify ETSI of its

willingness to license by submitting an information and licensing declaration that identifies

specific patents or pending applications that may be essential.  Guide, dkt. #149-23, § 2.1.2.

An owner may also use a general licensing declaration to notify ETSI that it is willing to

grant licenses for any of its intellectual property rights that become essential to a standard.

However, use of the general licensing declaration "does not take away the obligation for

members to declare essential patents to ETSI." Id.  Owners are not required to disclose any specific licensing terms and ETSI's policies provide that "[s]pecific licensing terms and negotiations are commercial issues between the companies and shall not be addressed within ETSI." Id. § 4.1.

If a patent owner tells ETSI that it is not prepared to license one of its patents that is relevant to a standard, ETSI's General Assembly reviews the requirements for that standard to determine whether "a viable alternative technology is available for the standard or technical specification" that is "not blocked by that [patent]." Dkt. #148-22, § 8.1.1. If the General Assembly concludes that no such viable alternative technology exists, ETSI "shall cease" work on the standard.  Id. § 8.1.2.  If the owner who is refusing to grant a licensee is a member of ETSI, the Director-General of ETSI asks the member to reconsider its position or provide a written explanation of its reasons for refusing to license its patents. Id.  The Director-General forwards the written explanation to "ETSI Counselors for their consideration."  Id.

> The objective of ETSI's intellectual property rights policy is to
>
> reduce the risk to ETSI, MEMBERS, and others applying ETSI STANDARDS and TECHNICAL SPECIFICATIONS, that investment in the preparation, adoption and application of STANDARDS could be wasted as a result of an ESSENTIAL [intellectual property right] for a STANDARD or TECHNICAL SPECIFICATION being unavailable.  In achieving this objective, the ETSI [intellectual property rights policy] seeks a balance between the needs of standardization for public use in the field of telecommunications and the rights of the owners of [intellectual property rights].

Id. § 3.1.  The policy goes on to state that ETSI "shall take reasonable measures to ensure, as far as possible," that standards and technical specifications will "be available to potential

users." Id. § 3.3.

ETSI's bylaws provide that any violation of the policy by an ETSI member "shall be deemed to be a breach, by that MEMBER, of its obligations to ETSI.  The ETSI General Assembly shall have the authority to decide the action to be taken, if any, against the MEMBER in breach, in accordance with ETSI Statutes."  Id. § 14.


2.  The Institute of Electrical and Electronics Engineers (IEEE)

IEEE is a standards-setting organization responsible for the standardization of wireless information exchange among systems and networks.  IEEE's bylaws in place from December 1993 through December 1995 provided that "IEEE standards may include patented technology if there is no equivalent noninfringing way of achieving the objectives of the standard, if it is justified for technical reasons, and if the patent holder agrees to nondiscriminatory licensing at reasonable rates."  Dkt. #148-23, § 5.

Between 1996 and 2005, IEEE requested owners of intellectual property rights that are essential to declared standards to submit a letter of assurance that was either a general disclaimer of their right to enforce patent claims against anyone practicing the standards or an agreement to license patent rights "without compensation or under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination."  Dkt. #148-26, § 6.

The policies that were approved in February 2011 state that "[n]o license is implied by the submission of a Letter of Assurance," dkt. #7-12, § 6.2, and that IEEE is "not

8

responsible for identifying Essential Patent Claims for which a license may be required, for conducting inquiries into the legal validity or scope of those Patent Claims, or for determining whether any licensing terms or conditions provided in connection with submission of a Letter of Assurance, if any, or in any licensing agreements are reasonable or non-discriminatory."  Id.

### B.  Motorola's Disclosure of Essential Patents and Commitments to License

Motorola has declared that its United States Patent Nos. 5,636,223 (the '223 patent), 5,311,516 (the '516 patent),  5,572,193 (the '193 patent), and the 5,319,712 (the '712 patent) are essential to the practice of the 802.11 wireless communication standard adopted by IEEE.  In 1994, Motorola submitted a declaration to IEEE, stating that Motorola agreed to license any patents essential to the 802.11 standard "on a non-discriminatory basis offering fair and commercially reasonable terms."  Dkt. #148-28.

In 2002, Motorola submitted declarations to ETSI and the 3G Project that its 6,175,559 (the '559 patent),  6,246,697 (the '697 patent) and 6,359,898 patents (the '898 patent) are essential or potentially essential to standards adopted by ETSI and the 3G Project.  As to the '559 and '697 patents, Motorola declared in a December 20, 2002 letter to ETSI that it "is prepared to grant irrevocable licenses on fair, reasonable and nondiscriminatory terms and conditions under such [patents], to the extent that the [patents] remain essential."  Dkt. #148-6.  As to the '898 patent, Motorola declared to ETSI in 2003 that it was "prepared to grant irrevocable licenses under the [patents] on terms and

9

conditions which are in accordance with Clause 6.1 of the ETSI [intellectual property rights] Policy, in respect of the STANDARD, to the extent that the [patents] remain ESSENTIAL." Dkt. #148-3.

### C.   Timeliness of Motorola's Disclosures

#### 1.   '697 patent

Motorola filed the application that led to the '697 patent on January 24, 1998.  In March 1998, Motorola submitted a proposal using the '697 patent's technology to SMG2, the working group developing a portion of the 3GPP standard for the 3G Project.  One of the inventors of the '697 patent, Motorola employee Nicolas Whinnett, participated in SMG2 meetings at that time.  Motorola did not disclose the '697 patent or application to ETSI, a partner in the 3G Project, or to the SMG2 working group.

In July 1999, the '697 patent inventors wrote an article discussing the technology of the '697 patent.  They filed applications for foreign counterparts of the '697 patent that were published on July 29, 1999 and November 22, 2000.

The 3GPP standard, including technology covered by the '697 patent, was adopted by the 3G Project in December 1999.  The '697 patent issued on June 12, 2001.  Motorola disclosed the '697 patent to ETSI on September 20, 2002.

#### 2.   '559 patent

Motorola filed the application that led to the '559 patent on July 7, 1999.  On July

13-16, 1999 at an ETSI meeting in Finland, Tyler Brown, a representative of Motorola and the sole inventor of the '559 patent, proposed including technology covered by the '599 patent in a portion of ETSI's Universal Mobile Telecommunications System standard (known as the UMTS standard).  Motorola did not disclose the '559 application.  In March 2000, the relevant section of the standard was finalized and adopted.  The '559 patent issued on January 16, 2001.  Motorola disclosed the '559 patent as essential to the standard in September 2002.

3.  <u>'898 patent</u>

Motorola filed a provisional, unpublished application that led to the '898 patent on September 2, 1997.  At a meeting in Sophia Antipolis, France, in November 1997, Motorola submitted "Contribution A330" to the ETSI working group developing a portion of the GPRS Technical Specification.  Motorola's Contribution A330 was created, in part, by two inventors of the '898 patent and it disclosed in nearly verbatim form the same technology that was described in a portion of the specification of the September 1997 patent application.   On March 11, 1999, Motorola's application that resulted in the '898 patent was published when Motorola applied for foreign counterparts to the application.  In April 2001, ETSI published the portion of the GPRS standard that incorporated the ideas from Motorola's Contribution A330.

The '898 patent issued on March 19, 2002.  Motorola disclosed the '898 patent to ETSI on April 8, 2003.

11

### D. Negotiations for Licensing between Apple and Motorola

In 2005, Apple began developing the iPhone.  No later than mid-2006, Apple became aware that Motorola had declared patents essential to cellular standards.  Apple released its iPhone in 2007 without seeking a patent license from Motorola.

In August 2007, Motorola offered Apple a license to its essential patents.  At the initial meeting between the companies, Motorola presented information to Apple concerning its licensing program and stated that its standard royalty rate was 2.25% for a worldwide license to its portfolio of standards-essential patents.   Apple rejected the 2.25% rate.  Motorola continued to engage in license negotiations with Apple for approximately three years, but Apple refused to accept a license on any terms offered by Motorola.

### E. Motorola's Termination of the Qualcomm License

Apple entered into a "Strategic Terms Agreement" with Qualcomm on December 16, 2009.  Dkt. #153-40.  The agreement set terms on which "certain Apple authorized purchasers may purchase certain components from time to time from" a Qualcomm affiliate "for use and incorporation in Apple products."   Id. at 1.  Among these components are chipsets that allow mobile devices to communicate via cellular networks, including the baseband processor incorporated into the iPhone 4S.  The chipsets incorporated technology that Qualcomm had licensed from Motorola since 1990.  The Strategic Terms Agreement did not require Apple or any of its affiliates to actually purchase chipsets and also did not guarantee that the chipsets or any other components supplied by Qualcomm would be

12

licensed under Motorola's or any other patent holder's patents.

On January 11, 2011, the day Apple announced the Verizon iPhone 4, Motorola sent a letter to Qualcomm, with a copy to Apple, stating that Motorola was terminating any and all license and covenant rights with respect to Qualcomm's business with Apple, effective February 10, 2011.

PROCEDURAL HISTORY

A. <u>Related Cases</u>

This particular dispute is related to three other proceedings.  First, there is the investigation pending in the International Trade Commission that defendant Motorola initiated on October 6, 2010.  <u>In the Matter of Certain Wireless Communication Devices, Portable Music and Data Processing Devices, Computers and Components Thereof</u>, ITC Investigation No. 337-TA-745.  In that case, Motorola sought an exclusion order and a permanent cease and desist order as a result of plaintiff Apple's alleged infringement of several of Motorola's United States patents, including the '697 and '223 patents.

As part of its original defenses in the International Trade Commission action, Apple argued that Motorola should be barred from enforcing its patents because it had unclean hands and had failed to offer licenses on fair, reasonable and nondiscriminatory terms.  In July 20, 2011, Apple notified the commission that it would "not be pursuing as part of the 745 investigation any affirmative defenses based on Motorola's failure to make a [fair reasonable and nondiscriminatory] Offer," but that it was "specifically reserv[ing] the right

13

. . . to pursue any of these defenses . . . and claims related to them in other actions, including for example, the 661, 662, and 178 actions pending in Wisconsin." Dkt. #153-35.

On April 24, 2012, the administrative law judge issued a preliminary ruling in the International Trade Commission action, finding Motorola's '697 patent valid and infringed by Apple. Dkt. #153-34. (Before this determination, Motorola abandoned its infringement claims as to some of its patents.) The administrative law judge rejected Apple's unclean hands defense, noting that Apple had no "proof that any act of Motorola actually caused any harm (to anyone)." Id. at 151.

Second (and third), the parties are litigating their disputes in two other patent infringement cases filed in this court. Plaintiff Apple filed case number 10-cv-661-bbc on October 29, 2010, asserting patent infringement claims against Motorola. On November 9, 2010, Motorola filed counterclaims in the '661 action alleging infringement of the same patents at issue in the International Trade Commission's 337-TA-745 investigation. On December 2, 2010, this court granted the parties' joint motion to stay the '661 case in favor of the proceedings in the commission. The case remains stayed.

Also on October 29, 2010, plaintiff Apple filed case number 10-cv-662-bbc in this court, asserting patent infringement claims against Motorola. On November 9, 2010, Motorola filed counterclaims against Apple for infringement of several of its United States patents, including the '516, '712, '230, '193, '559 and '898 patents, all of which Motorola has declared essential to certain standards adopted in the wireless communications industry. The 10-cv-662 case was transferred to the Northern District of Illinois in December 2011.,

14

where the case was dismissed with prejudice on June 22, 2012.  The court found that Motorola's patents were either invalid, not infringed by Apple or that Motorola could not prove the amount of damages to which it was entitled.  Apple, Inc. v. Motorola, Inc., 2012 WL 2376664 (N.D. Ill. June 22, 2012).

B.  The Case at Issue (11-cv-178-bbc)

Shortly after Apple removed this case to federal court, it moved for preliminary injunctive relief, seeking an order that would have enjoined Motorola from (1) proceeding as a party in the 337-TA-745 investigation in the International Trade Commission with respect to the '223 and '697 patents; (2) proceeding with its counterclaims filed in case number 10-cv-662-bbc in this court with respect to the '712, '230, '193, '559 and '898 patents; and (3) selectively terminating its patent license agreement with Qualcomm as to Apple.  A hearing was held on the motion on April 26, 2011.  At the conclusion of the hearing, I denied Apple's motion for a preliminary injunction.

Motorola filed a motion to dismiss Apple's claims, which I granted only with respect to Apple's claim of waiver.  Apple has the following 10 claims remaining in the case:

- Equitable estoppel (Count 1)

- Breach of contract with ETSI/3GPP (Count 2)

- Breach of contract with ETSI/3GPP to which Apple is a third party beneficiary (Count 3)

- Breach of contract with IEEE to which Apple is a third party beneficiary (Count 4)

- False commitments to license on fair, reasonable and nondiscriminatory terms and

deceptive acts in violation of § 2 of the Sherman Act (Count 5)

- Unfair competition and unlawful business practices in violation of Cal. Bus. & Prof. Code § 17200 (Count 6)

- Declaratory judgment that Motorola's offers have not been on fair, reasonable and nondiscriminatory terms (Count 7)

- Declaratory judgment on no entitlement to injunctive relief (Count 11)

- Declaratory judgment of patent misuse (Count 12)

- Interference with contract (Count 13)

Apple's Am. Cpt., dkt. #110.


OPINION

A. <u>Motorola's Motion for Summary Judgment</u>

1. <u>Claim preclusion</u>

Motorola contends that all of Apple's claims are barred by the doctrine of "res judicata" because Apple could have raised them in the International Trade Commission as defenses to Motorola's infringement claims, or did raise them there and they were rejected. Specifically, in the International Trade Commission action, Apple abandoned its argument that Motorola's patents were unenforceable because Motorola refused to license its patents on reasonable and nondiscriminatory terms. Apple did argue that Motorola's '697 patent was unenforceable under the doctrine of "unclean hands," but the administrative law judge rejected the argument and found that the '697 patent was valid and had been infringed by Apple.

16

Res judicata is the traditional term for the doctrine of claim preclusion, but is sometimes used generally to refer to both claim and issue preclusion. Hayes v. City of Chicago, 670 F.3d 810, 814 n.1 (7th Cir. 2012). Motorola does not identify whether it is intending to invoke claim or issue preclusion, but the majority of cases it cites concern claim preclusion. Thus, I am assuming that Motorola is arguing for the application of claim preclusion.

Claim preclusion "prohibits litigants from relitigating claims that were or could have been litigated during an earlier proceeding." Id. at 813. The case on which Motorola relies primarily is Martino v. McDonald's System, Inc., 598 F.2d 1079 (7th Cir. 1979), in which the court of appeals held that the plaintiff was barred from bringing an antitrust claim that would have undermined a previous consent judgment issued by a federal district court against the plaintiff. Id. at 1083. The court explained that "res judicata . . . treats a judgment on the merits as an absolute bar to relitigation between the parties . . . of every matter offered and received to sustain or defeat the claim or demand and to every matter which might have been received for that purpose." Id.

This case is distinguishable from Martino and the other cases cited by Motorola. In Martino, the plaintiff was attempting to attack a judgment issued by a federal court; in this case, Apple is asserting counterclaims that have the potential to undermine the International Trade Commission's decision regarding Apple's infringement of Motorola's patents. It is well established law that decisions of the International Trade Commission on issues of patent validity and enforceability are not entitled to preclusive effect. E.g., Powertech

17

Technology Inc. v. Tessera, Inc., 660 F.3d 1301, 1308 (Fed. Cir. 2011) ("resolution of the ITC action will not have preclusive effect" on district court action); Bio-Technology General Corp. v. Genentech, Inc., 80 F.3d 1553, 1564 (Fed. Cir. 1996); Texas Instruments Inc. v. Cypress Semiconductor Corp., 90 F.3d 1558, 1569 (Fed. Cir. 1996); Texas Instruments Inc. v. International Trade Commission, 851 F.2d 342, 344 (Fed. Cir. 1988).

Motorola argues that the general rule against granting preclusive effect to International Trade Commission determinations does not apply here because there is no rule barring a district court from giving preclusive effect to the commission's decisions on "non-patent" issues, such as Apple's antitrust, estoppel and contract claims. Motorola cites three cases that it believes support its position. In the first two cases, Aunyx Corp. v. Canon U.S.A., Inc., 978 F.2d 3, 7 (1st Cir. 1992) and Baltimore Luggage Co. v. Samsonite Corp., 1992 WL 296368, *4 (4th Cir. 1992), the courts held that it was appropriate to give preclusive effect to commission decisions concerning antitrust and unfair competition. However, neither of those cases is particularly useful because neither involved decisions from the commission arising out of patent disputes.

The third case cited by Motorola, Telectronics Proprietary, Ltd. v. Medtronic, Inc., 687 F. Supp. 832 (S.D.N.Y. 1988), is more helpful to its position. In Telectronics, the district court concluded that it was appropriate to apply issue preclusion to the commission's determination regarding a license defense to a patent dispute. The court distinguished between different types of defenses to patent infringement, stating that "[u]nlike invalidity and unenforeability, noninfringement is not a defense based on the validity of a patent.

18

Rather, it is a defense based on a contractual right to use the patent, or on defendant's lack of use of the patent." Id. at 846, n.40. The court concluded that "the ITC's determination as regards the existence of a license under a patent . . . was not one of the validity of a patent but of the existence of a contract" and should be "accorded preclusive effect." Id. at 845-46.

However, unlike the district court in Telectronics, the Court of Appeals for the Federal Circuit has not distinguished between types of defenses to patent infringement when discussing the preclusive effect of International Trade Commission decisions. As the court of appeals explained in Texas Instruments, 90 F.3d at 1569, "once we accept . . . that ITC decisions are not binding on district courts in subsequent cases brought before them, it necessarily follows that accused infringers can raise *whatever defenses they believe are justified*, regardless whether they previously raised them and lost in the ITC." (Emphasis added). See also Epistar Corp. v. Philips Lumileds Lighting Co., 2008 WL 3930030, *2-4 (N.D. Cal. Aug. 26, 2008) (patent defendant not precluded from raising defenses of license and covenant not to sue in district court patent infringement action even though it had waived those defenses in International Trade Commission).

In Texas Instruments, the court of appeals recognized that any defense an alleged infringer raises is properly treated as a "patent issue" for purposes of determining whether preclusion principles should apply. In this case, it is clear from Motorola's arguments that it is seeking to give preclusive effect to the International Trade Commission's decision on "patent issues." By seeking to bar Apple from presenting any claim that would undermine the commission's determination of validity and infringement, in effect, Motorola is asking

19

the court to give preclusive affect to the commission's conclusions regarding the enforceability of Motorola's patents.  Motorola admits as much in its brief, stating that the defenses that Apple abandoned in the commission challenged whether "the patents are unenforceable."  Motorola's Br., dkt. #151, at 5.

Motorola attempts to avoid the rule of <u>Texas Instruments</u> by arguing that the rule against giving preclusive affect to commission decisions applies only when an alleged patent infringer is facing parallel infringement claims before the commission and district court. Motorola contends that this case is different because Apple has not challenged Motorola's patent disclosures and licensing offers as defenses to an infringement claim, but as affirmative claims that constitute a direct attack on the commission's decisions.  However, Motorola cites no cases suggesting that a commission decision should be given preclusive effect in some types of district court cases and not others.

Moreover, Motorola's claim preclusion argument fails for another reason.  The claims Apple is pursuing in this case originated as "counterclaims" in the International Trade Commission that were subject to mandatory removal.  19 U.S.C. § 1337(c); 19 C.F.R. § 210.14(e).  Thus, the commission never had jurisdiction to hear Apple's counterclaims or to grant the type of relief that Apple is seeking in this case.  The doctrine of claim preclusion does not bar a party from asserting claims that could not have been raised in a previous proceeding.  <u>Carver v. Nall</u>, 172 F.3d 513, 516 (7th Cir. 1999) ("Claim preclusion does not operate so harshly as to bar whichever set of claims the chosen forum could not hear.").  <u>See also</u> <u>Bio-Technology</u>, 80 F.3d at 1563 ("[T]he bar against later claims based on the same

20

transactional facts is 'subject to certain limitations, one of which is that it will not be applied if the initial forum did not have the power to award the full measure of relief sought in the later litigation.'") (citation omitted).  Accordingly, Motorola is not entitled to summary judgment on the basis of claim preclusion.

2.  Noerr-Pennington doctrine

Next, Motorola contends that all of Apple's claims are barred by the First Amendment under the Noerr-Pennington doctrine.  The First Amendment protects "the right of the people . . . to petition the Government for a redress of grievances."  U.S. Const. amend. I. Under the Noerr-Pennington doctrine, a party that exercises its First Amendment right to petition the government for redress generally is immune from antitrust liability premised on the petition.  Eastern Railroad Presidents Conferance v. Noerr Motor Freight, Inc., 365 U.S. 127, 136 (1961); United Mine Workers of America v. Pennington, 381 U.S. 657, 670 (1965)).  This includes a party who brings a legitimate dispute to the courts for judicial resolution.  Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc., 508 U.S. 49, 56 (1993); California Motor Transportation Co. v. Trucking Unlimited, 404 U.S. 508, 510 (1972).  However, petitioning conduct is not immune if it is a "mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationship of a competitor."  Noerr, 365 U.S. at 144.  Motorola contends that Apple's claims in this case are based solely on Motorola's patent litigation in the International Trade Commission and district court, and that because its patent litigation is protected petitioning

21

activity, Motorola is immune from liability on Apple's claims.

Apple does not deny that initiating and prosecuting a patent infringement action is the type of petitioning activity protected by the Noerr-Pennington doctrine, and several courts have reached the same conclusion. See, e.g., ERBE Elektromedizin GmbH v. Canady Technology LLC, 629 F.3d 1278, 1292 (Fed. Cir. 2010); Monolithic Power Systems, Inc. v. O2 Micro International Ltd., 2007 WL 801886, *6 (N.D. Cal. Mar. 14, 2007); Hyniz Semiconductor Inc. v. Rambus, Inc., 2006 WL 1883353, *1-2 (N.D. Cal. July 7, 2006); In re Relafen Antitrust Litigation, 360 F. Supp. 2d 166, 177-78 (D. Mass. 2005). However, Apple contends that the immunity does not apply to any of its claims because they are not based on Motorola's petitioning activity.

a.  Apple's antitrust claim

Apple contends that its claim under § 2 of the Sherman Act arises out of Motorola's "abuse of the standard-setting process" and "Motorola's deceptive conduct and failure to offer a [fair, reasonable and nondiscriminatory] license." Apple's Br., dkt. #167, at 6. In support of its argument, Apple cites ERBE Elekromedizin, 629 F.3d at 1292, in which the Court of Appeals for the Federal Circuit explained that a party's assertion of non-sham claims for "patent infringement, trademark, and trade dress" was protected by Noerr-Pennington from antitrust liability, but that other conduct, including "interfering with and inhibiting the development and marketing of [disputed products], and interfering with . . . contracts and business expectations," could be a basis for antitrust liability. Id. at 1292-93.

22

See also Hyniz Semiconductor, 2006 WL 1883353, at *2 (holding that Noerr-Pennington immunity applies only to protected litigation-related activities, but would not immunize defendant from antitrust claims premised on broader unlawful course of anticompetitive conduct).

The problem for Apple is that its allegations and arguments make clear that its antitrust claim is necessarily based on Motorola's patent litigation.  In its brief, Apple contends that its antitrust claim arose sometime in 2007, when Motorola offered it a license with exorbitant royalty rates. Apple's Br., dkt. #167, at 13 (Apple's injury "could not have arisen until, at the very earliest, Motorola made its first royalty demand in September 2007").  However, Apple has presented no evidence that it suffered any antitrust injury as a result of Motorola's license demand.  It is well established law that a party can sustain an antitrust claim only if it has suffered an antitrust injury.  In re Copper Antitrust Litigation, 436 F.3d 782, 789 (7th Cir. 2006) ("[A]n antitrust cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business.") (citation omitted); Warren General Hospital v. Amgen Inc., 643 F.3d 77, 92 (3d Cir. 2011) ("It is a basic tenet of antitrust law that a cause of action will not lie if the plaintiff has not been harmed.").

In this case, it is undisputed that Apple refused to pay the 2.25% royalty rate that Motorola demanded and continued to manufacture and market its products despite Motorola's demands.  Apple has produced no evidence or argument suggesting that Motorola's licensing demand caused Apple to change its product, delay the release of the

23

iPhone, suffer from increased costs or lose any customers or market share.  Instead, the only injury Apple suffered as a result of Motorola's alleged antitrust violation was the attorney fees and costs that it has incurred responding to the patent litigation initiated by Motorola. Apple's damages expert identifies no other damages except litigation fees and expenses. Thus, Apple's antitrust claim is premised on Motorola's attempt to enforce its patents. Because Motorola's enforcement of its patents is privileged conduct protected by the First Amendment, the Noerr-Pennington doctrine applies.  Columbia Pictures Industries, Inc. v. Professional Real Estate Investors, Inc., 944 F.2d 1525, 1529 (9th Cir. 1991) (holding that defendant was immune from antitrust liability under Noerr-Pennington because all of plaintiff's claimed antitrust injuries were caused by defendant's enforcement of copyrights, not by defendant's refusal to license its copyrighted work).

Apple devotes one paragraph in its brief to the argument that Motorola may not be entitled to Noerr-Pennington immunity because its patent infringement claims may fall under the "sham" exception to the doctrine.  Apple's Br., dkt. #167, at 9.  As the party asserting the sham exception, Apple has the burden of showing that it should apply.  IGEN International, Inc. v. Roche Diagnostics GmbH, 335 F.3d 303, 312 (4th Cir. 2003); USS–POSCO Industries v. Contra Costa County Building & Construction Trades Council, AFL–CIO, 31 F.3d 800, 811 (9th Cir. 1994).  A petition or lawsuit may be considered a "sham" if it is (1) "objectively baseless"; and (2) subjectively motivated by a desire to impose anticompetitive harm from the judicial process rather than obtain judicial relief.  Professional Real Estate Investors, 508 U.S. at 61, 65.  Apple makes no real attempt to satisfy either

prong, stating only that Motorola has dropped two of its patent infringement claims and three others were found to be invalid or not infringed.  However, the fact that some or even all of Motorola's patent infringement claims were unsuccessful is not sufficient on its own to show that Motorola's claims are "objectively baseless," particularly in light of the preliminary finding of the International Trade Commission that Apple infringed one of Motorola's patents.  Simply stating, without factual support, that Motorola's patent litigation may be a sham is not sufficient to raise a genuine issue of material fact regarding the sham exception.  Accordingly, I find that Motorola is immune from Apple's antitrust claim.

b.  Apple's claims under Cal. Bus. & Prof. Code § 17200

Apple has two theories to support its claim of unfair competition and unlawful business practices in violation of Cal. Bus. & Prof. Code § 17200 (count 6).  First, Apple contends that Motorola engaged in unlawful business practices when it interfered with Motorola's contract with Qualcomm.  The <u>Noerr-Pennington</u> doctrine is not applicable to that theory because Motorola's actions toward Qualcomm are separate and distinct from Motorola's protected activity of patent litigation.  However, Apple's second theory of liability in count 6 is premised on the same allegations as its antitrust claim under § 2 of the Sherman Act.  In particular, Apple contends that Motorola engaged in unfair competition when it promised standards-setting organizations that it would disclose essential patents and license those patents on reasonable and nondiscriminatory terms, and later failed to disclose

the patents in a timely manner, refused to offer Apple a reasonable and nondiscriminatory license and sued Apple for patent infringement.

As with Apple's antitrust claim, a violation of Cal. Bus. & Prof. Code § 17200, requires showing that the unfair practice caused the plaintiff an economic injury. Kwikset Corp. v. Superior Ct., 246 P.3d 877, 884-85 (holding that party asserting unfair competition or unlawful business practices claim must "establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., economic injury . . . and show that that economic injury was the result of, i.e., caused by, the unfair business practice . . . that is the gravamen of the claim"). The only economic injury Apple suffered is the cost of defending itself from Motorola's infringement claims. Thus, Motorola is immune from Apple's unfair competition claim that is premised on the same theory as Apple's antitrust claim. Monolithic Power Systems, 2007 WL 801886, at *6 (holding that Noerr-Pennington can provide immunity against California unfair competition claims).

c. Apple's other claims

Motorola contends that the Noerr-Pennington doctrine provides immunity not just to Apple's statutory antitrust and unfair competition claims, but to Apple's contract and tort claims also. As Motorola points out, courts have applied the Noerr-Pennington doctrine outside the antitrust context. Theme Promotions, Inc. v. News America Marketing FSI, 546 F.3d 991, 1006-1007 (9th Cir. 2008) (applying doctrine to claim for tortious interference with prospective economic advantage under California law); International Brotherhood of

<u>Teamsters v. Philip Morris Inc.</u>, 196 F.3d 818, 826 (7th Cir. 1999) (applying <u>Noerr-Pennington</u> immunity to protect petitioning activity from liability for RICO suits); <u>Tarpley v. Keistler</u>, 188 F.3d 788, 794 (7th Cir. 1999) (applying doctrine to § 1983 claims); <u>Video International Production, Inc. v. Warner–Amex Cable Communications, Inc.</u>, 858 F.2d 1075, 1084 (5th Cir. 1988) (applying doctrine to state law claim for tortious interference with contract).  Courts have reasoned that because the <u>Noerr-Pennington</u> doctrine derives from the First Amendment, it should be applied broadly to protect the right to petition the government.  <u>New West, L.P. v. City of Joliet</u>, 491 F.3d 717, 722 (7th Cir. 2007) ("<u>Noerr-Pennington</u> has been extended beyond the antitrust laws, where it originated, and is today understood as an application of the first amendment's speech and petitioning clauses."); <u>White v. Lee</u>, 227 F.3d 1214, 1231 (9th Cir. 2000) (explaining that because "<u>Noerr-Pennington</u> is a label for a form of First Amendment protection . . . to say that one does not have <u>Noerr-Pennington</u> immunity is to conclude that one's petitioning activity is unprotected by the First Amendment"); <u>Kottle v. Northwest Kidney Centers</u>, 146 F.3d 1056, 1059 (9th Cir. 1998) ("the doctrine is a direct application of the Petition Clause").

However, Motorola has cited no authority for the proposition that the <u>Noerr-Pennington</u> doctrine should apply to Apple's breach of contract claims (counts 2, 3, and 4), and I conclude that applying immunity to Motorola from Apple's breach of contract claims is not appropriate.  Although the First Amendment protects Motorola's right to petition the courts to enforce its patents, Apple's breach of contract claims are based on the theory that Motorola agreed by contract that it would not enforce its patent rights until it offered a

27

license to Apple on fair, reasonable and nondiscriminatory terms. In other words, Apple contends that Motorola waived some of its petitioning rights through contract. It would be improper to use the Noerr-Pennington doctrine to bar Apple from enforcing that contract. Powertech Technology, Inc. v. Tessera, Inc., — F. Supp. 2d —, 2012 WL 1835699, *5 (N.D. Cal. May 21, 2012) (concluding that Noerr-Pennington does not provide immunity against breach of contract claims).

Similarly, Motorola has failed to cite any authority or develop any argument for applying Noerr-Pennington to Apple's equitable estoppel claim (count 1), which appears to be an alternative claim to its breach of contract claims. Because Motorola failed to develop any argument about why it should be immune from the equitable estoppel claim or why the estoppel claim should be treated differently from the contract claim, I will not apply Noerr-Pennington to the equitable estoppel claim. Cf. Garg v. Potter, 521 F.3d 731, 736 (7th Cir. 2008) (explaining that undeveloped arguments are waived).

As to Apple's tortious interference with contract claim (count 13), it is clear that this claim is not premised on Motorola's patent litigation. Rather, it is premised on Motorola's actions in relation to Qualcomm. Therefore, the Noerr-Pennington doctrine does not apply to that claim.

Finally, I note that Apple asserts three claims for declaratory judgment in its amended complaint. Apple seeks declarations that the terms of the license offered by Motorola to Apple were not fair, reasonable and nondiscriminatory (count 7); Motorola is not entitled to injunctive relief on its patent infringement claims (count 11); and Motorola misused its

28

patents by promising to offer fair licenses and then failing to do so (count 12). It is not clear from Apple's complaint whether its claims for declaratory judgment are based on a contract theory or an antitrust theory. To the extent that they are based on an antitrust theory, Motorola is immune under the Noerr-Pennington doctrine. To the extent that they are based on Apple's breach of contract theory or estoppel theory, they may proceed.

In sum, I am granting Motorola's motion for summary judgment on Apple's antitrust claim (count 5), its claim for unfair competition in violation of Cal. Bus. & Prof. Code § 17200 (count 6) as related to Motorola's licensing and disclosure obligations, and its claims for declaratory relief (counts 7, 11 and 12) to the extent they are based on antitrust or unfair competition theories of liability. Motorola is immune from liability for these claims under the Noerr-Pennington doctrine. I am denying Motorola's motion under the Noerr-Pennington doctrine with respect to Apple's remaining claims.

Because I am dismissing Apple's antitrust claim, I need not consider Motorola's argument that the antitrust claim is barred by the statute of limitations.

### 3. Apple's tortious interference with contract claim

Motorola has moved for summary judgment on Apple's claim that Motorola tortiously and unlawfully interfered with the Strategic Terms Agreement that Apple had entered into with Qualcomm in December 2009. Apple's Am. Cpt., dkt. #110, ¶¶ 190-195 (count 13). Under that agreement, Apple and Qualcomm agreed to terms under which Apple could purchase chipsets that would be used in Apple's products. The chipsets

29

incorporated Motorola's patented technology, and Motorola and Qualcomm had entered into a separate licensing agreement regarding the chipsets. Apple contends that Motorola committed the tort of interference with contract by terminating license and covenant rights with respect to Apple.

Apple and Qualcomm are both headquartered in California and both Apple and Motorola assume California law applies to Apple's tortious interference claim. Thus, I will apply California law. Auto-Owners Insurance Co. v. Websolv Computing, Inc., 580 F.3d 543, 547 (7th Cir. 2009) ("Courts do not worry about conflict of laws unless the parties disagree on which state's law applies.") (citation omitted). To establish the tort of intentional interference with contract under California law, a plaintiff must show:

> (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage.

Pacific Gas & Electric Co. v. Bear Stearns & Co., 50 Cal. 3d 1118, 1126, 270 Cal. Rptr. 1 (Cal. 1990).

Motorola contends it is entitled to summary judgment on Apple's tortious interference claim because Apple cannot establish the last two elements of its claim. Specifically, Motorola contends that Apple has not shown that either it or Qualcomm breached the Strategic Terms Agreement or that the agreement was otherwise disrupted and that Apple cannot show that it has suffered any injury as a result of Motorola's terminating its license and covenant rights with respect to Apple.

I agree with Motorola. Apple concedes that Motorola's decision to terminate license

rights with respect to Apple did not cause Apple or Qualcomm to breach the Strategic Terms Agreement. Motorola's actions did not affect the terms of the agreement itself, because the agreement never purported to guarantee that Qualcomm's chipsets were covered by licenses to third-party patents. Additionally, Apple admits that it has continued to purchase chipsets from Qualcomm under the agreement. Apple's Br., dkt. #167, at 30. Apple does not contend that Motorola's actions have made the chipsets more expensive, that it has been forced to seek chipsets from a different manufacturer or that it has incurred additional licensing fees in response to Motorola's decision to terminate any license and covenant rights Apple may have enjoyed under Motorola's agreement with Qualcomm. In fact, Apple does not even submit evidence about what benefits it would have enjoyed under the licensing agreement and whether it would have paid Qualcomm or Motorola any licensing fees on top of what it paid Qualcomm for chipsets, if Motorola had not terminated license and covenant rights with respect to Apple. Apple implies that the chipsets would have been covered under the Qualcomm's licensing agreement with Motorola, but submits no evidence on the issue.

Apple contends that even though Motorola's actions have not interrupted performance of the contract between Apple and Qualcomm, Motorola's actions constituted tortious interference because they have made performance of the contract "more expensive and burdensome." Pacific Gas & Electric, 50 Cal. 3d at 1127 ("interference which makes enjoyment of a contract more expensive or burdensome may be actionable"). However, Apple has adduced no factual support to show that Motorola has caused its contractual relationship with Qualcomm to be more expensive or burdensome. In its brief, Apple relies

solely on the allegation that Motorola's actions caused Apple to file a lawsuit in a district court in California to clarify its rights to use chipsets manufactured by Qualcomm without threat of patent infringement litigation from Motorola.  Apple v. Motorola Mobility, Inc., Case No. 12-cv-355 (S.D. Cal.).  Apple argues that the cost of the California litigation qualifies as "damages" arising out of Motorola's tortious interference.

Apple's theory of damages arising out of the California litigation was not pleaded in its complaint.  This makes sense because Apple filed the amended complaint in this case in October 2011 and did not commence the California lawsuit until February 2012.  Even if it were appropriate to consider this new theory of damages, Apple has included no facts about the California lawsuit or its costs in its proposed findings of fact or responses to Motorola's proposed facts.  Apple cannot create a genuine factual dispute sufficient to defeat summary judgment simply by making a factual assertion in its brief.  Moreover, even if I considered Apple's assertions about the California lawsuit, Apple fails to connect its litigation costs to the contract between itself and Qualcomm.  Apple argues that it was forced to litigate to protect its contractual rights.  Apple's Br., dkt. #167, at 31.  However, according to Apple's own description of its litigation, it is not suing to protect its rights under its agreement with Qualcomm.  Rather, it is suing Motorola in an attempt to enforce the terms of *Motorola's* contract with Qualcomm.  Apple's own agreement with Qualcomm did not promise any of the benefits of which Apple now seeks to take advantage.

In sum, Apple has adduced no evidence that Motorola's decision to terminate license and covenant rights with respect to Apple interfered with Apple's rights or benefits under

its agreement with Qualcomm or made Apple's contract with Qualcomm more expensive or burdensome.  Therefore, Motorola is entitled to summary judgment on Apple's claim of tortious interference with contract.

4. Apple's claim under Cal. Bus. & Prof. Code § 17200

As discussed above, Apple's claim under Cal. Bus. & Prof. Code § 17200 can be divided into two separate theories: (1) Motorola violated the law by initiating patent litigation against Apple after failing to offer Apple a license on fair, reasonable and nondiscriminatory terms; and (2) Motorola violated the law by suspending its contract with Qualcomm as it related to Apple.

Motorola has moved for summary judgment on Apple's claim under the first theory, contending that it is barred by California Civil Code § 47(b), which provides that the filing of a lawsuit is privileged activity immune from tort liability.  Because I concluded above that the Noerr-Pennington immunity doctrine applies to this claim, I need not address whether the claim would be barred by the California litigation privilege.

With respect to Apple's second theory of liability, Motorola contends that Apple has not proven that it suffered an economic injury, as required under Cal. Bus. & Prof. Code § 17200.  Kwikset, 246 P.3d at 884-85.  I agree.  To defeat Motorola's motion for summary judgment, Apple was required to adduce specific evidence showing that it lost money or property as a result of Motorola's termination of any license and covenant rights that flowed to Apple through Qualcomm.  As explained in the discussion of Apple's tortious interference

33

claim, Apple has failed to adduce any specific facts on this issue.  Therefore, Motorola is entitled to summary judgment on this claim.

5.  Apple's breach of contract claims

Motorola has moved for partial summary judgment on Apple's breach of contract claims, seeking a determination from the court that Apple has not suffered any damages from the alleged breaches.  (Motorola did not move for summary judgment on Apple's request for specific performance of Motorola's contractual obligations.)  The only damages Apple seeks to recover through its contract claims are litigation costs.  According to Apple's expert's report, Apple believes it is entitled to a minimum of $31,948,128.31 in damages based on "litigation costs, including attorneys' fees, Apple has incurred to date in (1) having to defend the ITC 745 Investigation; (2) having to defend the District Court Case; and (3) prosecuting the [present case] to establish Motorola's violation of its obligations to ETSI and IEEE."  Napper Rep., dkt. #153-36 at 6.  Motorola contends that litigation costs cannot be recovered as damages from a breach of contract claim.

The first question is what forum's law applies to Apple's contract claims.  Apple (a California company) is suing Motorola (an Illinois company) for violation of commitments to ETSI (based in France) and IEEE (based in New York).  Both parties agree that ETSI's bylaws are governed by the laws of France, so I will apply French law to Apple's claims involving ETSI.  (Under Fed. R. Civ. P. 44.1, courts determining foreign law "may consider any relevant material or source, including testimony, whether or not submitted by a party

34

or admissible under the Federal Rules of Evidence." Apple submitted an expert report from Philippe Delebecque regarding French contract law. Dkt. #159. Motorola submitted an excerpt regarding French law on damages from an English language treatise. Barry Nicholas, The French Law of Contract (2d ed. 1992), dkt. #176-1.)

Neither party undertakes an adequate choice of law analysis with respect to claims concerning IEEE, and both sides cite variously to Wisconsin, New York and Illinois law in support of their respective positions. However, it does not appear that there is a conflict among Wisconsin, New York or Illinois law relevant to the issues in this case. Thus, I will apply Wisconsin law to Apple's claims concerning IEEE. Danielson v. Gasper, 2001 WI App 12, ¶ 5, 240 Wis. 2d 633, 623 N.W.2d 182 (under Wisconsin's choice of law principles, if there is no genuine conflict between Wisconsin law and law of other possible state, court applies Wisconsin law); Tanner v. Jupiter Realty Corp., 433 F.3d 913, 915 (7th Cir. 2006) (federal court applies choice of law principles of forum state to determine which state's substantive law governs contract claim).

Motorola contends that under the laws of Wisconsin, France or any other jurisdiction, Apple cannot recover attorney fees as damages for a breach of contract action. However, Motorola does not cite any cases establishing such a bright-line rule. Motorola cites In re Guardianship & Protective Placement of Evelyn O., 214 N.W.2d 434, 571 N.W.2d 700 (1997), and Computer Docking Station Corp. v. Dell, Inc., 547 F. Supp. 2d 948, 951 (W.D. Wis. 2007), for the general "American rule" that a prevailing party may not recover attorneys fees unless authorized by statute or contract. However, Apple is not seeking an

award of attorney fees to a prevailing party.  It is seeking attorney fees as damages incurred because of Motorola's alleged breach of contract.

As Motorola concedes in its reply brief, Wisconsin law allows recovery of attorneys fees as contractual damages in some situations.  Motorola's Br., dkt. #173, at 7 (citing Repinski v. Clintonville Federal Savings & Loan Association, 49 Wis. 2d 53, 58, 181 N.W.2d 351, 354 (1970) ("An award of damages for breach of contract should compensate the injured party for losses necessarily flowing from the breach. . . .When litigation is a natural and proximate result of the breach, recovery may be had as damages for attorney's fees necessarily incurred in that litigation.") (dictum).  Additionally, Motorola concedes that French law allows recovery for damages that are the "immediate and direct and foreseeable result of breach."  Id.  However, Motorola contends that the litigation costs that Apple incurred are not compensable because many specific costs that Apple's expert included in his damages calculations, such as the costs of attorneys' meals and laundry, have too tenuous a relationship to Motorola's alleged breach.

Motorola has not shown that it is entitled to summary judgment on this issue.  Its legal analysis is incomplete; it cited no cases discussing whether a party can recover as contract damages the costs it incurred in previous litigation with the same defendant, let alone any cases actually holding that a party may not recover such costs.  Further, Motorola raised several new arguments in its reply brief regarding whether Apple's litigation costs were the direct and foreseeable result of Motorola's alleged breach.  Therefore, I am denying Motorola's motion for summary judgment on this issue.  If Motorola wishes to make further

36

arguments regarding whether certain costs identified by Apple's expert should be excluded, it may file a motion in limine on the subject.

## B. Apple's Motion for Partial Summary Judgment

Apple has moved for partial summary judgment, seeking to establish certain elements of its claims.  Because I have concluded that Motorola is entitled to summary judgment on all of Apple's claims with the exception of Apple's contract and estoppel claims, I will consider Apple's arguments only as they relate to those claims.  In particular, Apple requests a determination that:

- Motorola entered into binding contractual obligations with ETSI and IEEE to license its declared-essential patents on fair, reasonable and nondiscriminatory terms.

- Apple is a third-party beneficiary of Motorola's contractual obligations to ETSI and IEEE.

- In submitting technical proposals to ETSI for inclusion of Motorola technology in ETSI standards, Motorola was obligated by ETSI policy to make a bona fide effort to identify essential intellectual property rights that might be required by the technical proposal before the adoption of the technical proposal into the standard.

- Motorola was obligated to make a bona fide effort to disclose the applications leading to the issuance of the '898, '559 and '697 patents to ETSI before the adoption of Motorola's technical proposals, even when those patent applications were unpublished.

- Motorola disclosed the patent applications issuing as the '898, '559 and '697 patents after the adoption of the standards to which Motorola contends those patents are essential.

Notably, Apple does not seek a determination that Motorola's failure to disclose its

intellectual property rights was intentional, that Motorola failed to comply with the disclosure requirements of ETSI and IEEE policies or that Motorola breached its contractual obligations by demanding unreasonable licensing fees for its patents from Apple.

1.  Motorola's contracts with ETSI and IEEE

As discussed above, I am applying Wisconsin law to Apple's breach of contract claims related to IEEE and French law to the claims related to ETSI.

To form a valid contract under Wisconsin law, there must be evidence of an offer, acceptance and consideration, Kamikawa v. Keskinen, 44 Wis. 2d 705, 710, 172 N.W.2d 24, 26 (1969), and an understanding between the parties regarding the essential terms of the contract.  Metropolitan Ventures, LLC v. GEA Associates, 2006 WI 71, ¶ 24, 291 Wis. 2d 393, 717 N.W.2d 58.  Apple's expert states that French law requires the same general elements, which Motorola has not disputed.  Delebecque Rep., dkt. #146, ¶ 31 ("French law considers that the contractual agreement is reached . . . as of the moment the parties have reached an agreement on the essential elements of the contract.").

In this case, the combination of the policies and bylaws of the standards-setting organizations, Motorola's membership in those organizations and Motorola's assurances that it would license its essential patents on fair, reasonable and nondiscriminatory terms constitute contractual agreements.  The intellectual property rights policies of ETSI and IEEE constituted offers to Motorola for membership in the organization in exchange for Motorola's ability to participate in developing technical standards.  The "offers" set out the

38

essential terms of the contract, namely, that members must abide by intellectual property rights policies. Under IEEE's policy, members must submit letters of assurance including a commitment to license essential patents under reasonable and nondiscriminatory terms. Similarly, ETSI's policy states that its members shall use "reasonable endeavors" to inform the organization of essential patents "in a timely fashion." All members are asked to grant licenses to essential patents on fair, reasonable and nondiscriminatory terms; if they refuse, they must explain their reasons in writing.

Motorola accepted the offers and agreed to be bound by these policies when it joined ETSI and IEEE. Later, Motorola confirmed that it was bound by the organizations' policies when it submitted declarations and letters of assurance stating that it would license its patents on fair, reasonable and nondiscriminatory terms. In particular, Motorola sent declarations to ETSI regarding the '697, '898, '230 and '559 patents, and sent letters of assurance to IEEE regarding the '516, '193, '223 and '712 patents.

Both Motorola and the organizations benefited from this arrangement and thus, the element of consideration is satisfied. Motorola received the benefit of participating in the standards development process and influencing the choice of technology for the standards. The organizations benefited from Motorola's commitments by knowing that their technical standards would be available for use by third parties.

Several courts have reached similar conclusions. Microsoft Corp. v. Motorola, Inc., 2012 WL 2030098, *5-6 (W.D. Wash. June 6, 2012) (holding that contract was formed through Motorola's commitments to IEEE to license patents essential to 802.11 standard

on reasonable and nondiscriminatory terms); <u>Research In Motion Ltd. v. Motorola, Inc.</u>, 644 F. Supp. 2d 788, 797 (N.D. Tex. 2008) (holding at motion to dismiss stage that plaintiff had stated breach of contract claim based on defendant's failure to offer FRAND terms as it had agreed to ETSI and IEEE); <u>ESS Technology, Inc. v. PC-Tel., Inc.</u>, 1999 WL 33520483, *4 (N.D. Cal. Nov. 4, 1999) (holding that, as third-party beneficiary of contract between standards-setting organization and defendant-essential-patent holder, software manufacturer had properly stated claim for specific performance of agreement requiring defendant to license patents on nondiscriminatory and reasonable terms).

In its opposition brief, Motorola states that it "does not dispute that it made commitments to the industry groups," and "does not dispute that obligations flow from those commitments." Motorola's Br., dkt. #164, at 1. However, Motorola argues that its commitments are not binding contracts and that neither the industry groups nor Apple can enforce those commitments. In other words, Motorola argues that although it made promises, the promises are largely meaningless because they cannot be enforced by either the organizations or third parties.

Motorola relies largely on language from ETSI's and IEEE's policies to argue that the organizations do not intend to enforce their intellectual property rights policies. IEEE's policy states that "[n]o license is implied by the submission of a Letter of Assurance," and that "IEEE is not responsible for determining whether any licensing terms or conditions provided in connection with submission of a Letter of Assurance . . . are reasonable and non-discriminatory." ETSI's policy states that "[s]pecific licensing terms and negotiations are

40

commercial issues between the companies and shall not be addressed within ETSI."

These provisions do not say that the organizations will not enforce their policies. Rather, the provisions make clear that organizations will not be responsible for deciding what terms constitute a fair, reasonable and nondiscriminatory license. They will not resolve licensing disputes. However, ETSI and IEEE still require members to offer reasonable and nondiscriminatory licenses to their essential patents in order to comply with the conditions of membership and their declarations. ETSI's policies state explicitly that "[a]ny violation of the POLICY by a MEMBER shall be deemed to be a breach, by that MEMBER, of its obligations to ETSI." Similarly, in its commitment to IEEE, Motorola agreed that it would "license those patents on a non-discriminatory basis offering fair and commercially reasonable terms."

Motorola has several arguments about whether it complied with the terms of ETSI's and IEEE's policies by making reasonable efforts to disclose its patents and by offering to negotiate a licensing agreement with Apple. However, these arguments relate to whether Motorola breached the contracts, not whether contractual obligations exist. Neither Apple nor Motorola moved for summary judgment on the element of breach.

In sum, I am granting Apple's motion for summary judgment with respect to the existence of contracts between Motorola and the standards-setting organizations.


2. Apple's status as a third-party beneficiary

The next question is whether Apple has a right to enforce the contracts as a third

41

party beneficiary.  Becker v. Crispell-Snyder, Inc., 2009 WI App 24, ¶ 9, 316 Wis. 2d 359, 763 N.W.2d 192 (party wishing to enforce contract must either be party to contract or third-party beneficiary).  Under Wisconsin law, a third-party beneficiary is one whom the contracting parties intended to "directly and primarily" benefit.  Id. at ¶ 11 (citing Winnebago Homes, Inc. v. Sheldon, 29 Wis. 2d 692, 699, 139 N.W.2d 606 (1966)).  The benefit proven must be direct; an indirect benefit incidental to the primary contractual purpose is insufficient.  Id.  French law is consistent with Wisconsin law on this issue. Delebecque Rep., dkt. #159, ¶ 25.

Motorola advances several arguments in support of its contentions that its commitments to ETSI and IEEE were not intended primarily to benefit potential users of the standards.  However, none of its arguments are persuasive.  The primary purpose of the ETSI and IEEE intellectual property rights policies and Motorola's licensing commitments is to protect companies that need to obtain licences in order to practice the standards adopted by the organizations.  This is clear from the language of the policies.  For example, ETSI's policy states that an "objective" of the policy  is to "reduce the risk" of an essential patent's becoming "unavailable."  The entities that care the most about the availability of a license are those entities such as Apple, who will incorporate the standards into their own products.

As a potential user of the standards at issue and a prospective licensee of essential patents, Apple is a third party beneficiary of the agreements between Motorola and IEEE and Motorola and ETSI.  See also Microsoft, 2012 WL 2030098, at *5-6 (holding that

Microsoft was third-party beneficiary of Motorola's agreements with standard setting organization because the "commitments are clearly designed to benefit potential licensees of Motorola's standard essential patent by ensuring that such patents are readily accessible to everybody at reasonable rates").

### 3.  Scope of contractual obligations to ETSI

Apple also seeks summary judgment on issues related to the scope of Motorola's contractual obligations to ETSI.  In particular, Apple seeks a determination that (1) the ETSI intellectual property rights policy required Motorola to make a "bona fide" effort to identify its intellectual property rights that might be essential to a technical standard *before* the technical proposal was adopted into the standard; and (2) that Motorola was required to include its unpublished patent applications as part of those disclosures.

With respect to the first issue, the ETSI intellectual property rights policy is clear. It states that members

> submitting a technical proposal for a STANDARD shall, on a bona fide basis, draw the attention of ETSI to any of that MEMBER's [intellectual property rights] which *might* be ESSENTIAL *if that proposal is adopted*.

By using the terms "might" and "if," the policy clearly requires members to make efforts to disclose intellectual property rights *before* a standard is adopted.

Motorola has two arguments in opposition, neither of which is persuasive.  First, it says it was not required to disclose patents or patent applications at the time a technical proposal is made or during work meetings relating to the technical development of standards.

43

This argument is not responsive to Apple's motion.  Apple has not argued that Motorola was required to disclose its intellectual property rights during work meetings or when it submitted technical proposals.  Apple has argued only that Motorola was required to disclose its patents and patent applications at some point before a technical proposal is adopted into a standard.

Second, Motorola argues that it was relieved of its obligation to disclose specific patents by submitting a general declaration to ETSI, in which it agreed to license any of its essential patents on fair, reasonable, and nondiscriminatory terms.  However, the ETSI policies make clear that the submission of a general declaration does not relieve a member of its duty to make a timely declaration of specific patents and applications that it believes may be essential to an ETSI standard.  The ETSI Guide on Intellectual Property Rights states that use of a general licensing declaration "does not take away the obligation for members to declare essential patents to ETSI. . . ."

As to the issue of Motorola's obligation to disclose unpublished patent applications, ETSI's policy makes clear that members are required to disclose patents and "applications therefor."  The policy exempts "confidential information."  Apple asserts several reasons in its brief about why Motorola's patent applications issuing as the '898, '559 and '697 patents do not qualify as "confidential."  Apple's Br., dkt. #144, at 22-23.  For example, Apple contends that Motorola waived any confidentiality privilege that might have applied by publicly disclosing the relevant language in those applications through its technical proposals to the relevant working groups and through foreign patent applications.

Motorola's only response is to assert that ETSI members are not required to disclose confidential information and that patent applications may qualify as confidential. This is nonresponsive to Apple's arguments. By failing to respond to Apple's contention that the specific patent applications at issue in this case were not confidential, Motorola has waived any arguments in opposition and has failed to meet its burden at summary judgment of showing the existence of material facts in dispute regarding this issue of the scope of its contractual obligations to ETSI. Wojtas v. Capital Guardian Trust Co., 477 F.3d 924, 926 (7th Cir. 2007) ("A failure to oppose an argument permits an inference of acquiescence and 'acquiescence operates as a waiver.'") (quoting Cincinnati Insurance Co. v. East Atlantic Insurance Co., 260 F.3d 742,747 (7th Cir. 2001)).

### 4.  Timing of Motorola's disclosure

Finally, Apple seeks a determination that Motorola disclosed the patent applications issuing as the '898, '559 and '697 patents after Motorola made technical proposals using technology from those patents and after ETSI adopted standards to which Motorola contends those patents are essential. I am granting Apple's motion on this issue because it is uncontested.

### C.  Issues Remaining for Trial

I am dismissing all of Apple's claims with the exception of its breach of contract and equitable estoppel claims and its declaratory judgment claims premised on a breach of

contract or estoppel theory.

With respect to the breach of contract claims, Apple has shown that Motorola's membership in ETSI and IEEE and the intellectual property declarations it made established a contractual relationship that required Motorola to license its essential patents to third parties on fair, reasonable and nondiscriminatory terms. Additionally, Apple has shown that it is a third-party beneficiary of those contracts and has a right to enforce them. Apple has proven that Motorola's membership in ETSI required Motorola to make reasonable efforts to disclose any intellectual property rights that might have become essential to standards being considered by ETSI before those standards were adopted, including Motorola's unpublished patent applications that became the '898, '559 and '697 patents. Finally, Apple has shown that Motorola disclosed its '898, '559 and '697 patents to ETSI after Motorola made technical proposals using technology from those patents and after ETSI adopted standards to which Motorola contends those patents are essential.

However, there are still several unresolved issues related to Apple's breach of contract claims. To succeed on its claims, Apple must prove that Motorola breached a contract by failing to make bona fide efforts to disclose its patents to ETSI in a timely manner and by failing to offer a license to its essential patents to Apple on fair, reasonable and nondiscriminatory terms. As to the licensing offer, Apple must prove that Motorola's initial offer of a 2.25% royalty rate and attempts to negotiate were unfair, unreasonable or discriminatory and violated Motorola's commitments to ETSI and IEEE.

Additionally, Apple must prove that it suffered damages that are clearly connected to

46

Motorola's breach.  At this point, it is not clear how Apple intends to prove that it was damaged by Motorola's failure to disclose patents to ETSI in a timely manner.  Additionally, Apple must prove that any litigation damages it seeks to recover are directly attributable to Motorola's breach.

ORDER

IT IS ORDERED that

1.  Defendant Motorola Mobility, Inc.'s motion for partial summary judgment, dkt. #150, is GRANTED IN PART and DENIED IN PART.

The motion is GRANTED with respect to plaintiff Apple Inc.'s claims that Motorola violated § 2 of the Sherman Act (count 5), that it violated Cal. Bus. & Prof. Code § 17200 (count 6), and that it tortiously interfered with contract (count 13), and with respect to Apple's requests for declaratory relief in conjunction with these claims.

The motion is DENIED in all other respects.

2.   Plaintiff Apple Inc.'s motion for partial summary judgment, dkt. #143, is GRANTED.  The court finds as a matter of law that

   a.  Motorola entered into binding contractual obligations with ETSI and IEEE to license its declared essential patents on fair, reasonable and nondiscriminatory terms.

   b.  Apple is a third-party beneficiary of Motorola's contractual obligations to ETSI and IEEE.

   c.  In submitting technical proposals to ETSI for inclusion of Motorola technology in ETSI standards, Motorola was obligated by ETSI policy to make a bona fide effort to identify essential intellectual property rights that might be required by the technical proposal before the adoption of the technical proposal into the standard.

d.  Motorola was obligated to make a bona fide effort to disclose the applications leading to the issuance of its United States patents 6,175,559, 6,359,898 and 6,246,697 to ETSI before the adoption of Motorola's technical proposals, even when those patent applications were unpublished.

e.  Motorola disclosed the patent applications issuing as the '898, '559 and '697 patents after the adoption of the standards to which Motorola contends those patents are essential.

Entered this 10th day of August, 2012.

> BY THE COURT:
> /s/
> BARBARA B. CRABB
> District Judge

48