IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPLE, INC.,

                     Plaintiff,

      v.

MOTOROLA MOBILITY, INC.,

                     Defendant.

OPINION and ORDER

11-cv-178-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

A court trial is scheduled for November 5, 2012 to resolve plaintiff Apple, Inc.'s claims for breach of contract, equitable estoppel and declaratory judgment, all premised on Apple's contention that defendant Motorola Mobility, Inc. promised two standards-setting organizations that it would offer licenses to its standards-essential patents on fair, reasonable and nondiscriminatory terms and then refused to do so.

Now before the court are the parties' motions in limine.  I have grouped this for discussion purposes and resolved these as explained below.

TABLE OF CONTENTS

A.      Motions Regarding the Scope of Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      1.  Motorola's motion to preclude Apple
      from seeking specific performance, dkt. #280 . . . . . . . . . . . . . . . . . . . . . . . . . 7

      2.  Motorola's motion to preclude Apple from
      admitting evidence arising after January 4, 2011
      in support of its breach of contract and estoppel
      claims, dkt. #289 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . 11

3.  Motorola's motion to exclude evidence and
references to irrelevant standards and standards-setting
bodies, dkt. #298 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

B.    Motions Regarding the Relevance of Orders Issued in the
Related Patent Infringement Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

1.  Apple's motion for judicial notice of public
documents, dkt. #321, and Motorola's motion to
exclude all evidence concerning prior litigation
decisions, dkt. #292 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

2.  Apple's motion to exclude evidence and argument
that Motorola's patents ruled invalid or not infringed
have value, dkt. #311 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

3.  Apple's Motion to exclude evidence and argument
that Apple must satisfy a condition precedent to trigger
Motorola's obligation to license on fair, reasonable and
nondiscriminatory terms, dkt. #312 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

4.  Whether Motorola breached its contracts by seeking
an injunction in the Illinois case and an exclusionary
order in the International Trade Commission
proceeding, dkt. ##286, 310 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

C.   Motions Related to Apple's Claim that Motorola Breached
     its Contracts with ETSI by Failing to Make Bona Fide
     Efforts to Disclose its Patents to ETSI in a Timely Manner . . . . . . . . . . . . . . . . 30

     1.  Motorola's motion to preclude evidence and argument
     relating to timeliness of patent disclosures to ETSI, dkt. #283 . . . . . . . . . . . . . 30

     2.  Apple's motion to preclude Motorola from offering evidence
     or argument that it had a "process" for complying with ETSI's
     disclosure policies, dkt. #313 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

D.   Motions Related to Non-parties Chi Mei Communications
     Systems and Qualcomm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . 33

     1.  Motorola's motion to exclude any evidence and argument
     relating to non-parties Chi Mei Communication Systems
     and Qualcomm, dkt. #295 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

     2.  Apple's motion to preclude Motorola from offering evidence
     about why it purported to suspend its license with
     Chi Mei, dkt. #314 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

     3.  Apple's motion to preclude Motorola from arguing that
     its cellular standards-essential patent rights were not "exhausted"
     as to the first iPhone, dkt. #315 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

E.   Motions Related to Expert Witness Reports and Testimony . . . . . . . . . . . . . . . 38

     1.  Motorola's motion to preclude the testimony and
     opinions of Dr. Louis Berneman, dkt. #301 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

     2.  Motorola's motion to preclude the testimony and
     opinions of Dr. Dennis Carlton relating to licensing
     and market power, dkt. #304 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

     3.  Motorola's motion to exclude evidence or argument
     related to allegedly "non-infringing alternatives" to
     Motorola patents, dkt. #307 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

     4.  Apple's motion to preclude evidence and argument
     regarding opinions on alternatives from Motorola's
     technical experts, dkt. #316 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

5.  Apple's motion to exclude Dr. Gregory Leonard from
offering opinions on the correct fair, reasonable and
nondiscriminatory royalty rate for Motorola's declared
standards-essential patents, dkt. #318, and opinions
about "synergies," dkt. #319 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

6.  Apple's motion to exclude Motorola's expert testimony not
previously disclosed in a report, dkt. #317 . . . . . . . . . . . . . . . . . . . . . . . . 50

7. Motions regarding Apple's use of supplemental expert
reports by Dr. Cimini and Dr. Napper . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

          a.  Dr. Cimini's August 14, 2012 report . . . . . . . . . . . . . . . . . . . . . . . . . 51

          b.  Brian Napper's supplemental report . . . . . . . . . . . . . . . . . . . . . . . . 54

### A.  Motions Regarding the Scope of Trial

It is clear from several of the motions that the parties have significant disagreements about the scope of the upcoming trial.  The main disagreement is whether the trial will result in a determination of a specific rate or range that constitutes a fair, reasonable and nondiscriminatory license for Motorola's patents and an order requiring Motorola to offer that license to Apple.  According to Motorola, the trial cannot and should not address what constitutes a fair, reasonable and nondiscriminatory license.  Instead, the only issues that should be resolved at trial with respect to Apple's breach of contract claim are whether Motorola's initial offer of a 2.25% royalty rate was unfair, unreasonable or discriminatory and whether Motorola failed to negotiate in good faith.  Motorola suggests that if Apple prevails on its breach of contract claim, Apple's only remedy would be nominal damages and perhaps an order from the court instructing the parties to negotiate a license.  (Apple reduced its damages demand to nominal damages of less than $20 when it filed its motion for a court trial.  Dkt. #255.)

Motorola finds support for its position from statements I made during a hearing on Apple's request for a preliminary injunction and the order issued at summary judgment.  During the April 26, 2011 hearing, I stated

> [A]t some point the court could say you haven't negotiated fairly.  I mean, it wouldn't be proper for the Court to say you haven't negotiated fairly, you should really be paying 1.36 or something like that.  But you could, after a determination of the facts, decide that one party or the other had not been participating reasonably in any attempt to negotiate a license.

Dkt. #90, Apr. 26, 2011 Hrg. Tr. at 82:11-18.  See also id. at 86:11-22 (The court: "My sense is that if the Court could do anything, it would only be in the situation in which the parties had absolutely refused and the party with the essential patents just said we're not going to — we aren't going to engage in any kind of negotiation; we don't want a license; we don't have to

license; we're not going to do anything.").  However, these statements did not limit the issues

to be resolved in this case or limit the remedies to which Apple can seek at trial.  They were

made during a preliminary review of the case, before the parties had developed the facts or legal

theories.

Additionally, the summation in the summary judgment opinion regarding the issues

remaining for trial did not restrict Apple from seeking a particular remedy or limit the type of

evidence that may be presented at trial.  In an opinion and order entered August 10, 2012, I

granted Apple's motion for partial summary judgment and concluded that Motorola was a party

to binding contracts with the European Telecommunications Standards Institution (ETSI) and

the Institute of Electrical and Electronics Engineers (IEEE) and that those contracts required

Motorola to license its declared-essential patents to Apple on fair, reasonable and

nondiscriminatory terms.  Dkt. #194 at 38-42.  However, I pointed out that there were still

several unresolved issues related to Apple's breach of contract claims, stating:

> Apple must prove that Motorola's initial offer of a 2.25% royalty rate and
> attempts to negotiate were unfair, unreasonable or discriminatory and violated
> Motorola's commitments to ETSI and IEEE.  Additionally, Apple must prove that
> it suffered damages that are clearly connected to Motorola's breach.

Id. at 46-47.  Although Motorola contends that these issues identified in the court's summary

judgment opinion are the *only* issues remaining in the case, that is not what the opinion says.

At summary judgment, the focus was on the interpretation of the ETSI and IEEE contracts, as

well as damages issues.  Neither party had discussed the type of evidence that Apple would

present to prove its breach of contract claims and neither party had raised issues related to

equitable relief.  Thus, I did not include in the opinion any discussion of issues related to

equitable relief or of Apple's theories of liability that were not raised in the parties' summary

judgment briefing.  However, this does not mean that Apple is barred from raising other issues at trial; Apple may pursue any theories of liability and requests for relief that it pleaded in its amended complaint and that have not been explicitly dismissed from the case.

1.  **Motorola's motion to preclude Apple from seeking specific performance, dkt. #280**

Motorola's motion to preclude Apple from seeking specific performance is related to its interpretation of the issues remaining in the case.  If Apple prevails on its claim that Motorola breached its contracts with ETSI and IEEE by failing to offer a fair, reasonable and nondiscriminatory license to Apple, Apple intends to seek an order requiring specific performance of Motorola's contractual commitments.  In particular, Apple intends to ask the court to order Motorola to offer a license for its standards-essential patents to Apple on fair, reasonable and nondiscriminatory terms.  Motorola has moved for an order precluding Apple from seeking specific performance, contending that the court cannot order that because (1) Motorola's obligations under the contracts with the standards-setting organizations are too vague; (2) there is not enough evidence in the record from which the court could determine appropriate license terms; and (3) supervising the performance would not be practicable for the court.  I am denying Motorola's motion.

With respect to its first argument, Motorola contends that specific performance is an exceptional remedy that is appropriate only if damages are inadequate and only if the terms of the contracts at issue are sufficiently specific.  Motorola contends that its contracts with the standards-setting organizations are not specific because they do not explain what constitutes a "fair, reasonable and nondiscriminatory" license and they do not provide instructions on how

to determine appropriate license terms.

It is true that the "normal remedy for breach of contract is an award of damages," while specific performance is an "exceptional" remedy. Miller v. LeSea Broadcasting, Inc., 87 F.3d 224, 230 (7th Cir. 1996). Additionally, courts generally order specific performance "only when the terms of the contract are sufficiently specific to allow the precise drafting of such an order." TAS Distributing Co. v. Cummins Engine Co., 491 F.3d 625, 637 (7th Cir. 2007) (Illinois law). See also Krause v. Holand, 33 Wis. 2d 211, 214, 147 N.W.2d 333 (1967) (request for specific performance will normally be denied "if the essential terms of the contract are not established with clarity").

I conclude that specific performance may be an appropriate remedy under the circumstances of this case. In fact, it may be the only appropriate remedy. As I held previously, Motorola's declarations to ETSI and IEEE constitute binding agreements to license its essential patents on fair, reasonable and nondiscriminatory terms, and Apple is a third party beneficiary to those agreements. Dkt. #194 at 42. As a third party beneficiary, Apple is entitled to a license of Motorola's patents on fair, reasonable and nondiscriminatory terms. Unless and until Motorola gives Apple a fair license to its declared-essential patents, Apple will continue to face the threat of patent infringement litigation from Motorola. It would be highly inefficient to require Apple to bring a new lawsuit for monetary damages or declaratory relief each time Motorola sues it for patent infringement. Additionally, it makes little sense to order the parties to continue negotiating a license when they have been unable to reach an agreement through five years of negotiations.

Instead, it makes sense to allow Apple to sue for specific performance of Motorola's

contractual obligations and for the court to determine license terms, if necessary.  In fact, in situations such as this in which the parties cannot agree on the terms of a fair, reasonable and nondiscriminatory license, the court may be the only forum to determine license terms.  Both ETSI and IEEE have declared their unwillingness to assist parties in determining license terms or in resolving disputes between the parties.  E.g., dkt. #282-3, 2003 Report of the GA ad hoc group on ETSI's Intellectual Property Rights Policy operation, at § 4.4 (ETSI is "unable to define FRAND conditions" and "a court of law seems to be the only authority which can ultimately decide whether, or not, terms are Fair, Reasonable And Non-Discriminatory"); dkt. #282-5, ETSI Guide on Intellectual Property Rights, § 4.1 ("Specific licensing terms and negotiations are commercial issues between the companies and shall not be addressed within ETSI."); dkt. #282-6, IEEE-SA Standards Board Bylaws, § 6.2 (IEEE not responsible for "determining whether any licensing terms or conditions provided in connection with submission of a Letter of Assurance, if any, or in any licensing agreements are reasonable or non-discriminatory.").  As the District Court for the Western District of Washington explained recently in a similar case involving Motorola's licensing commitments to IEEE,

> Having made the determination that Motorola must grant a [reasonable and nondiscriminatory] license for its essential patents, the court is left with the inescapable conclusion that a forum must exist to resolve honest disputes between the patent holder and implementer as to what in fact constitutes a [reasonable and nondiscriminatory] license agreement. Here, the courthouse may be the only such forum. . . Although no specific remedy has been determined, and certainly no remedy has been proven, the court declines to dismiss from Microsoft's possible remedies the very license agreement to which the court has already determined it is entitled.

Microsoft Corp. v. Motorola, Inc., Case No. C10-1823JLR, 2012 WL 4827743, *6 (W.D. Wash. Oct. 10, 2012).

I am not persuaded by Motorola's argument that its commitments to the standards-setting organizations are too vague to allow the court to determine an appropriate license rate. In making this argument, Motorola fails to consider that specific performance is a remedy that would be considered only if Apple proves that Motorola has refused to give Apple a license on fair, reasonable and nondiscriminatory terms. In other words, before the court considers the remedy of specific performance, Apple must first prove that Motorola breached its contract. To prove this, Apple will have to show that Motorola's licensing offers have not been fair, reasonable and nondiscriminatory. This will require the court to determine first what rate or range of rates would qualify as a fair, reasonable and nondiscriminatory license offer for Motorola's standards-essential patents and then determine whether Motorola's licensing offers were a breach of its duty to offer a license within that range. If I reach the question whether specific performance would be an appropriate remedy, I necessarily will have determined a meaning for the phrase "fair, reasonable and nondiscriminatory" with respect to Motorola's standards-essential patents, and the only remaining question will be whether Motorola should be required to license its patents to Apple on those terms.

I am also not persuaded by Motorola's argument that Apple should be barred from seeking specific performance because there is insufficient evidence from which the court could determine a fair, reasonable and nondiscriminatory rate in this case. Motorola's argument on this point is simply a critique of the methods and opinions of Apple's experts. In particular, Motorola criticizes the methods used by Apple's experts and argues that the experts failed to consider the hundreds of essential patents owned by Motorola as well as the confidential settlement negotiations between the parties after January 4, 2011. Motorola is free to make

10

these arguments at trial and to present contrary opinions from its own experts to support its argument that it has offered fair licensing terms to Apple.  However, I will not limit Apple's possible remedies simply because Motorola disagrees with the opinions of Apple's experts.

Finally, Motorola does not explain why the court would be required to engage in any monitoring or supervision of the parties as a result of an order of specific performance.  Therefore, I will not bar Apple from seeking the remedy of specific performance at trial.

## 2. Motorola's motion to preclude Apple from admitting evidence arising after January 4, 2011 in support of its breach of contract and estoppel claims, dkt. #289

Motorola contends that all evidence relating to its conduct or the parties' patent license negotiations after January 4, 2011 should be precluded under the parties' Mutual Non-Disclosure and Rule 408 Agreement.  The agreement places restrictions on the use of "Confidential Information" exchanged during settlement negotiations, dkt. #291-1, §§ 1-5, as well as restrictions on the use of "communications and documents exchanged between [the parties] in furtherance of their joint negotiation efforts."  Id., § 10.  Under § 10(C) of the agreement,

> No party to this Agreement shall use any documents or information contained or exchanged in any such meeting, discussion or correspondence (i) in any adversarial proceeding or as the basis for any adversarial proceeding in any forum in the United States or in any other country; (ii) in any manner or for any purpose other than in connection with the settlement negotiations between them; or (iii) as the basis for a declaratory judgment action . . . or other proceedings before any court. . . . The parties further agree that the existence of the settlement meetings, and documents and information prepared for or exchanged at any such meetings will not be admissible as evidence or used for any other purpose including, without limitation, filings with any court. . . .

Id., § 10.C.  The agreement was extended in November 2011 until November 16, 2013.  Dkt.

11

#291-2.  Motorola contends that this language precludes Apple from introducing evidence of Motorola's conduct after January 4, 2011 or of any evidence obtained after that date.

I am granting Motorola's motion in part and denying it in part.  I agree with Motorola that the parties' non-disclosure agreements limit the parties' ability to introduce certain types of evidence at trial.  In particular, the non-disclosure agreements preclude the parties from introducing evidence of the parties' settlement discussions and of information and documents produced and exchanged during settlement negotiations.  Dkt. #291-1, § 10(A); dkt. #291-2, § 4.

However, I disagree with Motorola's argument that the non-disclosure agreements preclude *all* evidence relating to the parties' conduct after January 4, 2011.  The January 2011 agreement provides exceptions, generally allowing for the disclosure of information that is acquired independently of settlement discussions.  Dkt. #291-1, § 2 ("Recipient is not obligated to maintain as Confidential [information that] (i) is now available or becomes available to the public . . . (iii) is lawfully obtained from a third party or parties without the duty of confidentiality; (iv) is known to the Recipient prior to such disclosure; or (v) is independently developed by Recipient without the use of any Discloser's Confidential Information or any breach of this Agreement."); § 10.C ("The restrictions of [] paragraph 10(C) shall not apply to any document or information which (a) is in the public domain, or (b) is properly obtained by a party to this Agreement in discovery or otherwise from some source other than the settlement negotiations between them.").  Additionally, the November 2011 agreement includes an exception allowing either party to "submit[] the Confidential Information in the Pending Litigation to establish its position that it has engaged in good faith negotiations, or to address

12

any inaccurate or incomplete position taken by another party. . . ."  Dkt. #291-2, § 15. Therefore, Apple may introduce evidence of information or activities arising after January 4, 2011 that fall under these exceptions to the non-disclosure agreements.

Motorola did not move to exclude any specific evidence that Apple intends to introduce, so I cannot provide any further guidance for the parties on this issue beyond stating that the parties are both constrained by the explicit prohibitions of the non-disclosure agreement, but not beyond those explicit prohibitions.

### 3.  Motorola's motion to exclude evidence and references to irrelevant standards and standards-setting bodies, dkt. #298

Apple's breach of contract claims are premised on Motorola's commitments to ETSI and IEEE with respect to certain standards, including ETSI's Universal Mobile Telecommunications System standard, the General Packet Radio Service functionality of ETSI's Global System for Mobile Communications standard and the IEEE's 802.11 standard.  Motorola has moved to exclude evidence relating to standards-setting organizations and standards that are not at issue in this case.  Apple opposes the motion, contending that Motorola has made such evidence an issue by introducing evidence regarding its practices in relation to other standards-setting organizations.

I am granting this motion in part and denying it in part.  I agree with Motorola that testimony and evidence regarding standards-setting bodies and standards other than ETSI, IEEE and their standards should be precluded because it is irrelevant and would be waste of time. Thus, Apple will be precluded from arguing that Motorola breached its contractual obligations

13

to other organizations or failed to disclose patents relevant to other standards not at issue. However, if Motorola introduces evidence of its practices with respect to other standards or standards-setting organizations in an attempt to show that it made a bona fide effort to comply with its disclosure and licensing obligations to ETSI and IEEE, Apple may introduce evidence to the contrary.

## B.  Motions Regarding the Relevance of Orders Issued in the Related Patent Infringement Proceedings

The patents at issue in this case are Motorola's United States Patents Nos. 5,636,223 (the '223 patent), 5,311,516 (the '516 patent), 5,572,193 (the '193 patent), 5,319,712 (the '712 patent), 6,175,559 (the '559 patent), 6,246,697 (the '697 patent) and 6,359,898 (the '898 patent).  All of these patents have been the subject of prior litigation between Motorola and Apple, either in the International Trade Commission or federal court.  The '697 and '223 patents were the subject of In re Certain Wireless Communication Devices, Portable Music and Data Processing Devices, Computers and Components Thereof, U.S.I.T.C. Investigation No. 337-TA-745.  In that case, Motorola sought an exclusion order and permanent cease and desist order as a result of Apple's alleged infringement of the '697 and '223 patents, among other patents.  In a decision issued August 24, 2012, the commission concluded that the accused Apple products did not infringe either the '697 or '223 patents.  Dkt. #294-1 at 23, 47.

The '898, '559, '516, '712, '230 and '193 patents were all the subject of Apple Inc. v. Motorola Inc., Case No. 1:11-cv-8540 (N.D. Ill.), which was a case that originated in this court as 10-cv-662-bbc and was transferred to the Northern District of Illinois in December 2011.

14

Motorola voluntarily withdrew the '516 and '230 patents from suit.  On summary judgment, the district court found that the '193 patent was invalid, that the '712 and '559 patents were not infringed and that Motorola could not prove the amount of damages to which it was entitled with respect to the '898 patent.  Dkt. #320-3 (Order of Jan. 16, 2012 in Illinois case, finding '193 patent invalid and '712 patent not infringed); #320-4 (Order of Apr. 9, 2012 in Illinois case, finding claim 4 of '559 patent not infringed); #320-5 (Order of June 5, 2012 in Illinois case, finding claim 5 of '559 patent not infringed). The case was dismissed with prejudice on June 22, 2012.  Apple, Inc. v. Motorola, Inc., 2012 WL 2376664 (N.D. Ill. June 22, 2012).

The parties have filed several motions in limine related to filings and decisions from the district court and International Trade Commission proceedings.

## 1. Apple's motion for judicial notice of public documents, dkt. #321, and Motorola's motion to exclude all evidence concerning prior litigation decisions, dkt. #292

As a threshold matter, both parties have filed motions regarding whether documents related to the International Trade Commission and Northern District of Illinois proceedings may be admitted for *any* purpose at trial.  Motorola has moved under Fed. R. Evid. 402, 403 and 802 to exclude all evidence and argument related to these proceedings, contending that it would be irrelevant and inadmissible hearsay.  Dkt. #292.  Apple disagrees, and has moved for judicial notice under Fed. R. Evid. 201(b) of several filings and decisions related to those proceedings, as well as for judicial notice of documents from other patent infringement litigation involving the parties. Dkt. #321. Lopez Dec., Exhs. 1-45, dkt. ##322-1 to 323-28.  Under Rule 201(b), "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it:  (1)

is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).

I am granting Apple's motion and denying Motorola's motion on this issue.  The documents for which Apple seeks judicial notice fall into the following categories:  (1) records of court proceedings and administrative agencies in which determinations were made regarding infringement and validity of Motorola's patents; (2) party filings in court proceedings; (3) patents and patent-related documents; (4) documents filed publicly with the Securities and Exchange Commission; and (5) interest and foreign exchange rates published by the Federal Reserve Board.  These types of documents are appropriate for judicial notice: they are matters of judicial and public record and Motorola has not disputed their authenticity.  General Electric Capital Corp. v. Lease Resolution Corp., 128 F.3d 1074, 1081 (7th Cir. 1997) ("The most frequent use of judicial notice of ascertainable facts is in noticing the contents of court records."); Opoka v. Immigration and Naturalization Services, 94 F.3d 392, 394 (7th Cir. 1996) ("[I]t is a well-settled principle that the decision of another court or agency, including the decision of an administrative law judge, is a proper subject of judicial notice."); Henson v. CSC Credit Services, 29 F.3d 280, 284 (7th Cir. 1994) ("district court may also take judicial notice of matters of public record").

Motorola's objections to these documents are not actually about whether the particular documents are the type that are generally appropriate for judicial notice.  Instead, Motorola's arguments address the weight that should be given the conclusions or opinions expressed within the documents, rather than about the admissibility of the documents generally.  However, I am

16

not taking judicial notice of the truth or accuracy of the facts, opinions or decisions contained within the documents.  I am taking judicial notice that the contents of these documents are contained in the public record or were filed in related proceedings.  Whether these documents have any persuasive or preclusive effect depends on the documents and purpose for which they are being presented.

**2.  Apple's motion to exclude evidence and argument that Motorola's patents ruled invalid or not infringed have value, dkt. #311**

Whether Motorola's license offer to Apple was fair and nondiscriminatory depends on the value of Motorola's patent portfolio, and both parties intend to introduce expert testimony and other evidence on this issue.  However, Apple has moved to preclude Motorola from offering evidence regarding the value of the patents in its declared standards-essential portfolio that have been adjudged invalid or not infringed by Apple in the Northern District of Illinois or the International Trade Commission.  Apple contends that because these patents are either invalid or not infringed, they have no value and should not be considered when determining the value of a fair, reasonable and nondiscriminatory license.

In response, Motorola contends that the reasonableness of its 2.25% licensing offer to Apple must be evaluated in light of the information available at the time the offer was made. I agree.  At the time Motorola made its initial 2.25% offer to Apple in August 2007, Motorola's patents were presumed valid and essential to cellular standards.  35 U.S.C. § 282 ("A patent shall be presumed valid.").  As Apple's own experts have testified, the value of Motorola's declared-essential patents should be determined by an assessment of their value over any non-

17

infringing alternatives at the time Motorola's patents were incorporated into the standard.  E.g., Carlton Rep., dkt. #208, ¶ 49.  The invalidity and infringement decisions were issued by the International Trade Commission and the Northern District of Illinois nearly four years after Motorola's license demands and are not relevant or admissible to show that Motorola's license offers were unfair or discriminatory at any time before the decisions were issued.

It is a different question whether the decisions of the International Trade Commission and Northern District of Illinois are relevant to the *present* value of Motorola's standards-essential patent portfolio.  If Apple prevails on its breach of contract claim and persuades the court that it is entitled to specific performance, the court will need to determine what constitutes a fair, reasonable and nondiscriminatory license to Motorola's standards-essential patents.  I agree with Apple that the validity of Motorola's patents and whether Apple's products infringe them would be relevant in calculating the current fair license rate for purposes of specific performance.

This leaves the question whether the decisions by the Northern District of Illinois and the International Trade Commission on infringement and validity of certain of Motorola's patents have preclusive effect on this court's determination of the value of those patents.  Apple contends that the decisions of these courts have preclusive effect under the doctrine of issue preclusion.  The federal common law of issue preclusion applies if:

> (1) the issue sought to be precluded must be the same as that involved in the prior action, (2) the issue must have been actually litigated, (3) the determination of the issue must have been essential to the final judgment, and (4) the party against whom estoppel is invoked must be fully represented in the prior action.

Washington Group Int'l, Inc. v. Bell, Boyd & Lloyd LLC, 383 F.3d 633, 636 (7th Cir. 2004)

I agree with Apple that Judge Posner's decisions in the Illinois case on the invalidity and

infringement of the '559, '712 and '193 patents are entitled to preclusive effect.  All of the factors of issue preclusion are present.  First, because the patents were found invalid or not infringed by Apple in the Illinois case, they are unnecessary to Apple's compliance with the relevant standards and therefore have no value to Apple.  The second and third factors are met because the issue was actually litigated and the court's determination that the patents were invalid or not infringed was necessary to the court's final judgment dismissing Motorola's infringement claims on these patents.  It does not matter that Motorola has appealed the judgment in Illinois.  A final judgment for purposes of issue preclusion can include judgments at the district court level that are final and pending appeal.  Old Republic Insurance Co. v. Chuhak & Tecson, P.C., 84 F.3d 998, 1000-01 (7th Cir. 1996). Finally, Motorola is the same party to both actions and was represented in the Illinois case.  Accordingly, the '559, '712 and '193 patents should not be included as evidence of what value would constitute a current fair, reasonable and nondiscriminatory license to Motorola's standards-essential patents to Apple.

With respect to the decision by the International Trade Commission regarding infringement and validity of the '697 and '223 patents, the general rule is that determinations of patent infringement and validity by the International Trade Commission are not entitled to preclusive effect.  Powertech Tech. Inc. v. Tessera, Inc., 660 F.3d 1301, 1308 (Fed. Cir. 2011); Texas Instruments Inc. v. Cypress Semiconductor Corp., 90 F.3d 1558, 1569 (Fed. Cir. 1996). Thus, the commission's decision alone would be insufficient to prove that Motorola's '697 and '223 patents lack value.  However, findings by the commission can be considered by district courts for their persuasive value, so the parties may present evidence and argument at trial about whether the decision of the commission should affect the value of Motorola's standards-essential

19

patent portfolio and the calculation of a fair, reasonable and nondiscriminatory license rate.

Texas Instruments, 90 F.3d at 1569 ("The district court can attribute whatever persuasive value

to the prior ITC decision that it considers justified.").

**3.  Apple's Motion to exclude evidence and argument that Apple must satisfy a condition**

**precedent to trigger Motorola's obligation to license on fair, reasonable and**

**nondiscriminatory terms, dkt. #312**

At trial, Motorola intends to argue as a defense to Apple's breach of contract claim that

Apple failed to meet *Apple's* obligations under the ETSI and IEEE policies to negotiate with

Motorola as a condition to receiving a fair, reasonable and nondiscriminatory license.  Apple has

moved to preclude this line of argument, contending that it is barred by the doctrine of issue

preclusion.  Apple contends that Judge Posner decided in the Illinois case that Apple was not

required to negotiate or make counteroffers as a condition to receiving a fair, reasonable and

nondiscriminatory offer from Motorola.

In the Illinois patent infringement case, Judge Posner rejected Motorola's argument that

"Apple should lose the FRAND safe harbor" because Apple "refus[ed] to negotiate with

[Motorola] after rejecting its initial offer of a 2.25 percent royalty."  Apple, Inc., 2012 WL

2376664, at *12.  Judge Posner explained that:

> Motorola agreed to license its standards-essential patents on FRAND terms as a
> *quid pro quo* for their being declared essential to the standard . . . It does not claim
> to have conditioned agreement on prospective licensees' making counteroffers in
> license negotiations.

Id.  He went on to explain that "[i]f Apple said no to 2.25 percent, it ran the risk of being

ordered by a court to pay an equal or even higher royalty rate, but that is not the same thing as

20

Motorola's being excused from no longer having to comply with its FRAND obligations." Id.

I agree with Apple that the doctrine of issue preclusion applies to Judge Posner's conclusion that Motorola was required to give Apple a fair and nondiscriminatory license regardless whether Apple made counteroffers to Motorola. Judge Posner considered the same issue that is present in this case: whether Motorola's obligation to give a fair and nondiscriminatory license was dependent on Apple's refusal to negotiate by making counteroffers to Motorola's 2.25% demand. The issue was actually litigated and was necessary to Judge Posner's conclusion that Motorola was not entitled to injunctive relief on its patent infringement claim.

Motorola contends that issue preclusion should not apply because Judge Posner did not consider the particular contracts at issue in this case to evaluate whether Motorola had conditioned its licensing commitments on prospective licensees' willingness to make counteroffers and engage in negotiations. However, even if issue preclusion did not apply, Motorola points to nothing in either the ETSI or IEEE policies to support its argument that potential licensees must negotiate for a license and make counteroffers before Motorola's obligations are triggered, and my review of the contracts reveals no provisions supporting such a requirement. The District Court for the Western District of Washington reached a similar conclusion when considering Motorola's contracts with IEEE, holding that "it was not the intent of the contracting parties (Motorola and the IEEE/ITU) to require that [the] implementer of a standard first apply for a license and then negotiate for a license in good faith before Motorola's RAND obligations are triggered." Microsoft Corp. v. Motorola, Inc., C10-1823- JLR, 2012 WL 2030098 (W.D. Wash. June 6, 2012). The court explained that

21

> [N]o words that would indicate the parties' conditional intent . . .are found in Motorola's Letters of Assurance to the IEEE. . . . Likewise, a finding that negotiating in good faith is condition precedent to Motorola's RAND obligations to the implementer would run contrary to the purpose of Motorola's commitments to the IEEE, [because it would allow Motorola to] preemptively request exorbitant compensation for its standard essential technology, and the implementer would be compelled to negotiate in good faith in response to the exorbitant demand.

Id. at *8-9.  I agree with this reasoning.  Motorola's contracts with ETSI and IEEE placed the burden of fair and nondiscriminatory licensing on Motorola, not on potential licensees.  As Judge Posner explained, Motorola received an important benefit from the agreements by having its intellectual property rights incorporated into standards.  Apple, Inc., 2012 WL 2376664, at *12 ("Motorola agreed to license its standards-essential patents on FRAND terms as a quid pro quo for their being declared essential to the standard.").

All that being said, Motorola raises an issue in its response to Apple's motion in limine to which neither party has given much attention in this case.  Motorola points out that under ETSI's Intellectual Property Rights policies, it was entitled to condition its license offer to Apple on receiving a reciprocal license for Apple's standards-essential patents.  The provision at issue states that members' commitments to license standards-essential patents on fair, reasonable and nondiscriminatory terms "may be made subject to the condition that those who seek licenses agree to reciprocate."  Dkt. #288-3, Annex 6: ETSI Intellectual Property Rights Policy § 6.1.

This provision does not change my conclusion that Judge Posner's decision is entitled to preclusive effect on the issue whether Apple was required to make counteroffers and negotiate with respect to Motorola's 2.25% offer as a condition to Motorola's offering a fair, reasonable and nondiscriminatory license.  However, this provision does suggest that Motorola cannot be found to have made an unreasonable or discriminatory offer simply because it demanded that

22

Apple provide a reciprocal license to Apple's standards-essential patents.  Additionally, this provision suggests that Apple may have been required to engage in licensing negotiations related to its own patents.  In other words, evidence that Apple refused to provide a license to its own patents or refused to engage in negotiations related to its own patents would be relevant to whether Motorola breached its contract with ETSI.  Neither party has provided evidence or argument on this issue, so I cannot determine the significance of this provision at this stage.  The parties should be prepared to address this issue at trial.

4.  **Whether Motorola breached its contracts by seeking an injunction in the Illinois case and an exclusionary order in the International Trade Commission proceeding, dkt. ##286, 310**

In separate motions in limine, both parties have sought clarification about what constitutes a "breach" of Motorola's contracts with ETSI and IEEE.  In particular, both seek the court's interpretation whether, as a matter of contract law, the ETSI and IEEE policies at issue in this case precluded Motorola from seeking injunctive relief to enforce its patent rights in its standards-essential patents.

In Apple's motion, dkt. #310, Apple asks the court to conclude that Motorola breached its contracts with ETSI and IEEE by seeking injunctive and exclusionary relief through patent infringement litigation.  Apple argues that Motorola's commitments to ETSI and IEEE prohibit Motorola from bringing a suit to bar Apple from producing or selling products that incorporate Motorola's technology that is essential to ETSI or IEEE standards.  Motorola objects to Apple's proposed interpretation of the contracts, contending that nothing in the language of its

23

commitments to ETSI and IEEE bars Motorola from seeking injunctive relief or exclusion orders. Dkt. #286.  The threshold question is whether this issue was resolved by Judge Posner in the context of the parties' patent infringement case in the Northern District of Illinois.  Apple contends that the parties litigated this issue and that Judge Posner concluded that Motorola's commitments to ETSI and IEEE barred it from seeking injunctive relief.

Judge Posner dismissed Motorola's claim for damages in the patent infringement case, concluding that Motorola had provided no evidence from which a fair, reasonable and nondiscriminatory royalty could be calculated.  Apple, Inc., 2012 WL 2376664, at *11.  He then considered whether Motorola could be entitled to injunctive relief on its infringement claims.  Motorola presented arguments on the issue, contending that its commitments to standards-setting organizations should have no effect on the availability of injunctive relief.  Dkt. #382-7 at 16-17 (Motorola's Br. in 11-cv-8540 (N.D. Ill)).  Motorola argued that as a policy matter, if "Apple has no risk whatsoever of an injunction for any standards-essential patents, Apple would effectively have no incentive to ever engage in any good faith licensing negotiations regarding these standards based patents."  Id. at 17.  Motorola also argued that although ETSI used to have a rule barring injunctions, that rule was changed in 1994 and there was currently "no ETSI rule barring injunctions."  Id.  Finally, Motorola cited cases in which district courts had imposed injunctions for standards-essential patents.  Id. (citing CSIRO v. Buffalo Tech. Inc., 492 F. Supp. 2d 600, 603-08 (E.D. Tex. 2007)).

Judge Posner rejected Motorola's argument, stating:

I don't see how, given FRAND, I would be justified in enjoining Apple from infringing the '898 [patent] unless Apple refuses to pay a royalty that meets the FRAND requirement. By committing to license its patents on FRAND terms, Motorola committed to license the '898 to anyone willing to pay a FRAND

royalty and thus implicitly acknowledged that a royalty is adequate compensation for a license to use that patent. How could it do otherwise? How could it be permitted to enjoin Apple from using an invention that it contends Apple *must* use if it wants to make a cell phone with UMTS telecommunications capability—without which it would not be a cell *phone*. . . Motorola agreed to license its standards-essential patents on FRAND terms as a quid pro quo for their being declared essential to the standard.

Apple, Inc., 2012 WL 2376664, at *12 (emphasis in original). See also id. at *13 ("A FRAND royalty would provide all the relief to which Motorola would be entitled if it proved infringement of the '898 patent, and thus it is not entitled to an injunction."). Judge Posner's conclusion was clear: Motorola's request for injunctive relief was incompatible with its commitment to license its declared-essential patents in exchange for a fair, reasonable and nondiscriminatory license.

Apple argues that the only reasonable interpretation of Judge Posner's decision is that Motorola breached its contracts with the standards-setting organizations by seeking an injunction. I disagree. Judge Posner's decision did not resolve the contract issue now before this court. Although Judge Posner concluded that Motorola was not entitled to injunctive relief, he did not state explicitly that Motorola's act of seeking injunctive relief constituted a *breach of its contract* with ETSI or IEEE. He did not purport to interpret the terms of the ETSI or IEEE contracts or make any rulings with respect to Motorola's contractual obligations under the ETSI and IEEE policies. In fact, he never refers to the ETSI or IEEE policies as "contracts." In dismissing Motorola's claim for injunctive relief, Judge Posner cited policy and economic arguments, not contract provisions. Id. at *12.

It could be that Judge Posner believed Motorola was contractually barred from seeking injunctive relief. However, it also could be that he believed Motorola was barred by the equitable defenses of estoppel or waiver, or even that Motorola's commitments created an

25

implied license that rendered moot any claim to injunctive relief.  E.g. "Submission of the Office of Unfair Import Investigations on Remedy and the Public Interest," filed on July 18, 2012, in In re Certain Wireless Communication Devices, Portable Music & Data Processing Devices, Computers & Components Thereof, Inv. No. 337–TA–745, 2012 WL 4840603 (existence of "RAND commitment" is "an affirmative defense" to patent infringement, not an "obligation preclud[ing] issuance of an exclusion order"); Doug Lichtman, Understanding the Rand Commitment, 47 Hous. L. Rev. 1023, 1043 (2010) (suggesting that licensing commitments to standards-setting organizations could be interpreted "as a public commitment that creates a defense of equitable estoppel" to patent infringement or as "creating an implied license, with the license rendering moot any claim to injunctive relief or triple damages, but leaving the court with the power to determine the royalty due").  It is simply not clear that Judge Posner relied on contract law in dismissing Motorola's claim for injunctive relief.  Thus, the doctrine of issue preclusion does not resolve the parties' motions in limine.

Apple contends that even if issue preclusion does not apply, the court should interpret Motorola's contracts with ETSI and IEEE as prohibiting Motorola from seeking an injunction or exclusionary order because any other interpretation would completely frustrate the policies underlying the standards-setting process's insistence on licensing commitments. At least two courts have found this reasoning persuasive and have questioned whether injunctive relief is appropriate where a patent is encumbered by fair, reasonable and nondiscriminatory licensing obligations.  E.g. Microsoft Corp. v. Motorola, Inc., Case No. 12-35352, —F.3d—, 2012 WL 4477215, *12 (9th Cir. Sept. 28, 2012) ("Implicit in such a sweeping promise [made by Motorola to standards-setting organizations] is, at least arguably, a guarantee that the

26

patent-holder will not take steps to keep would-be users from using the patented material, such as seeking an injunction, but will instead proffer licenses consistent with the commitment made . . . [I]njunctive relief against infringement is arguably a remedy inconsistent with th[at] licensing commitment."); Realtek Semiconductor Corp. v. LSI Corp., Case No. C-12-03451-RMW, 2012 WL 4845628 (N.D. Cal. Oct. 10, 2012) (noting that in light of defendants' obligations to license on fair and nondiscriminatory terms, "[t]he court is troubled by defendants' decision to choose, in the first instance, a forum for enforcing their patent rights in which money damages are unavailable and the only relief is injunctive in nature").

I agree with Apple that from a policy and economic standpoint, it makes sense that in most situations owners of declared-essential patents that have made licensing commitments to standards-setting organizations should be precluded from obtaining an injunction or exclusionary order that would bar a company from practicing the patents.  Thus, it may be entirely appropriate for a court or the International Trade Commission to deny a request for an injunction or exclusionary order by a patent holder that has made commitments to offer a license on reasonable and nondiscriminatory terms.  However, whether Motorola breached its contracts with ETSI and IEEE by seeking an injunction is a question that must be resolved using principles of contract law, not on the basis of economic policy or equitable principles.

When interpreting a contract, the court's goal is to "ascertain the true intentions of the parties as expressed by the contractual language." Town Bank v. City Real Estate Development, LLC, 2010 WI 134, ¶ 33, 330 Wis. 2d 340, 793 N.W. 2d 476.  (At summary judgment, I applied Wisconsin law to Motorola's contracts with IEEE and French law to the ETSI contracts. In their motions on limine, both parties cite Wisconsin contract law and do not argue that

27

French law is any different.  I will apply general principles of Wisconsin contract law to interpret Motorola's commitments to both IEEE and ETSI.)   Thus, in determining the meaning of Motorola's commitments to license its essential patents on fair, reasonable and nondiscriminatory terms, I must consider the policies of ETSI and IEEE as well as Motorola's written agreements with the organizations.

The parties cite only a couple of provisions as being relevant to the analysis of the parties' intent.  With respect to IEEE, Section 6 of the IEEE's Intellectual Property Rights Policy requires members to submit letters of assurance including a commitment to license essential patents under reasonable and nondiscriminatory terms.  Dkt. #148-26, § 6.  Similarly, ETSI's Intellectual Property Rights Policy requires its members to use "reasonable endeavors" to inform the organization of essential patents "in a timely fashion," and asks members to grant irrevocable licenses to essential patents on fair, reasonable and nondiscriminatory terms.  Dkt. #148-22, §§ 4.1, 6.1.  The objectives of ETSI's policy are to insure that standards remain available for adoption by members of the industry and also to insure that holders of essential patents are able to receive adequate compensation from their innovations.  Id. §§ 3.1, 3.2.  The parties point to no other provisions in ETSI's or IEEE's policies relevant to Motorola's contractual obligations.

None of these provisions expressly precludes Motorola or any patent owner from pursuing an injunction or other relief as a remedy for infringement.  Nonetheless, Apple contends that the court should infer that the contracts bar injunctive relief as a matter of contract law.  However, it points to no provisions in the contract from which I could draw that inference.  As I explained in a previous case, "a court's role in contract interpretation . . . is not to make contracts or to reform them, but to determine what the parties contracted to do; not

28

necessarily what they intended to agree to, but what, in a legal sense, they did agree to, as evidenced by the language they saw fit to use." FPL Energy Point Beach, LLC v. Energy Resource of Australia Ltd., 565 F. Supp. 2d 999, 1004 (W.D. Wis. 2008) (quoting Miller v. Miller, 67 Wis. 2d 435, 441-42, 227 N.W.2d 626, 629 (1975)).  There is no language in either the ETSI or IEEE contracts suggesting that Motorola and the standards-setting organizations intended or agreed to prohibit Motorola from seeking injunctive relief.  In fact, both policies are silent on the question of injunctive relief.  Moreover, in light of the fact that patent owners generally have the right to seek injunctive relief both in district courts, 35 U.S.C. § 283, and in the International Trade Commission, 19 U.S.C. § 1337(d), I conclude that any contract purportedly depriving a patent owner of that right should clearly do so.  The contracts at issue are not clear.  Therefore, I conclude that Motorola did not breach its contracts simply by requesting an injunction and exclusionary order in its patent infringement actions.  I will deny Apple's motion in limine on this issue.

I will also deny Motorola's motion in limine on this issue.  Motorola suggests in its motion in limine that there is *no* situation in which it could have breached its contracts by filing suit.  However, Motorola does not respond to Apple's argument that the contracts require Motorola to first offer a license to Apple on fair, reasonable and nondiscriminatory terms before filing suit.  Because this argument was not addressed fully by either party, I cannot resolve it at this point.

**C.  Motions Related to Apple's Claim that Motorola Breached its Contracts with ETSI by Failing to Make Bona Fide Efforts to Disclose its Patents to ETSI in a Timely Manner**

One of Apple's breach of contract claims remaining in this case is that Motorola breached its contracts with ETSI by failing to make "bona fide efforts" to disclose intellectual property rights in its '559, '697 and '898 patents to ETSI in a timely manner.  In the August 10 summary judgment order, I granted Apple's motion for partial summary judgment on several issues of contract interpretation related to this claim, but noted that Apple would have to prove at trial that Motorola failed in fact to make bona fide efforts to disclose its patents to ETSI in a timely manner and that Apple was injured by Motorola's untimely disclosure.  Dkt. #194 at 47.  Both parties have filed motions in limine relevant to this untimely disclosure claim.

**1.  Motorola's motion to preclude evidence and argument relating to timeliness of patent disclosures to ETSI, dkt. #283**

Motorola has moved to dismiss Apple's breach of contract claim based on ETSI's disclosure policy, arguing that there is no relief the court can grant Apple on that claim.  First, Motorola argues that Apple did not request any declaratory or equitable remedy in its amended complaint for Motorola's alleged breach of ETSI's disclosure policy.  Motorola argues that because Apple has reduced its damages claim to nominal damages, it makes no sense to resolve a claim for which Apple could receive no relief.  Second, Motorola argues that Apple cannot prove that it suffered any harm from Motorola's alleged untimely disclosure of its essential patents.

30

I am denying the motion.  Motorola's argument that Apple failed to plead a claim for declaratory or injunctive relief is simply incorrect.  In its amended complaint, dkt. #110, Apple pleaded claims for breach of contract, equitable estoppel and patent misuse based on Motorola's untimely disclosure of intellectual property rights to ETSI and sought relief in the form of (1) an order that Motorola be estopped from enforcing its untimely disclosed intellectual property rights in the International Trade Commission or any other forum, id. at ¶ 197(a); (2) an order that Motorola be barred from seeking an injunction to prevent Apple from practicing certain standards, id. at ¶ 197(l); and (3) an order declaring  that Motorola's essential intellectual property rights be declared unenforceable for patent misuse, id. at ¶ 197(m).

Additionally, Motorola's arguments about Apple's inability to prove that Motorola's alleged breach of the disclosure policy caused Apple any harm are nothing more than broad challenges to the weight of Apple's evidence.  Although it would have been appropriate to challenge Apple's ability to prove breach of contract at the summary judgment stage, Motorola did not move for summary judgment on those grounds.  Instead, Motorola argued only that Apple's claim was barred by the Noerr-Pennington doctrine.  I rejected that argument and concluded that Apple could proceed with its breach of contract claims premised on Motorola's untimely disclosure of its intellectual property rights.  Dkt. #194 at 28-29.  Although I noted that it was "not clear how Apple intends to prove that it was damaged by Motorola's failure to disclose patents to ETSI in a timely manner," id. at 47, this was not an invitation for Motorola to file an untimely and undeveloped summary judgment motion in the form of a motion in limine.  In its motion in limine, Motorola devotes only two paragraphs to its argument that Apple cannot prove that it suffered harm from Motorola's late disclosures, dkt. #284 at 5-6, and

fails to explain with any specificity why it believes Apple's evidence of injury is insufficient. Therefore, I will not bar Apple from presenting its nondisclosure case at trial.

**2.  Apple's motion to preclude Motorola from offering evidence or argument that it had a "process" for complying with ETSI's disclosure policies, dkt. #313**

As discussed above, one of the issue remaining in this case is whether Motorola made "bona fide" efforts to comply with ETSI's disclosure policies.  Motorola's position is that it had an internal process in place to insure compliance with the intellectual property rights disclosure policies of standards-setting organizations such as ETSI.  However, Apple contends that Motorola should be precluded from introducing any evidence or argument about such a "process" because Motorola has continually invoked attorney-client privilege and refused to disclose any information about the process.

Motorola's arguments in opposition to Apple's motion are nonresponsive.  Motorola argues that Apple is not entitled to an "adverse inference" that Motorola failed to make bona fide efforts simply because it invoked attorney-client privilege.  However, Apple has not argued that it is entitled to an adverse inference.  Apple argues only that Motorola should be precluded from introducing evidence at trial of a process that it has kept hidden from Apple.

I am granting the motion, with one exception.  Motorola cannot introduce any evidence at trial regarding its process for disclosing intellectual property rights unless it made that information available to Apple during discovery.  For example, although Motorola's 30(b)(6) witness invoked attorney-client privilege frequently during her deposition when asked about Motorola's disclosure procedures, she did provide some general information on the subject.  E.g.,

32

Gordon Dep., dkt. #161, at 138-40; Gordon Dep., dkt. #250, at 143-50.  Thus, Motorola may introduce information it provided during discovery but may not introduce any information to which it previously claimed privilege.  Manning v. Buchan, 357 F. Supp. 2d 1036, 1048 (N.D. Ill. 2004) ("[W]hen a party asserts a privilege to preclude its opponent from obtaining information in discovery, it relinquishes the ability to use that information in its favor at trial.").

### D.  Motions Related to Non-parties Chi Mei Communications Systems and Qualcomm

Among the claims I dismissed at summary judgment was Apple's claim that Motorola tortiously and unlawfully interfered with a contract that Apple had entered into with Qualcomm in December 2009.  Under that agreement, Apple and Qualcomm agreed to terms under which Apple could purchase chipsets that would be used in Apple's products. The chipsets incorporated Motorola's patented technology, and Motorola and Qualcomm had entered into a separate licensing agreement regarding the chipsets. Apple contended that Motorola committed the tort of interference with contract by terminating Qualcomm's license and covenant rights with respect to Apple.  I granted Motorola's motion for summary judgment on that claim because Apple had failed to adduce any evidence that Motorola's actions had disrupted performance of Apple's contract with Qualcomm.  Dkt. #194 at 31.

Although Apple's tortious interference claim has been dismissed, the facts surrounding Motorola's termination of Qualcomm's licensing rights remain relevant to the case.  Specifically, Apple pleaded a breach of contract theory premised on Motorola's termination of the Qualcomm license, contending that Motorola's selective termination violated its contractual obligations to

33

offer fair, reasonable and nondiscriminatory licenses to its patents. Apple's Am. Cpt., dkt. #110, ¶¶ 110-11.

In a related breach of contract theory, Apple also alleged in its amended complaint that Motorola unreasonably terminated an agreement it had with Chi Mei Communications Systems, another supplier of component parts for Apple, through which Apple had paid royalties of approximately $1 for each phone for a license to certain of Motorola's standards-essential patents. Id. at ¶¶ 54-55. Shortly after Motorola terminated the Chi Mei license, Motorola sought a license rate from Apple of $12 for each phone. At summary judgment, Motorola did not challenge Apple's ability to prove breach of contract on the basis of the Chi Mei and Qualcomm licenses.

Both parties have filed motions in limine regarding admissibility of evidence regarding these companies.

1.  **Motorola's motion to exclude any evidence and argument relating to non-parties Chi Mei Communication Systems and Qualcomm, dkt. #295**

Motorola has moved to preclude Apple from offering evidence and argument at trial relating to Chi Mei and Qualcomm, arguing that Apple's breach of contract theories relating to these two companies are too "tenuous" to be asserted in this action and would "unnecessarily complicate the issues for trial." Dkt. #296 at 3. Specifically, Motorola argues that to resolve Apple's claims, the court would be required to interpret the contracts between Motorola, Chi Mei and Qualcomm and determine whether Apple qualifies as a third party beneficiary to those contracts, whether Motorola's actions were permitted under the contracts and whether

Motorola's actions breached Apple's alleged third party beneficiary rights in those contracts.

In response, Apple contends that its breach of contract claims do not depend on resolution of the issues identified by Motorola. Apple does not intend to debate at trial whether it was a third party beneficiary to the contracts between Motorola and Chi Mei or Qualcomm or whether Motorola breached some particular clause of its contracts with those companies. Instead, Apple contends that whether or not Motorola's actions were permitted under its contracts with those companies, its actions were unreasonable and discriminatory and constituted a breach of its contractual obligations to ETSI and IEEE to grant "irrevocable licenses on fair, reasonable and nondiscriminatory terms." Apple's Br., dkt. #376 at 2.

Apple's breach of contract theories premised on the Chi Mei and Qualcomm licenses may be flawed. Although Motorola's contracts with ETSI and IEEE required it to give Apple a fair, reasonable and nondiscriminatory license to its standards-essential patents, it is not clear that the contracts prohibited Motorola from altering its license agreements with Chi Mei and Qualcomm simply because Apple was benefiting from the licenses. Motorola's contracts with ETSI and IEEE required it to offer Apple a fair license, not to offer Apple a license through a third party. Unfortunately, this issue was not raised at summary judgment and the parties' briefing on the present motion in limine does not clarify the issue. Instead of addressing Apple's theories directly, Motorola attempts to avoid them by arguing that they are complicated and irrelevant. Without more evidence and argument from the parties on this issue, I cannot conclude that Apple's theories are unsupported by the contracts or the law. Moreover, I agree with Apple that at the very least, the Chi Mei and Qualcomm licenses are relevant to the reasonableness of Motorola's licensing demands. Therefore, I will not preclude Apple from

introducing evidence of the Chi Mei and Qualcomm licenses and of Motorola's actions in terminating them.

**2.  Apple's motion to preclude Motorola from offering evidence about why it purported to suspend its license with Chi Mei, dkt. #314**

Apple contends that Motorola should be precluded from offering any evidence about the reasons why it suspended its license with Chi Mei in August 2007 because Motorola has continually asserted attorney-client privilege on this issue and has refused to provide any information to Apple regarding the suspension.  Apple points to the depositions of Motorola's Rule 30(b)(6) witness, Ray Warren, in particular.   On several occasions during his two depositions, Warren refused to answer questions about Motorola's termination of the Chi Mei license on the basis of privilege.  E.g., Warren Dep., dkt. #162, at 179-180; Warren Dep., dkt. #268, at 132-33.

I agree with Apple that Motorola should not be permitted to submit evidence at trial about the particular reasons it terminated its license with Chi Mei, to the extent that Motorola refused to answer specific questions and provide specific information on that issue.  However, Motorola did provide some general information during discovery regarding its relationship with Chi Mei and module licensing, through the testimony of Neill Taylor.  E.g., Neill Taylor Dep., dkt. #158, at 139-142.  Motorola may present any evidence on this issue at trial that it provided to Apple during discovery.

**3.   Apple's motion to preclude Motorola from arguing that its cellular standards-essential patent rights were not "exhausted" as to the first iPhone, dkt. #315**

Apple has moved to preclude Motorola from arguing that its license agreement with Chi Mei did not "exhaust" its patent rights with respect to its standards-essential patents that were incorporated into Chi Mei's modules, or that the covenant-not-to-sue contained in the Chi Mei license did not apply to Apple.  The doctrine of patent exhaustion provides "that the initial authorized sale of a patented item terminates all patent rights to that item." Quanta Computer, Inc. v. LG Electronics, Inc., 553 U.S. 617, 625 (2008).  Under Apple's theory, because its iPhone was covered by Chi Mei's license with Motorola, Motorola could not sue Apple for patent infringement of the standards-essential patents covered by the license.  Additionally, after Motorola suspended the license, Motorola could not sue Apple under a covenant-not-to-sue contained in the Chi Mei license.

Apple's motion is less a motion to preclude Motorola from presenting certain evidence than it is an opportunity for Apple to present a new theory based on the doctrine of patent exhaustion.  Apple's amended complaint contained no suggestion that it was pursuing a patent exhaustion theory or that its breach of contract claims were related in any way to a covenant-not-to-sue provision in the Chi Mei license.  Allowing Apple to raise this new theory on the eve of trial through a motion in limine would be highly prejudicial to Motorola.  Therefore, I am denying the motion.

### E. __Motions Related to Expert Witness Reports and Testimony__

Both parties disclosed several experts who have provided reports and who may testify at trial.  Both parties have filed multiple motions seeking to exclude or limit the testimony of the opposing side's experts under Fed. R. Evid. 702 and Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993).  In assessing a motion to exclude testimony under Rule 702 and Daubert, the court must consider whether the proposed opinion witness (1) is qualified to offer opinion testimony under Rule 702, (2) has employed reliable methods, (3) proposes to offer opinions that follow rationally from the application of his "knowledge, skill, experience, training, or education" and (4) presents testimony on a matter that is relevant to the case at hand, and thus helpful to the trier of fact.  Walker v. Soo Line R.R. Co., 208 F.3d 581, 586 (7th Cir. 2000). This evidentiary inquiry is meant to be flexible and fact specific, and a court should use, adapt or reject Daubert factors to accommodate the facts of a particular case.  Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141-42 (1999).

Before turning to the parties' specific motions and arguments, I note that because this case will be tried as a bench trial, there is less need to make Rule 702 admissibility determinations before the testimony is presented.   "That is not to say that the scientific reliability requirement is lessened in such situations; the point is only that the court can hear the evidence and make its reliability determination during, rather than in advance of, trial."  In re Salem, 465 F.3d 767, 777 (7th Cir. 2006).  See also Metavante Corp. v. Emigrant Savings Bank, 619 F.3d 748, 760 (7th Cir. 2010) (observing that "the court in a bench trial need not make reliability determinations before evidence is presented").  Thus, I am not overly concerned about admitting expert opinions grounded on questionable methods or of limited significance.  During

38

the trial, the parties will have the opportunity to question experts about their methods and make arguments about the flaws or limitations of the analyses and conclusions presented. If I determine at trial that an expert's testimony is not useful, I will put an end to the questioning. If I conclude later that any expert opinions that were admitted were unreliable, I will not consider them in making a decision. Still, it will be helpful to the parties to have rulings on their specific arguments about expert testimony, so I will address their motions.

1. **Motorola's motion to preclude the testimony and opinions of Dr. Louis Berneman, dkt. #301**

Motorola has moved to preclude Apple from introducing or relying on opinions from its expert Dr. Louis Berneman at trial. Motorola contends that Berneman's opinions do not meet the threshold requirements for admissibility under Rule 702 and Daubert because Berneman "admitted" that he did not apply proper and accepted methods for valuing Motorola's portfolio of standards-essential patents in reaching his conclusion that Motorola's 2.25% opening offer was unreasonable and discriminatory. Motorola's Br., dkt. #302, at 3. In particular, Motorola argues that Berneman failed to use analytical tools to determine the value of each patent in Motorola's portfolio.

Motorola misconstrues Berneman's deposition testimony. At his deposition, Berneman testified that there are two ways to value a standards-essential patent portfolio: (1) differential valuation, which requires using analytic tools that rate and rank the value of each individual patent in the portfolio; and (2) proportional valuation, which assigns equal value to all patents essential to a standard and thus uses the number of patents in the portfolio to approximate

39

portfolio value.  Berneman Dep., dkt. #260, at 43-45.  Berneman went on to explain that he did not attempt to value Motorola's individual patents using analytical tools because he applied "proportional valuation" to Motorola's patent portfolio.  Id. at 49-50.  He offered the opinion that proportional valuation was more appropriate in the standards-setting context.  Id. at 43.

Motorola does not argue that proportional valuation is an unreliable method of valuing patent portfolios.  Instead, it argues only that Berneman "admitted" that he failed to use appropriate methods by failing to use analytical tools in his valuation.  Contrary to Motorola's assertions, Berneman did not testify that he had failed to use appropriate methods and he did not testify that it was necessary to use analytical tools and determine the value of each patent in Motorola's portfolio before a fair and nondiscriminatory license rate could be calculated.  Therefore, Motorola has not identified any valid basis for excluding Berneman's testimony.

## 2.  Motorola's motion to preclude the testimony and opinions of Dr. Dennis Carlton relating to licensing and market power, dkt. #304

Motorola has moved to preclude the testimony and opinions of Apple's expert, Dr. Dennis Carlton, regarding the reasonableness of Motorola's 2.25% license offer to Apple. Motorola contends that Dr. Carlton's opinions are unreliable and should be excluded under Rule 702 and Daubert for three reasons: (1) Dr. Carlton considered the value of only five of Motorola's patents and failed to analyze the remainder of Motorola's portfolio of standards-essential patents; (2) Dr. Carlton failed to undertake any independent analysis of Motorola's existing licensing agreements before concluding that Motorola's offer was discriminatory; and (3) Dr. Carlton's opinions relating to "market power" were relevant only to Apple's now-

40

dismissed antitrust and unfair competition claims.

With respect to Motorola's first argument, Motorola does not take issue with Carlton's general method for valuing patents in the standards-setting context. Both Carlton and Motorola's expert, Dr. Gregory Leonard, agree that a reasonable royalty for a declared-essential patent is a royalty that reflects the value of the patent over the next-best alternative available to the standards-setting organization before the standard was set. Carlton Rep., dkt. #208, ¶ 49; Leonard Rep., dkt. #209, ¶ 19. However, Motorola contends that Dr. Carton's conclusions are flawed because he applied his method only to the specific patents Motorola asserted against Apple in patent infringement lawsuits and not to the "hundreds" of other patents Motorola also claims as essential to cellular and wireless standards.

Instead of considering the ex ante value of each patent in Motorola's portfolio, Dr. Carlton used as a benchmark for the value of Motorola's entire portfolio the rate Apple had paid Chi Mei of 93 cents on each iPhone for the rights to Motorola's declared-essential patents. Carlton Rep., dkt. #208, ¶¶ 55-60. To test the benchmark, Carlton considered whether the five specific patents Motorola was asserting against Apple (as of March 2012) had sufficient value to justify Motorola's attempt to charge Apple a rate twelve times what Apple had been paying Chi Mei, or approximately $12.35 an iPhone. Id. at ¶¶ 55-56. Carlton concluded that the five patents represent only marginal improvements over alternatives that were available at the time the standards were being set and thus, Motorola's licensing demand was "inconsistent with the limited value of the [asserted] patents themselves." Id. at ¶ 56.

Motorola contends that in order to determine whether its license offers were reasonable and nondiscriminatory, Dr. Carlton was required to analyze and value Motorola's entire

41

portfolio of essential patents and any possible technological alternatives to those patents that existed before the relevant standards were adopted. However, Motorola cites no evidence or expert opinion in support of its criticism of the report or its assertion that it would be necessary or even possible to analyze each of its standards-essential patents to determine a reasonable royalty rate. Additionally, Motorola does not provide any specific criticism of Dr. Carlton's decision to use the Chi Mei rate and the incremental value of a few patents to evaluate Motorola's licensing offer to Apple. Without more specific challenges from Motorola, I cannot conclude that Dr. Carlton's opinions are unreliable.

Motorola's second argument is that Dr. Carlton's opinions are unreliable because he did not apply any analysis in identifying which license agreements would be comparable to a license between Apple and Motorola. Instead, Carlton relied wholly on the work of another Apple expert, Dr. Brian Napper.

By itself, the fact that Carlton relied on Dr. Napper's work in forming his own opinions is not a sufficient reason to exclude Carlton's opinions. Walker, 208 F.3d at 588 (observing that "courts frequently have pointed to an expert's reliance on the reports of others as an indication that their testimony is reliable"). See also Owens v. Ford Motor Co., 297 F. Supp. 2d 1099, 1108 (S.D. Ind. 2003) (testifying expert may rely on another expert's opinions); Janopoulos v. Harvey L. Walner & Associates, Ltd., 866 F. Supp. 1086, 1095 (N.D. Ill. 1994) (same). However, "[e]xpert testimony relying on the opinions of others should, of course, be rejected if the testifying expert's opinion is too speculative . . . or the underlying basis is faulty." Walker, 208 F.3d at 588.

Motorola presents no persuasive reason for finding the work of Dr. Napper on which

42

Carlton relied was unreliable or faulty. Motorola criticizes Napper's September 14, 2011 report regarding "balancing payments," but there is no indication in Carlton's report that he relied on Napper's September 14 report. Motorola also criticizes Napper's March 1, 2012 report, a report on which Carlton did rely, for failing to "disclose with specificity the analysis or investigation" Napper undertook to determine licensees comparable to Apple. Motorola's Br., dkt. #305, at 7. However, Motorola fails to acknowledge that Napper's March 1 report includes a section titled "Determining the Licensees Comparable to Apple," in which Napper describes how he identified licensees that may be comparable to Apple's. Napper's Supp. Rep., dkt. #355, at 3-5 ("Determining the Licensees Comparable to Apple"). Because Motorola failed to address Napper's own description of his method, I cannot determine whether Napper's work is too "speculative" or "faulty" to provide a basis for Carlton's opinions.

Motorola's final argument is that Carlton's opinions on "market power" should be excluded because those opinions were relevant only to Apple's now-dismissed antitrust claims. Motorola does not identify particular opinions that it thinks should be precluded as irrelevant, arguing instead that the court should exclude all opinions included under the sections titled "Market Power Concerns with Collective Standards Setting" and "Motorola's Acquisition and Exercise of Market Power." The problem with this broad argument is that those two sections make up 28 of the 32 total pages of Carlton's report and include several opinions regarding issues that remain relevant in this case, including the potential for patent hold up and discrimination in standards-setting contexts, how licensing and disclosure obligations address those problems, Carlton's interpretation of "reasonable and "nondiscriminatory" and his opinions as to whether Motorola complied with its licensing and disclosure obligations. Because

Motorola does not identify specific opinions that should be excluded, I will not preclude any opinions contained in those sections.

### 3.   **Motorola's motion to exclude evidence or argument related to allegedly "non-infringing alternatives" to Motorola patents, dkt. #307**

In their expert reports, Apple's experts identified and analyzed potential alternatives to the technologies covered by five of Motorola's declared-essential patents and concluded that Motorola's technical proposals to the standards-setting organizations were competing with equally beneficial alternatives for inclusion in the relevant standards.  Heegard Rep., dkt. #278, ¶ 7; Heegard Rep., dkt. #279, ¶¶ 76-79; Cimini Rep., dkt. #233, at ¶¶ 36, 39.  Motorola has moved to preclude Apple from presenting any argument or evidence at trial related to alternatives to Motorola's '516, '559 or '898 patents for three reasons: (1) Apple's experts failed to consider whether the purported alternatives were covered by patents; (2) Dr. Heegard's opinions about alternatives to the '559 patent are speculative; and (3) Dr. Cimini's opinions about alternatives to the '898 patent rely on flawed methods.

Motorola's first argument is that Apple's experts' conclusions regarding alternative technology are not reliable because they fail to address the costs associated with adopting an alternate technology, namely, the potential patent licensing fees that would have been paid to a third party whose alternate technology was adopted.  The problem with this argument is that Motorola never explains why potential patent licensing fees are relevant to the purpose for which Apple's experts analyzed the alternative technologies.  Apple intends to use evidence of alternatives to establish a reasonable license rate for Motorola's declared-essential patents, based

on the value of Motorola's patents before they were incorporated into standards.  Apple says that the existence of alternatives that provide the same technical benefit as Motorola's proposals show that Motorola's patented proposals were "valueless" under an ex ante valuation analysis. Also, Apple contends that the existence of potential patent licensing fees on the purported alternatives is not relevant to the ex ante analysis.  Motorola does not explain how potential patent licensing fees should have been incorporated into Apple's experts' analyses of ex ante valuation.

Motorola's second argument is that Dr. Heegard's opinions about non-infringing alternatives to the '559 patent are based on "unfounded speculation" about the standards-setting process.  Motorola objects in particular to Heegard's statement that there are "many reasons why one proposal is chosen over another for inclusion in a standard," including "negotiations among participants," "compromise and 'horse trading.'"  Id. at ¶ 13.  Motorola argues that Heegard's suggestion that "negotiation" or "horse trading" influenced the inclusion of the '559 technology into the UMTS standard is based entirely on speculation because Heegard was not involved in developing the UMTS standard and has not even attended any ETSI working groups or meetings.

Motorola's criticisms of Heegard are more about the weight that should be given Heegard's opinions, not about the reliability of Heegard's methods or the usefulness of his report.  As explained in his deposition, Heegard's opinions about negotiations and horse trading were based on his personal experience with standards-setting organizations generally.  Heegard Dep., dkt. #264, at 150-51.  Although Heegard has not participated in ETSI meetings and did not participate in development of the UMTS standard, he stated that he had "been involved in

45

quite a few different standards," including some comparable to ETSI standards, and that in his experience, standards-setting necessarily involves negotiation and horse trading. Heegard Dep., dkt. #264, at 114. This is legitimate expert opinion. Fed. R. Evid. 702 ("A witness who is qualified as an expert by knowledge, skill, *experience*, training, or education may testify in the form of an opinion or otherwise . . . .") (emphasis added). Cf. Gayton v. McCoy, 593 F.3d 610, 619 (7th Cir. 2011) ("[A]n expert need not testify with complete certainty about the cause of an injury; rather he may testify that one factor could have been a contributing factor to a given outcome."). If Motorola believes that Heegard's opinions deserve less weight because of his lack of experience with ETSI and the UMTS standard in particular, Motorola is free to make that argument at trial.

Motorola's final argument addresses Dr. Cimini's opinions about alternatives to the '898 patent. Dr. Cimini gave the opinion that there were two alternatives to the '898 patent proposed by Nortel and Ericsson that ETSI could have adopted and that neither of those alternatives was covered by patents. Motorola contends that Dr. Cimini's opinions should be excluded because he relied on flawed search parameters when searching for patents that might cover the two alternatives. Notably, Motorola does not contend that it looked for or discovered any patents that cover the two alternatives identified by Cimini. Instead, Motorola argues that Cimini should have looked harder and used different search terms. Additionally, Motorola argues that Cimini should have considered whether the Nortel alternative was covered by a Nortel patent that was filed more than one year *after* the alternative was published.

I am not persuaded that Cimini's failure to consider the later-filed patent and his failure to search exhaustively for patents that may cover the Nortel and Ericsson alternatives are

sufficient reasons to preclude his opinions.  As with Motorola's previous objections to Apple's experts' opinions, these objections are more about the weight that should be given Cimini's opinions than whether Cimini's opinions are reliable.  Therefore, I am denying Motorola's motion in full.

### 4. **Apple's motion to preclude evidence and argument regarding opinions on alternatives from Motorola's technical experts, dkt. #316**

Apple contends that Motorola should be precluded from relying on its technical experts' analyses of potential alternatives to its standards-essential patents that existed at the time Motorola's patents were adopted into standards.  First, Apple contends that any expert opinion regarding alternatives to the '223, '559 and '697 patents is irrelevant because those patents were found "worthless" in the related patent infringement suits in the International Trade Commission and Northern District of Illinois.  As I explained already, evidence regarding the value of these three patents is relevant to whether Motorola's initial license offer to Apple was fair, reasonable and nondiscriminatory because that offer was made before the patents had been found invalid or not infringed.  Apple makes no other argument about why this evidence should be precluded.

Second, Apple contends that Motorola's experts' testimony regarding potential alternatives to the '516 and '898 patents should be excluded because the experts failed to "quantify" the purported benefits that these patents had over potential alternatives.  Apple criticizes Dr. Kevin Almeroth for not calculating how often the transmitter and receiver may lose synchronization under Apple's alleged ETS 300 alternative method.  Apple's Br., dkt. #316 at

47

4-5.  Apple criticizes Dr. Tim Williams for failing to calculate "how much faster the ['898 patent system] can re-allocate resources or how much more data the system can handle by using the method of the '898 patent."  Id. at 5.

Apple does not explain why Dr. Almeroth or Dr. Williams was required to "quantify" the purported benefits of Motorola's patents or make the specific calculations identified by Apple in order to comply with the requirements of Rule 702 and Daubert.  Smith v. Ford Motor Co., 215 F.3d 713, 719 (7th Cir. 2000) ("[T]he Rule 702 test is a flexible one, and no single factor is either required in the analysis or dispositive as to its outcome.").  Apple cites an order issued by Judge Posner in the Illinois patent infringement case in which he excluded the testimony of Motorola's damages expert, in part because she did not "quantify the benefit" to Apple of using the AT&T network over another carrier, such as Verizon.  Apple, Inc., 2012 WL 1959560, *11.  However, Apple does not explain why Judge Posner's analysis of the testimony of a *damages* expert in the patent infringement case has any applicability to the opinions of the *technical* experts in this case.  Both Dr. Almeroth and Dr. Williams provided detailed expert reports containing extensive descriptions of Motorola's patents, as well as the possible alternatives.  If Apple believes their reports are deficient, it may present evidence and argument at trial to undermine them.  However, Apple has not shown that their testimony should be excluded under Rule 702.  Michaels v. Mr. Heater, Inc., 411 F. Supp. 2d 992, 996 (W.D. Wis. 2006) ("Although defendants' challenges to these experts' qualifications are fodder for cross-examination at trial, they do not demonstrate that the opinions fail to meet the requirements of Fed. R. Evid. 702.).

48

**5.  Apple's motion to exclude Dr. Gregory Leonard from offering opinions on the correct fair, reasonable and nondiscriminatory royalty rate for Motorola's declared standards-essential patents, dkt. #318, and opinions about "synergies," dkt. #319**

Apple contends that Motorola's expert Dr. Leonard should not be permitted to testify or offer opinions as to what would constitute a fair, reasonable and nondiscriminatory royalty rate for a license of Motorola's standards-essential patents because he did not disclose these opinions in his expert report or deposition testimony.  Additionally, Apple contends that Dr. Leonard should be precluded from offering opinions that Motorola's patented technology creates "synergies" with non-accused features of Apple's products, making it appropriate for Motorola to seek a royalty based on the handset price of Apple's products.

I am granting these motions in part and denying them in part.  Motorola concedes that Dr. Leonard did not offer any opinion about what particular rate or range or rates would constitute a fair, reasonable and nondiscriminatory royalty.  Motorola's Resp. Br., dkt. #363, at 1.  Therefore, he may not testify about a particular rate at trial.  However, Dr. Leonard did offer opinions in his report and at his deposition about whether Motorola's 2.25% offer was so unreasonable as to be a breach of Motorola's contracts with ETSI and IEEE.  Additionally, Dr. Leonard offered criticisms of the method used by Apple's experts to calculate a particular rate and concluded that Apple's experts failed to consider the overall value that Motorola's technology added to Apple's products.  He may testify as to any of these opinions contained in his report.  Although Apple challenges Dr. Leonard's opinions as not being supported by the law of damages in patent infringement cases, this is not a patent infringement case.  Moreover, neither party has cited any clearly established law regarding what factors may be considered in

49

determining a fair, reasonable and nondiscriminatory license rate in the standards-setting context.  Under these circumstances, I conclude that it makes sense to hear what both sides' expert economists have to say on the subject.  Apple's challenges may be appropriately pursued in cross-examination at trial.

## 6.  Apple's motion to exclude Motorola's expert testimony not previously disclosed in a report, dkt. #317

Apple has moved to exclude Motorola from introducing expert testimony at trial that was not disclosed previously in expert reports.  This motion is redundant of Apple's other motions regarding expert reports and is unnecessary.  Further, Motorola "agrees that neither party should be ambushed at trial with expert opinions on which it did not have adequate notice."  Motorola's Br., dkt. #365, at 1.  If Apple believes at trial that Motorola is attempting to introduce opinions that were not disclosed previously, it may object to them at the appropriate time.  This broad motion will be denied.

## 7.  Motions regarding Apple's use of supplemental expert reports by Dr. Cimini and Dr. Napper

The parties filed three motions addressing Apple's use of supplemental expert reports.  Motorola filed a motion to strike the August 14, 2012 supplemental report of Dr. Leonard Cimini, dkt. #218, and the August 23, 2012 supplemental report of Dr. Brian Napper, dkt. #229, while Apple filed a motion requesting leave to use the two supplemental reports at trial, dkt. #226.

50

a. **Dr. Cimini's August 14, 2012 report**

Expert reports were due in this case on March 6, 2012, with responsive reports due April 3, 2012. Dkt. #117. On March 6, 2012, Apple filed an initial report by Dr. Cimini, in which Cimini offered the opinion that there were at least two viable alternatives to the technology of the '898 patent that existed at the time the '898 patent was declared essential to ETSI standards and was incorporated into standards adopted by the 3G Project. The two alternative methods were documented in publications by Ericsson and Nortel and were termed "Contributions 75/95 and 99/96." Dkt. #233, ¶¶ 19, 24.

On August 14, 2012, Apple filed a supplement report, in which Cimini identifies two additional alternatives to the technology of the '898 patent. Dkt. #234. In particular, Cimini states that the 3G Project could have considered Contribution 239/97 and GSM 03.64 as alternatives. Id. at ¶ 6. Cimini's supplemental report relied on documents produced by AT&T on March 2, 2012, describing the functionality of base stations created by Ericsson and Nokia Siemens Networks. Id. at 11. The documents were produced in response to a subpoena that had been issued by Motorola to AT&T on February 8, 2012. AT&T later produced similar documents on March 30, 2012 in response to a subpoena served by Apple.

Motorola contends that Cimini's supplemental report should be stricken under Fed. R. Civ. P. 37(c) the ground that it was not timely disclosed as required by Rule 26(a) or (e) and it is prejudicial. In response (and in support of its motion to supplement), Apple contends that Cimini's supplemental report was a timely supplemental report under Rule 26(e) and this court's scheduling order, and that even if it was untimely, the delay was substantially justified and

caused no prejudice to Motorola.

Under the scheduling order in this case, Rule 26(e) supplementation to an expert report must be "limited to matters raised in an expert's first report, must be in writing and must be served not later than five calendar days before the expert's deposition. . . ." Dkt. #102 at 2. Under Rule 37,

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing,  or at a trial, unless the failure was substantially justified or is harmless.

Fed. R. Civ. P. 37(c).

Apple contends that Cimini's August 14 supplemental report complies with these rules because it was served nearly two weeks before his deposition was scheduled on August 31 and was limited to matters raised in his first report.  In particular, Apple contends that both Cimini's initial and supplemental reports focused on alternatives that the 3G Project could have used in place of the technology claimed in the '898 patent.  The supplemental report merely elaborates on points he made in his original report.

Apple's arguments are not persuasive.  Although Cimini's new report covers the same general topics as his original report, it includes significant new details.  Rule 26(e) is intended to provide parties an opportunity to correct mistakes or oversights, not to include new examples and illustrations to bolster previous opinions.  Innogenetics N.V. v. Abbott Laboratories, 2006 WL 6000791, *2 (W.D. Wis. 2006).  Although Apple contends that the AT&T documents were not "available," it does not suggest that its failure to discover the documents earlier was Motorola's fault and it does not identify any particular reason why it could not have found the documents in time to include them in Cimini's original report.

52

Additionally, Apple has not shown that its late supplementation is "substantially justified." Apple received the information produced by AT&T and used by Cimini in his supplemental report on March 2, 2012, four days before Apple filed Cimini's initial report in this case. Apple states that Cimini had finished his initial report on March 1, 2012, so that it could be filed in the related patent infringement case pending in the Northern District of Illinois, and that Cimini did not have time to update that report before the March 6 deadline in this case. That may be true, but Apple does not explain why it waited *more than five months* until August 14, 2012 to update Cimini's report.

Instead of explaining its five-month delay, Apple argues that Motorola was not prejudiced by Cimini's new opinions because Motorola has been aware of the AT&T documents since at least March 2, 2012 and questioned Cimini about the AT&T documents during his May 4, 2012 deposition in the Illinois case. I disagree. Although Motorola knew that Apple intended to rely on the AT&T documents in the Illinois case, it did not know that Apple would rely on those documents in this case. Motorola could have believed reasonably that Apple's decision not to file a supplemental expert report in this case meant that Apple did not intend to rely on the documents.

Finally, Motorola's expert did not prepare a response to Cimini's supplemental opinion. If I allowed Apple to rely on the new opinion at trial, Motorola would have to devote resources to rebutting that opinion when it otherwise could be preparing for other aspects of trial. Motorola's ability to prepare for trial should not be hampered in order to accommodate Apple's untimely supplemental opinion.

In sum, because Apple has not shown that Cimini's supplemental report is either justified

or harmless, I am denying Apple's motion to supplement, dkt. #226 and granting Motorola's motion to strike it. Dkt. #208.

**b.  Brian Napper's supplemental report**

The parties also dispute whether Apple should be allowed to rely on the supplemental report of its damages expert, Brian Napper.  Although the parties disagree about whether Apple's supplementation was proper, the more important question is why Apple needs to rely on this report at all.  Apple has withdrawn its claim for damages over the amount of $20 and has agreed to pursue only nominal damages, equitable remedies and declaratory relief at trial.  Napper's supplemental report contains opinions about additional fees that Apple incurred in the International Trade Commission investigation and the Illinois case, but Apple has not explained why these opinions remain relevant.  Therefore, I am denying Apple's motion to supplement, dkt. #226 and granting Motorola's motion to strike the report, dkt. #229.

ORDER

IT IS ORDERED that

1.  Plaintiff Apple Inc.'s motion to preclude Defendant Motorola Mobility, Inc. from offering evidence or argument that it was entitled to seek injunctive relief or that it did not breach its contracts with ETSI and IEEE by doing so, dkt. #310, is DENIED.

2.  Apple's motion to exclude evidence and argument that Motorola's patents ruled invalid or not infringed have value, dkt. #311, is GRANTED IN PART and DENIED IN PART. Prior decisions regarding validity and infringement of Motorola's declared-essential patents are

relevant to the current fair, reasonable and nondiscriminatory rate for Motorola's standards-essential patent portfolio, but are not relevant to Motorola's license offers made before the decisions were issued, as explained in this opinion.

3.  Apple's motion to exclude evidence and argument that Apple must satisfy a condition precedent to trigger Motorola's licensing obligation, dkt. #312, is GRANTED.

4.  Apple's motion to preclude Motorola from offering evidence or argument that it had a "process" for complying with standards-setting organizations' disclosure policies, dkt. #313, is GRANTED IN PART and DENIED IN PART.  Motorola cannot introduce any evidence at trial regarding its process for disclosing intellectual property rights unless it made that information available to Apple during discovery.

5.  Apple's motion to preclude Motorola from offering evidence about why it purported to suspend its license with Chi Mei, dkt. #314, is GRANTED IN PART and DENIED IN PART.  Motorola may present any evidence on this issue at trial that it provided to Apple during discovery.

6.  Apple's motion to preclude Motorola from arguing that its cellular standards-essential patent rights were not exhausted as to the first iPhone, dkt. #315, is DENIED.

7.  Apple's motion to preclude evidence and argument regarding opinions on alternatives from Motorola's technical experts, dkt. #316, is DENIED.

8.  Apple's motion to exclude certain Motorola expert testimony, dkt. #317, is DENIED.

9.  Apple's motion to exclude Dr. Leonard from opining on the correct royalty rate for Motorola's declared standards-essential patents, dkt. #318, is GRANTED IN PART and DENIED IN PART.  Dr. Leonard may not testify about a particular rate or range that qualifies

as a fair, reasonable and nondiscriminatory rate for Motorola's standards-essential patents, but may offer opinions about whether Motorola's 2.25% offer was a breach of Motorola's contracts with ETSI and IEEE. Additionally, Dr. Leonard may offer criticisms of the methods used by Apple's experts to calculate a particular rate.

10. Apple's motion to exclude testimony of Dr. Leonard relating to synergies, dkt. #319, is DENIED.

11. Apple's motion to take judicial notice of Exhibits 1-45, dkt. ##322, 323, to the Sept. 28, 2012 Declaration of Richard Anthony Lopez, dkt. #321, is GRANTED.

12. Apple's motion for leave to rely on supplemental expert reports, dkt. #226, is DENIED.

13. Motorola's motion to preclude Apple from seeking specific performance, dkt. #280, is DENIED.

14. Motorola's motion to preclude evidence and argument relating to timeliness of patent disclosures to ETSI, dkt. #283, is DENIED.

15. Motorola's motion to determine the terms of ETSI and IEEE policies, dkt. #286, is DENIED.

16. Motorola's motion to preclude evidence and argument arising after January 4, 2011, dkt. #289, is GRANTED IN PART and DENIED IN PART. Both parties are constrained by the explicit prohibitions of their non-disclosure agreements, but may introduce evidence arising after January 4, 2011 that is not expressly prohibited by those agreements.

17. Motorola's motion to exclude evidence and argument concerning prior litigation judicial decisions regarding the patents-in-suit, dkt. #292, is DENIED.

56

18.  Motorola's motion to exclude evidence and argument relating to non-parties Chi Mei Communications Systems and Qualcomm, dkt. #295, is DENIED.

19.  Motorola's motion to exclude evidence and references to irrelevant standards and standards-setting bodies, dkt. #298, is GRANTED IN PART AND DENIED IN PART.  Apple is precluded from introducing testimony and evidence regarding standards that are not at issue in this case and standards-setting bodies other than ETSI and IEEE, and ETSI and IEEE standards that are not at issue in this case, unless Motorola opens the door to such evidence and argument.

20.  Motorola's motion to preclude the testimony and opinions of Dr. Louis Berneman, dkt. #301, is DENIED.

21.  Motorola's motion to preclude the testimony and opinions of Dr. Dennis Carlton, dkt. #304, is DENIED.

22.  Motorola's motion to exclude evidence or argument related to allegedly "non-infringing alternatives" to Motorola patents, dkt. #307, is DENIED.

23.  Motorola's motion to strike the supplemental expert report of Dr. Cimini, dkt. #218, is GRANTED.

24. Motorola's motion to strike the supplemental expert report of Dr. Brian Napper, dkt. #229, is GRANTED.

Entered this 29th day of October, 2012.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge