UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

* * * * * * * * * * * * * * * * * * * * * * * * * *

APPLE, INC.,

      Plaintiff,

 -vs-                                    Case No. 11-CV-178-BBC

MOTOROLA MOBILITY, INC.,          Madison, Wisconsin
                                  November 5, 2012
      Defendant.                  9:00 a.m.

* * * * * * * * * * * * * * * * * * * * * * * * * *

STENOGRAPHIC TRANSCRIPT OF FIRST DAY OF COURT TRIAL
   HELD BEFORE DISTRICT JUDGE BARBARA B. CRABB,

APPEARANCES:

For the Plaintiff:  Tensegrity Law Group LLC
                    BY:  MATTHEW POWERS
                    555 Twin Dolphin Drive, Ste. 360
                    Redwood Shores, California  94065

                    Covington & Burling LLP
                    BY:  ROBERT FRAM
                    One Front Street 35th Floor
                    San Francisco, California  94111

                    Covington & Burling LLP
                    BY:  JASON RAOFIELD
                    1201 Pennsylvania Avenue  NW
                    Washington, DC  20004-2401

For the Defendant:  Quinn Emanuel Urquhart & Sullivan
                    BY:  STEPHEN SWEDLOW
                    500 West Madison Street, Ste. 2450
                    Chicago, Illinois  60661

Lynette Swenson   RMR, CRR, CBC
Federal Court Reporter
U.S. District Court   120 N. Henry St., Rm. 520
Madison, WI  53703   (608) 255-3821

1  Appearances continued:

2

3  For the Defendant:   Quinn Emanuel Urquhart & Sullivan
                        BY:  EDWARD DEFRANCO
                        51 Madison Avenue, 22nd Floor
4                       New York, New York  10010

5                       Quinn Emanuel Urquhart & Sullivan
                        BY:  BRIAN CANNON
6                       555 Twin Dolphin Drive, 5th Floor
                        Redwood Shores, California  94065

7
                        Reinhart Boerner Van Deuren, S.C.
8                       BY:  LYNN STATHAS
                        P.O. Box 2018
9                       Madison, Wisconsin  53701

10 Also appearing:      David Melaugh, Apple representative
                        Chester Day, Motorola representative

11

12                         *  *  *  *  *

13           THE CLERK:  Case Number 11-CV-178-BBC.  *Apple*

14 *v. Motorola Mobility* is called for a hearing and first

15 day of court trial.  May we have the appearances,

16 please.

17           MR. POWERS:  Good morning, Your Honor.  Matt

18 Powers, Rob Fram, Jason Raofield for Apple.  David

19 Melaugh from Apple.

20           THE COURT:  Thank you.

21           MR. SWEDLOW:  Morning, Your Honor.  Stephen

22 Swedlow, Ed DeFranco, Lynn Stathas and Brian Cannon,

23 along with Chester Day from Motorola.

24           THE COURT:  Thank you.  We had a new proposal

25 yesterday afternoon from Apple that had two options.

1    One, Apple suggested that we would start the trial today

2    on the understanding that the Court will set a FRAND

3    rate according to a method that both parties will agree

4    to be bound by.  I'd like to get some understanding of

5    what method Apple thinks both parties would agree to be

6    bound by.

7         And I'd like to also ask why is this new proposal

8    to include the value of Apple's patents not totally

9    outside the pleadings; in other words, how is it

10   connected to the breach of contract claim that you've

11   been pleading all along?

12        MR. POWERS:  Two questions -- I guess there's

13   three questions involved in that, Your Honor.  First,

14   what methodology -- as you could tell from the trial

15   briefs, there are different ways presented by the

16   parties for assessing what a FRAND rate might be.  And

17   the point of the first proposal was that Your Honor may

18   choose, after you've heard the evidence, one of those

19   methodologies over others.  And the point of the first

20   proposal was that you wouldn't be hearing evidence about

21   Apple's patents per se, but you would be adopting a

22   methodology that could be applied to Apple's patents.

23   Just as an example, if Your Honor chose a methodology

24   which said as of 2012, I'm going to use a party's

25   percentage of declared essential patents to the

1  particular standard and apply that to the base of X,

2  base defined however you decide it ought to be defined,

3  that's a methodology.  That's a methodology which could

4  be applied to both Motorola and to Apple.

5      The numbers that one would plug into that formula

6  are not -- they actually are in the record here, but

7  it's certainly not been the focus here.  But my point

8  was not that at the end of your order there would be a

9  statement of what the rate would be for each side, but

10  there would be a methodology that you would order, which

11  both sides would agree to be bound by, which would then

12  end the question because your methodology would decide

13  the rate for Motorola's patents and would decide the

14  rate for Apple's patents.

15      THE COURT:  So in other words, you would have

16  experts telling me how they thought I should construct

17  this method that I would announce at the end of the

18  trial.

19      MR. POWERS:  Yes.  The expert reports at least

20  on Apple's side do so.  The expert reports obviously on

21  Motorola's side, because they do not, as Your Honor

22  noted in your motions in limine rulings, they do not

23  render an opinion as to what the proper FRAND rate is.

24  So you would take the evidence on the record in this

25  case as it exists and you would reach a decision about

1   what the FRAND methodology is, and as to Motorola's

2   patents, what that rate is because you have all of that

3   data, and that same methodology would then be applied to

4   Apple's patents in a way that I think would not be

5   controversial, depending on what methodology you chose,

6   and that would accomplish the twin objectives that Your

7   Honor stated in your November 2 ruling.  One was that it

8   would be binding, and the second -- because it would be

9   agreed to be binding by both sides.  And the second is

10  it would actually -- one of the concerns that Your Honor

11  raised was that you were concerned that a ruling as the

12  trial had been conceived by Apple, which was that you

13  would be ordering specific performance in the form of an

14  order which told Motorola to make a FRAND offer, which

15  it had not made, one concern you expressed was that if

16  Apple did not accept that offer, it would not end these

17  disputes and not be effective.

18      This both solves that and goes further because not

19  only would it end that dispute, it would end the dispute

20  about what Motorola has to pay for Apple's patents,

21  which is the mirror image of the same dispute.  And

22  you're correct that claim is not in this case because

23  Motorola chose not to bring it.  But if the goal is to

24  make this an effective proceeding and if Motorola is

25  taken at its word in the first paragraph of its

1    submission to you on Sunday which is that it wants a

2    license agreement and wants a process to get there,

3    option one is just such a process, as is option two.

4           THE COURT:  So you would agree to be bound by

5    the rate.

6           MR. POWERS:  Yes.

7           THE COURT:  The framework.  That, of course,

8    doesn't say anything about whether you would be -- agree

9    to be bound by the -- all the other aspects of the

10   licensing agreement such as how long it would last, who

11   would do the oversight, where the disputes would be

12   determined, the geographic scope, all of those other

13   things.  How would that be done?

14          MR. POWERS:  None of those things has been

15   discussed other than geographic scope, in which case we

16   raised the question of worldwide and said it must be

17   worldwide and explained why.  If you had a normal

18   license agreement, you're right, there would be a number

19   of terms ranging from boiler plate to not so boiler

20   plate.  But you would have defined the essential term.

21   And I don't think either side has asked you to write the

22   agreement.

23          THE COURT:  So when you say "according to a

24   method that both parties will agree to be bound by,"

25   you're talking about a method that the Court will decide

1    after hearing all of the evidence.

2            MR. POWERS:  Exactly.  A method of computing

3    FRAND.

4            THE COURT:  Mr. Swedlow, will you be

5    responding?

6            MR. SWEDLOW:  Yes.  Motorola would like some

7    process to end the disputes between the parties, but the

8    entire dispute isn't before the Court in the form of

9    Motorola as a defendant in a breach of contract action.

10   The assertion that Motorola should have somehow placed

11   at issue Apple's portfolio in this case is turning it on

12   its head.  We can't sue Apple for a breach if Apple has

13   not sued Motorola on standards-essential patents and

14   failed to offer a FRAND rate.  So we can't file that

15   lawsuit because it doesn't exist yet.  And because it

16   doesn't exist in this case or anywhere yet, what Apple

17   is essentially asking this Court to do is determine a

18   methodology that would apply to a group of assets,

19   Apple's patents, that we don't know anything about.  The

20   methodology that Apple would like would be based upon

21   Apple's arguments about Motorola's portfolio.  But as

22   was made clear to me after looking at Apple's 166-slide

23   opening statement, there are many different ways you

24   could calculate and can calculate a FRAND rate.

25   Percentage of the portfolio, just take that example --

1   percentage of the standard, which is what Mr. Powers

2   just referred to, that may be relevant depending on what

3   your patents are and how you count them.  But you could

4   be a company that has one patent that is so foundational

5   to the standard that you can't simply say you have one,

6   but there are 10,000, because other companies have

7   declared essential many, many thousands of patents that

8   are of a different value or of a different type.  And

9   what we don't have in this case from either party is any

10  -- you will not be able to know what any of the hundreds

11  of other Motorola patents even relate to within the

12  standard because no expert is going to tell you, from

13  either side, Motorola has these hundreds of patents and

14  these are the numbers and this is what they relate to.

15      The way this process works in the real world, so to

16  speak, is that Motorola, which is what actually

17  happened, goes to Apple and says here are some of our

18  patents.  Here are 40 where we've charted the actual

19  invention against what your product does.  And then the

20  parties engage in technical discussions to determine

21  whether there is infringement, whether the patent is

22  essential, what value that patent would have to a

23  particular product.  And in the context of negotiation,

24  there may be a counting, meaning you have X hundreds of

25  patents and so the company has X hundreds, but that's

1  not a methodology that not knowing what Apple's

2  portfolio looks like we could even argue against.  You

3  would be deciding a methodology for basically for all

4  companies.  So Qualcomm and everyone else who owns

5  standards-essential patents, there would now be a

6  judicial opinion where only one portfolio was even being

7  discussed, and in that context, it wasn't even being

8  discussed on a technical or invention standpoint, just

9  on counting the patents or whatever methodology Apple

10  proposes.

11      So even though Motorola does truly want to get

12  Apple to pay, it can't follow a structure whereas a

13  defendant in a lawsuit and a methodology is agreed to in

14  advance without knowing what Apple's portfolio is or

15  what arguments we might possibly make about that value.

16  So the methodology would be decided without knowing what

17  it is the methodology is being applied to except as it

18  relates to Motorola's patents.

19          THE COURT:  So is this -- clearly this is an

20  argument for why Apple's patents should not be included

21  in this discussion, but is it also an argument for

22  saying that the determination of the method that

23  Mr. Powers is talking about is not an appropriate way to

24  reach a resolution of the case?

25          MR. SWEDLOW:  The appropriate method for

1    valuing a standards-essential portfolio depends on the

2    portfolio.  There is no one method to value different

3    assets.  We own whatever we own in terms of patents.

4    Apple owns whatever it owns.  Qualcomm owns -- there are

5    other companies that own.

6         What Apple wants this Court to do is to say the way

7    you would value a standards-essential portfolio in this

8    case, Motorola -- if Motorola ever tries to engage in

9    cross-licensing with Apple, you have to accept that

10   methodology without knowing what the patents are or how

11   they impact the standard or, for example, when Apple got

12   the patents.  We know Apple had basically no patents

13   that were standards essential in 2007.  Apple has now

14   acquired standards-essential patents over the years

15   through acquisitions of companies and just purchases of

16   patents.

17        So when would you determine what Apple's count is?

18   I know that Mr. Powers said as of 2012, because I just

19   know from reading the popular press, Apple got a bunch

20   of patents from a big Nortel portfolio because they

21   bought them.  But that doesn't have anything to do with

22   what Apple should pay in terms of a net license fee in

23   2007.  So you can't -- it's not that you can't -- one

24   cannot determine a methodology to value an asset without

25   knowing what the asset is.  And just because these are

1   patents, that's not good enough to know what Apple's

2   portfolio is or how you would value it.  We can't agree

3   to a methodology without having the evidence about what

4   their portfolio is and when they got it.

5           THE COURT:  Mr. Powers.

6           MR. POWERS:  Yes, Your Honor.  I think there's

7   three points built into that.  I'd like to respond

8   briefly to all three, if I may.  The first is a comment

9   that they don't know what Apple's patents are, and I

10  think in fairness that's just not true.  The parties

11  have had discussions over the years where both sides

12  have made presentations to each other about patents;

13  where both sides have exchanged charts; have exchanged

14  lists of patents; have gone back and forth about what

15  those patents cover; have made extensive presentations

16  about the scope and breadth of patents in both

17  directions.  So the statement that Motorola is ignorant

18  about what Apple's patents are I believe will be

19  demonstrably untrue.

20      The second is that the level that Mr. Swedlow was

21  commenting, it's also not relevant to the way the

22  parties have set this case up for trial.  Neither side,

23  neither Motorola nor Apple, has suggested that you have

24  to do a patent-by-patent subject matter analysis of all

25  of the patents that Motorola has declared to be

1  essential or all of the patents that Apple has declared

2  to be essential.

3      As Your Honor noted in the motion in limine ruling,

4  that's probably not even possible.  What the parties

5  have done, for example, one of our experts admitted and

6  their expert has I think admitted that's an appropriate

7  methodology is to use the percentage of IPR method.

8  It's common sensical.  Basically it says if there's a

9  total number of, say, a thousand patents that are

10 declared essential to a standard and one party has a

11 thousand of them or 10%, then that party should be able

12 to charge 10% of whatever the total amount of royalty

13 burden you're willing to put on that standard.  And the

14 other holders of the other 9,000 get their percent of

15 shares.  If they're all truly essential, they're all of

16 essentially equal value.  Each one is essential.  That's

17 the whole point of --

18         THE COURT:  Who decides which ones are

19 essential?

20         MR. POWERS:  You use what the parties have

21 declared to be essential.  And some of those may not be

22 as truly essential as Motorola has found when it

23 asserted its eight essential patents that it picked for

24 its proud list against Apple.  Most of those were found

25 not, in fact, to be essential because they were found to

1  not infringe or invalid.  But for this purpose, we agree

2  with the pragmatic point that Your Honor made in the

3  motion in limine ruling which is you can't go through

4  potentially thousands of patents to do that sort of

5  analysis, so you take on face value the parties'

6  declared essential patents and apply that percentage.

7  And our experts have done that.  It's a straightforward

8  calculation.  The percentages of IPR really aren't in

9  dispute.  There's a list.  And then the only question is

10  to which base you apply it.  And that is in dispute.

11  And Your Honor would, after hearing the evidence, make a

12  decision about which base that percentage should be

13  applied to --

14       THE COURT:  And what base are you talking

15  about?  The rate or something else?

16       MR. POWERS:  Something else.  So, the way one

17  would compute the overall royalty amount would be to

18  take a percentage, and this percentage of IPR says that

19  you apply a percentage based on -- if you're applying a

20  percentage based on the smallest saleable unit; in other

21  words, the functionality here relates to a cellphone,

22  and if you open up a cellphone, there are lots of chips

23  and components inside that cellphone.  One of those

24  chips provides all of that cellular functionality.  So

25  that one of the debates before you in this trial will be

1   what is the base amount that that rate is applied to.

2       So, Motorola has argued you apply it to the entire

3   full, fully-loaded sales price of an iPhone, which is

4   now on the order of I think $700.  Another option is to

5   go down, as the case law suggests, the *Laser Dynamics*

6   case, for example, this is all related to patent law

7   damages because it's how much your patents are worth.

8   You go to what *Laser Dynamics* -- those that called Laser

9   Dynamics last month the lowest saleable unit which

10  embodies the patented functionality, and that's the one

11  chip inside the phone that provides all of that cellular

12  functionality.  The price of that chip is about $15.

13      So, if one were to apply a percentage to that $15,

14  you come up with a dollar number per phone.  And one of

15  the things that you would see in the evidence is that

16  various people in the industry have done licenses on

17  various terms.  Some have done it on that lowest

18  saleable unit basis that I just described.  Some have

19  done it all the way at the other extreme on the full

20  price of a phone.  But when they do it on the full price

21  of the phone, they don't apply the full percentage

22  because by definition the entire value of that phone

23  with all those other chips and all that other

24  functionality is not all driven by that one cell check.

25  So they apply a much lower percentage and come up with a

1    much lower number.

2         And there are ways of doing it in between.  That

3    chip can appear on a board with other chips.  That board

4    costs about $35.  Sometimes out of convenience people

5    apply a percentage rate to the board, in which case

6    again the rate comes down.  So the point of this is that

7    the goal in licensing and determining a FRAND rate is in

8    many ways exactly the same goal as a traditional damages

9    analysis Your Honor is used to performing all the time,

10   which is determining the value contributed by that

11   patent.

12        Now, in this case, you have one complicating factor

13   which is that patent relates to a body of functionality,

14   a standard, a cellphone standard, where there are

15   thousands of other patents that also contribute to that

16   value.  So you can't give each owner of one patent 5% of

17   the value by definition.  So this percentage of IPR

18   methodology is one way that the industry has looked to

19   to say here's how we're going to take care of that

20   problem.

21            THE COURT:  And what cases do you know of in

22   which that has been done?

23            MR. POWERS:  Well, cases as in law cases or

24   cases as in licenses?

25            THE COURT:  Law.

1          MR. POWERS:  As Your Honor noted on Thursday,

2    we are in fairly novel uncharted territory on this

3    question with regard to setting a FRAND rate.  I'm not

4    aware of a case that has set a FRAND rate on any

5    methodology.  And I believe neither party has cited one

6    to you.  It is an important topic being discussed

7    currently in many fora, including regulatory fora,

8    including legislative fora, and judicial fora.  And the

9    fact that there is no case which has adopted a

10   particular methodology obviously gives the Court less

11   judicial guidance, but there is still economic and

12   licensing guidance available to the Court to help with

13   that exercise.  And the concept that I just laid out of

14   one methodology, a percentage of IP ownership, is

15   conceptually I think fairly straightforward.  It's not

16   difficult to understand at all.

17        There are other ways of looking at the problem.

18   For example, another way of looking at the problem is to

19   step back and say let's look at the licensor's other

20   patents or the licensee's, the putative licensee's other

21   licenses for the same standard as a way of getting a

22   sense for what other companies out there are either

23   paying or charging for their standards-essential

24   patents.

25        Now if you're looking at the licensor's licensing

1  history, you have the benefit that it's the same body of

2  patents.  So that variable stays constant.  A variable

3  that changes is they're licensing another party and that

4  other party may have a different number of patents to

5  give back in a cross-license or that a particular

6  structure of that license might be different because of

7  idiosyncrasies of that particular negotiation.  So

8  sorting through the impact of those idiosyncratic

9  variances from the licensor's other patents is a

10  complication, but a complication of the type that judges

11  deal with often.  The point being if one can decide from

12  the licensor's own licensing history what the actual

13  effective rate is that they get; not the original rate

14  they asked for, but the actual rate they get in real

15  life, if you can get to a point where you have a sense

16  of that, that is also something that gives you a sense

17  of what the actual FRAND rate should be.

18      So hypothetically, without revealing any

19  confidential information in a crowded courtroom, if

20  Motorola had licensed to eight other parties at rates

21  which once analyzed properly ended up at a dollar a

22  phone or less, that would be persuasive evidence that

23  the rate that Apple seeks, about a dollar a phone or

24  less, is an appropriate FRAND rate on two independent

25  grounds.  One, the reasonableness ground, and we believe

1   that the evidence will lead to this place, but I'm not,

2   again, revealing actual confidential information.  Both

3   on the reasonableness ground because it's evidence of

4   what that -- those patents are commanding in the real

5   world as opposed to an initial demand, but also on the

6   nondiscriminatory aspect of FRAND, which is the "n-d" of

7   FRAND of course, because if others in the industry

8   reasonably similarly-situated are paying only about a

9   dollar a phone or less, than Apple should not be asked

10  to pay $12.35 a phone or currently over $14 a phone,

11  because not only would that be unreasonable, it would be

12  discriminatory.  So that's the second path.  Our view is

13  that each of these paths, when you examine the evidence,

14  goes to the same place.

15       A third way of looking at it, and this is a way

16  that we've looked at it which I believe is public, is

17  that Motorola licensed a company called *Chi Mei*.  Chi

18  Mei makes the cellular module, the set of chips that

19  performs the cellular functionality that relates to all

20  their patents on cellular, and Apple bought that module

21  from Chi Mei for the original iPhone and Apple paid Chi

22  Mei a specific royalty rate designed for Motorola

23  explicitly.  Chi Mei said here is the amount you're

24  going to pay to us on top of the cost of the module and

25  that is the amount that we will pay to Motorola under

1  our license agreement for all of their patents, their

2  standards-essential patents.

3      So Apple went out and specifically ensured that it

4  was licensed to Motorola's patents and paid a fee.  And

5  Motorola accepted that fee for a very brief period of

6  time before it figured out that it wanted to stop Apple,

7  and then it purported to suspend that Chi Mei license

8  because it wanted to come after Apple for more than the

9  amount it was getting from Apple via Chi Mei.  That

10 amount was also less than a dollar a phone.

11     So when you analyze -- and then when you analyze

12 the rates that Apple is paying to other licensors of

13 their essential patents, now here you have a variable

14 that those other licensors have different numbers of

15 patents than does Motorola; in some cases, many many

16 more declared essential patents, in some cases fewer.

17 But again, if you do an analysis to try and determine

18 from those other licenses which Apple has obtained for

19 standards-essential patents for the same standard and

20 decide from that what an effective rate, an equivalent

21 rate for Motorola would be.  So again, hypothetically

22 without disclosing confidential business information,

23 Apple may negotiate a rate with company X where it pays

24 X amount per phone.  But company X, say, has five times

25 the number of essential patents that Motorola does.

1    Under this methodology, Motorola should not be able to

2    command the same rate per phone of a company that has

3    five times the number of essential patents Motorola has.

4    So you do an analysis, which we've done, which says all

5    right, we take these licenses that Apple got from our

6    licensors and we make them equivalent, apples to apples,

7    if you will, based on the number of patents Motorola has

8    and that will produce a rate that's equivalent to these

9    various licensors.   Those rates are all below a dollar a

10   phone.

11       So our view is that once you see the evidence, you

12   will see that all roads lead to a number that is below a

13   dollar a phone; whether it's Chi Mei, whether it's

14   Motorola's other licenses to other companies properly

15   analyzed, whether it's Apple's other licenses from other

16   companies properly analyzed, all of those lead to a

17   number that's below a dollar a phone.   And that I think

18   is the answer to how you would -- how once you hear the

19   evidence --

20            THE COURT:  I understand how that might lead me

21   to a number for Apple, but how does that lead me to

22   something that I could apply to Motorola?

23            MR. POWERS:  As an example, if you chose a

24   methodology which said I'm going to take the percentage

25   of IPR ownership and apply it to the chip price that

1    performs the functionality, which is exactly what *Laser*
2    *Dynamics* as a case instructs to be done in this context,
3    that would take Apple's percentage of its essential
4    patents, which is a known number, apply it to the price
5    of the chip that Motorola puts in its phones, which is a
6    known number, and multiply it.  It would at that point
7    be no more complicated than that if that's the method
8    Your Honor chose.
9           THE COURT:  But in terms of evaluating the
10   patents that Motorola would be cross-licensing from
11   Apple.
12          MR. POWERS:  That's what I was referring to --
13          THE COURT:  And nothing but the number of
14   patents that are declared to be standards essential?
15          MR. POWERS:  Exactly.  Which is really --
16   that's what that methodology is.  It says you take that
17   percentage and you apply it to the lowest saleable unit,
18   as *Laser Dynamics* instructs.  And those are both known
19   numbers.
20          THE COURT:  All right.  Mr. Swedlow.
21          MR. SWEDLOW:  Your Honor, we just heard about
22   what was characterized as idiosyncratic variances in
23   negotiations and all of the factors that Apple believes
24   weigh in its favor to arrive at the same number we were
25   at a week ago, which is less than a dollar, and if it's

1  less than a dollar and you would apply that to something
2  not in the case, then Apple would say okay.  Those
3  idiosyncratic variances are exactly why there is not one
4  methodology for valuing a patent portfolio, even if it's
5  standards essential.  You don't simply count -- the
6  parties don't, all the negotiating parties, don't simply
7  count the number of patents, because if you did, then
8  all that would lead to is parties declaring as essential
9  a higher number of patents without looking at what is
10  claimed within the patented technology.  It isn't --
11  patent counting is something that can be done as is
12  comparison of relevant cross-licenses which would,
13  without revealing confidential information, they aren't
14  a dollar.  They're much, much more significant than a
15  dollar when you look at what people have paid for
16  Motorola's portfolio, which is what we're talking about
17  here.
18       So we can't agree to a methodology for something
19  that although Apple says we might know about it as a
20  company, in this litigation when Apple was asked what is
21  the monetary value of your portfolio, Apple's attorneys
22  say "I'll instruct you not to answer to the extent doing
23  so would reveal attorney/client communication."  And
24  then the witness said "the only way I know that is from
25  talking to attorneys."

1  So although it may exist in the world that we know

2 some of their patents, in this case there will be no

3 evidence of what Apple's portfolio is, what it's worth,

4 what the patents cover, because Apple -- Motorola was

5 denied discovery of that.

6  So we can't agree in advance to determine a

7 methodology for an asset that's not in this case in

8 order to make Apple pay if you set a rate.  I guess I

9 should take one more step back.  There is no rate set if

10 we didn't breach.  So if we're not in breach, there

11 won't be a rate set.  Part of determining whether we

12 breached is to determine whether or not the requirement

13 of reciprocal licensing or some aspect of that has been

14 satisfied by Apple as well.

15  So turning to the question I thought we were going

16 to address here today is can this Court proceed with a

17 trial where the discretionary declaratory relief would

18 actually do something, meaning it would resolve any

19 dispute between the parties, and simply by counter

20 proposing that if Motorola accepts a methodology for

21 some patents that aren't in the case as applied to

22 theirs, and we just heard a large part of Mr. Powers'

23 opening statement, we don't agree on the methodology.

24 We don't agree that the way you would prove the

25 methodology to the Court is even the same.

1        We will bring in individuals who have negotiated

2   these complicated licenses for 20 years and they'll

3   explain to you what parties actually do when they're in

4   negotiation and what are the actual terms, which we

5   can't say in open court, of the license agreements that

6   Motorola has entered into for these exact same patents.

7   And that number of patents and quality of patents and

8   what standard is being practiced, that always changes.

9   So these contracts don't last forever.  You would have

10  to identify what term, now looking back and looking

11  forward, would we apply to a particular license

12  agreement that the Court would fashion.  But unless the

13  Court fashions the entire license agreement, there isn't

14  an effective declaratory remedy that the Court would be

15  giving to the parties because Apple has to pay on a

16  license agreement.  If Apple says we'll only agree if

17  you accept the methodology that the Court puts in place

18  and you don't have to decide the rest of the terms, then

19  what happens?  Where do we go after that?  We don't get

20  any money.  So the specific performance of make Motorola

21  take an amount of money and license us wasn't actually

22  granted, and we're in the same spot that we were a week

23  ago.

24           THE COURT:  Because there are so many other

25  issues that have to be decided, is that it?

1          MR. SWEDLOW:  Yes.  Because the rest of the

2     license agreement would have to be established in order

3     to actually make Apple pay.  And Apple won't pay if it

4     doesn't think a product needs to be paid upon, meaning

5     maybe there's something about a particular model of the

6     iPhone -- I know Apple will take this position -- that

7     means Apple shouldn't have to pay or we haven't decided

8     that -- this patent infringement concept of lowest

9     saleable unit is a patent infringement concept -- case

10    law.  It's not how do you license a gigantic portfolio.

11         So if we were using that, we'd have to look at each

12    patent.  You can't use patent infringement law to

13    determine how you would negotiate a fair reasonable and

14    nondiscriminatory license unless you were using patent

15    law completely.

16         So that methodology, you can't just adopt a

17    methodology from some case law in another context and

18    say that that will be the only way you could do it here.

19    But in order to get to a declaratory relief, which is in

20    your discretion, that means something.  The entire

21    agreement has to be established so that Apple will pay.

22    Otherwise it will be back in some courtroom somewhere to

23    make Apple pay, both from 2007 to today and then going

24    forward.

25         MR. POWERS:  May I respond briefly, Your Honor?

1          THE COURT:  You may.

2          MR. POWERS:  Motorola is beginning to sound

3    like a party that just won't take yes for an answer.

4          THE COURT:  Actually it struck me that it has

5    some very good points.

6          MR. POWERS:  Well, where we started is they

7    wanted Apple to be bound by Your Honor's decision, and

8    Apple originally said yes, but with caveats.  And now

9    Apple is saying all right, we'll remove most of those

10   caveats as long as Motorola agrees to be bound because

11   the Court's desire was to have a process that's

12   effective in resolving the parties' disputes, and I

13   think the proposal that we made is more effective.  And

14   Your Honor will be aware that we proposed two

15   alternatives.  One was that if Your Honor is going to

16   set a methodology that determines what Apple has to pay,

17   if Motorola agrees to be bound by that same methodology,

18   we're done.  Now Motorola is saying you have to fashion

19   the entire license agreement down to choice of governing

20   law terms and dispute resolution.  That's a new argument

21   as of this morning.

22          THE COURT:  Well, there are two ways of looking

23   at that:  One is that Motorola is asking for an entire

24   agreement to be fashioned.  I'm not going to do that.

25   The second is that the nature of a negotiation like this

1   and the nature of an agreement that's going to be

2   reached is so complex and so detailed that it is not

3   something that the Court can do or should do, and that

4   we're back in this position where it would be simply an

5   advisory opinion by the Court that oh, by the way, by

6   the time you work out all of these other issues, the

7   rate should be calculated in this manner.

8           MR. POWERS:  I hear the point, but with respect

9   to I think the gorilla in the room, the issue that needs

10  to get resolved is the amount both sides pay.  Governing

11  law, those sorts of things, the other provisions are not

12  holding up these agreements.  What's holding up these

13  agreements is exactly what we've asked you to decide,

14  the amount that should be paid.  And once that's set, I

15  am -- can I guarantee it?  Because I can't speak for

16  both sides.  But common sense tells us that's what

17  drives this deal.

18      If Your Honor says for the entire

19  standards-essential portfolio Apple has to pay "X" and

20  Motorola has to pay according to "Y" formula, this deal

21  will be done.  We're not asking you to fashion --

22          THE COURT:  There's another gorilla in the room

23  and that is what would Apple's patents be worth.

24          MR. POWERS:  That's the second half of what I

25  just said.  It --

1          THE COURT:  But --

2          MR. POWERS:  That Motorola has to pay for

3    Apple's patents according to the formula and the formula

4    would be the same formula.  All we're saying is --

5          THE COURT:  But I'm not sure from what you've

6    described that I would be able to determine the value of

7    Apple's patents -- you know, your idea is that this is a

8    great way to do it.  You just count the number of

9    patents that are declared standards-essential and then

10   you do a few calculations and you have the answer.  I'm

11   not sure that that is an appropriate way to do this.

12         MR. POWERS:  I understand, Your Honor, and

13   that's why we proposed the second alternative as a

14   response to that concern.  I mean the express reason for

15   the second alternative was that if Motorola were

16   unwilling to accept this methodology that you adopt for

17   their patents to apply equally to Apple's patents, if

18   they were unwilling to do that, either because they

19   haven't had a chance to put in evidence that they would

20   like to put in on that or if more to the point you are

21   uncomfortable that you're not sure you can fashion a

22   methodology in this case that should apply in your view

23   to the Apple patents, if either of those were true,

24   that's the explicit reason for the second alternative

25   which says all right, let's solve both of those by

1  deferring this trial for a short period to allow the

2  parties to put in exactly what that evidence is.  And

3  you'll have then one proceeding which addresses both at

4  the same time.

5       The second alternative was put in exactly to

6  address the concern that you're raising and exactly the

7  concern that Motorola is raising.  We put the first

8  proposal in because it too has attractive features:  The

9  first attractive feature being we're all here and ready

10 to start a trial; the second feature is one could easily

11 see a path whereby whatever methodology you chose to

12 apply to Motorola's patents could then be applied to

13 Apple's.  But we recognized in advance the concerns that

14 Motorola has raised here.  We recognized in advance the

15 concerns that Your Honor has expressed, and for that

16 reason set out what we think is a sensible way to

17 address both of those concerns and to do what at least

18 Motorola said it wants to do in the first paragraph of

19 its November 4 brief to you which is have a process that

20 resolves the parties' disputes and gets to an agreement.

21      And if in six months we could have a hearing before

22 Your Honor which does that for both sets of patents,

23 that would be, in my mind, the most efficient way of

24 resolving the concerns that have been raised and doing

25 what at least Motorola says it wants.

1          THE COURT:  If we proceeded today and I let you

2    try to prove that this percentage of IPR process would

3    produce a FRAND rate --

4          MR. POWERS:  Yes.

5          THE COURT:  -- for anybody --

6          MR. POWERS:  Yes.

7          THE COURT:  -- Apple, Qualcomm, Samsung,

8    whoever.  And let's say that Motorola showed that you

9    hadn't met your burden of proving that it did, where

10   would we be?

11         MR. POWERS:  Your Honor would have -- obviously

12   you haven't heard the evidence yet.  I've only briefly

13   sketched out what that evidence could be.

14         THE COURT:  This is a hypothetical.  I'm not

15   judging your evidence at this point.  I'm just saying

16   what would be -- where would we have gotten.

17         MR. POWERS:  Understood.  My point was that the

18   evidence isn't limited.  The evidence in this trial, if

19   we started to, would not be limited to that percentage

20   of IPR.  It would be -- it would include the other

21   information that I went through about ten minutes ago,

22   which is an analysis of the parties' licenses, both

23   Motorola's licenses under its patents and Apple's

24   licenses of standards-essential patents from other

25   parties on the same standard.  So you would have

1  additional evidence from which to formulate a decision

2  as to what the appropriate FRAND rate might be.

3        THE COURT:  So you would identify each of the

4  standards-essential patents owned by Motorola and Apple

5  and give me a sense of what each patent covers?  Is that

6  what you're saying?

7        MR. POWERS:  That's not at all what I'm saying.

8        THE COURT:  Good.

9        MR. POWERS:  No.

10        THE COURT:  What are you saying?

11        MR. POWERS:  None of the evidence really goes

12  to that, put forth by either party.  What I'm saying is

13  there are multiple ways one could try to figure out what

14  an appropriate FRAND rate is for a body, a corpus of

15  patents that relates to a standard.  In this case, the

16  appropriate standard we're talking about is a cellphone

17  standard, that little chip that provides that cellular

18  functionality.

19     One way is Chi Mei.  You could just decide

20  theoretically that because Motorola gave a patent

21  license on exactly the same patents we're talking about

22  here, the entire body, so we don't need to analyze them

23  one-by-one, it's the same group, on the same technology

24  to the same products to the same party for a rate that

25  was below a dollar a phone, you could say after hearing

1   all the evidence that's the rate for Motorola's patents.

2           THE COURT:  But that doesn't help me decide

3   what Apple's patents are worth.

4           MR. POWERS:  I agree.  That's why I was calling

5   that out first as an exception.  That is, in this case,

6   fairly unique for purposes of FRAND and that's one of

7   the reasons we suggested the second alternative.

8   Because that is an argument Apple is making that when

9   Motorola chose to license all of its standards-essential

10  patents and licensed it at this module level for less

11  than a dollar a phone and accepted Apple's payments for

12  the iPhone, the same product, for the same patents and

13  the same parties, that tells you what FRAND is.  It's

14  negotiated.  It's done.  It's real world.  It's not two

15  economists debating each other.  It's a real world

16  license.

17      Now that evidence is unique to Motorola because you

18  rarely find same patent, same products, same parties, et

19  cetera in a FRAND context.  So that might mean if you

20  chose that as a methodology, it would not be

21  particularly useful for deciding what Apple's patents

22  were worth.  But you will also hear evidence about all

23  of Motorola's licenses to other parties on the same

24  Motorola patents, on the same standard, and Apple's

25  licenses from other parties on the same standard but

33

with a different set of patents; in other words, those

companies' patents.  There is obviously some work to be

done to try to get to an apples-to-apples comparison.

That's why economists and accountants and damage experts

do what they do, is to look at the consideration flowing

back and forth in those license agreements and say here

is the effective rate.

I'll give you an example.  Without doing any

details, several of Motorola's licensing agreements use

a lump sum approach.  So it doesn't just say here's a

percent per phone or a percent per module or whatever,

it says pay us "X."  And then if you sell two phones,

you still pay us "X."  If you sell a billion phones, you

still pay us "X."  The effective rate per phone

obviously is different whether they sell two phones or a

billion phones.

So one of the things you have to do is an analysis

that says how many phones have they sold and then how

many phones, even assuming no growth, are they likely to

sell.  You take that total number of phones, divide it

by the lump sum, and then you can come up with an actual

amount per unit.  That amount per unit in many, many

instances comes out below a dollar a phone.

And so that's one way of saying that's an amount

which the parties have -- which the world has started to

34

say is a FRAND rate.  Because if you look at agreement

after agreement after agreement and you see a trend, a

pattern, a consistent valuation, even though those

agreements may be structured differently, but at the end

of the day if you see a consistent valuation, that's one

way Your Honor could come to a FRAND methodology which

could apply to Apple's patents or Motorola's patents.

THE COURT:  Mr. Swedlow, any comments?

MR. SWEDLOW:  Yes.  You've heard a lot of

discussion about alternative methodologies and

information you could consider that are -- some are

unique to the Motorola circumstance, some are not, and

all of which you could consider.  Motorola cannot agree

that based on the unique and not unique circumstances of

this case that whatever methodology you would determine

would apply to Apple's portfolio because we don't have

any evidence of the unique circumstances relating to the

Apple portfolio or how Apple has licensed it or how --

we don't know any of that.  You won't be able to know

any of that.  We can't agree in advance in one trial

where that's not at issue to have that apply to the next

trial.

The problem with each of the ways you could compare

a license that have been described to you is that you

have to look at that circumstance.  So if Motorola has a

1  lump sum payment license with a company, they enter it

2  on -- let's say they enter it on the first day of 2010.

3  Neither party knows how many phones they're going to

4  sell for the next five years, because if you knew that,

5  then business would be a lot easier and you could just

6  trade stocks rather than do anything else for a living.

7  So both parties have to project or guess.  So that lump

8  sum was based upon what Motorola thought the other

9  company would sell and it would sell itself, and the

10  other company had thoughts about what Motorola would

11  sell and it would sell itself because these net

12  payments, when you cross-license -- so if -- I'll just

13  say company "X" so I don't isolate any company.  Company

14  "X" who sells phones and Motorola who sells phones.

15  Motorola may have thought that it would be the market

16  leader and sell 40% of the phones and have 75 billion

17  dollars a year in revenue.  The other company may not

18  have believed the same thing or thought it might sell

19  more or less, and you only pay on the cross-revenue with

20  respect to the value of each license.

21      So a prediction has to be made.  What Apple is

22  saying is that you would go back and you would -- you

23  would go back in time and say what both parties

24  predicted.  Let's assume they were both right and they

25  knew exactly what both parties were going to do in terms

of sales.  Then we'll figure out what was actually paid.
But that's not what happened when the agreement was
entered into.  Both parties used the lump sum or some
other contract mechanism because they had to enter into
a contract that was going to apply for a period of years
without knowing what was going to happen during those
period of years, including new patents become declared
essential, companies that participate in the standards
participate in the standards and increase their
contribution so even the portfolios change over time.
And without knowing the other asset that we're valuing,
we will not agree to a methodology that would apply to
that asset.

     It's like saying there's a beautiful orb on the
table, but we're not going to look at it.  We're going
to try to value it by looking at other stuff.  But
whatever we decide over there is going to apply to this
thing that we won't have any evidence about.

     I'd like to communicate to you why there's a very
low chance that the Chi Mei module agreement is going to
apply as a surrogate for Motorola's FRAND rate, but
those terms are confidential.  It's a bilateral
agreement where we can't reveal it without Chi Mei's
written agreement.  I do believe that Apple knows that
term, but they shouldn't, meaning Apple the company,

1  because it was confidential.

2      Apple is saying that agreement should be -- one

3  part of the agreement, which is the wrong part, should

4  be the surrogate.  It's not the right part of the

5  agreement.  But I can't tell you the terms unless we

6  clear the courtroom because we owe that right to Chi Mei

7  and we have that right ourselves.  I don't think Apple,

8  the company, should have known that contract at the time

9  or today.

10      THE COURT:  Apple, is it clear that you aren't

11  interested in going into this unless you have some sort

12  of determination of what your patents are worth?

13      MR. POWERS:  I would say the following:  We are

14  prepared to go forward starting today under the original

15  conception that we proposed, which is that Your Honor

16  will declare a breach of FRAND; declare a breach of

17  their nondisclosure agreement; declare whatever you

18  decide appropriate after you've heard the evidence,

19  because obviously you haven't heard the evidence yet,

20  and that might include specific performance, it may

21  include merely a declaration of what the FRAND rate

22  ought to be, it might be whatever you decide is

23  appropriate after hearing the evidence.  That's option

24  one.

25      THE COURT:  In that case, you would not agree

1    to be bound.

2            MR. POWERS:  Correct.

3            THE COURT:  So we're back to --

4            MR. POWERS:  That's option one.

5            THE COURT:  We're back to Friday.

6            MR. POWERS:  Option one would be back to

7    Friday.

8            THE COURT:  All right.

9            MR. POWERS:  And we believe for the reasons we

10   expressed on Thursday, that that's entirely appropriate.

11   The point -- if I may just slightly on that point, there

12   is a completed contract that we're trying to accomplish.

13   The point is not that we're trying to do half of a

14   contract between Motorola and Apple, we're trying to

15   complete the contract between Motorola and its

16   standards-essential bodies.  That's the contract we're

17   asking for specific performance of.  And Motorola has

18   repeatedly tried to shift it as if we're trying to put

19   in half of an agreement between Apple and Motorola that

20   gives us the option.  That's not what this case is about

21   or ever has been.  The contract which was breached was a

22   contract between Motorola and the standard-setting

23   bodies.  Motorola has already received the consideration

24   from those standard-setting bodies.  Motorola's patented

25   technologies are included in the standards at Motorola's

39

1  request.

2      The *quid pro quo* is that once Motorola has already

3  received that consideration -- and that's considerable

4  consideration because that's what allows Motorola then

5  to go out and say pay us license fees.  So Motorola has

6  already gotten its half of the bargain.  What we're

7  saying is complete that bargain.  Make Motorola do what

8  it said it would do in exchange for that consideration,

9  which is offer a FRAND license.  So it's not advisory,

10 it's not inchoate, it's not a gotcha, it's completing an

11 agreement which Motorola has already received its

12 consideration from.  That's what we're asking specific

13 performance for.

14     It's similar to an options contract where if I pay

15 Mr. Swedlow $50 for the option of buying something later

16 and then he refuses to give me the option to buy it,

17 he's already gotten my $50 and he has -- the

18 consideration for that is he has to give me the option

19 to buy the piece of property.

20         THE COURT:  But that's a very specific thing.

21         MR. POWERS:  So is this.  It's more complicated

22 to compute, but that's the Court's job.  That's what we

23 do in patent damages analysis every day is decide what

24 patents are worth.

25         THE COURT:  But he doesn't get to come back to

1  you and say well, you know, that's the price.  But I

2  don't think I'll be bound by that.

3        MR. POWERS:  The fact that it's more

4  complicated is different.  What we're saying is that in

5  the options contract, Mr. Swedlow has to give me the

6  option.  That's what I paid my $50 for.  The option

7  contract doesn't require me to buy it.

8     Now in most cases there you would, and in many

9  cases here we would.  If you do it at a dollar a phone

10 or in that zip code, I can, without having the authority

11 to bind Apple in any way, common sense tells you what in

12 fact would happen.

13       THE COURT:  But you could bargain it down a

14 little more.

15       MR. POWERS:  If you say that the FRAND rate is

16 a dollar, I doubt we'll be able to bargain it down below

17 that as a FRAND rate for Motorola's patents.  That will

18 govern that agreement.  That was my point on Thursday,

19 which is what's held up this negotiation for three years

20 is Motorola's insistence on rates that are not FRAND.

21       THE COURT:  This is like getting me to be

22 deciding whether the option that Mr. Swedlow may sell

23 you should -- he should sell it for $20 or $22 or $23,

24 that you're going to bargain it away.  This is what

25 really bothers me is that you want me to give you a

1   bargaining chip.  You've got this great rate maybe.  I
2   mean if it's below a dollar, I assume from everything
3   you've said you would consider that a great rate.  So
4   then you can bargain all the other things that are part
5   of this final agreement for a license and you've got the
6   power because you've got the bargaining chip that the
7   Court gave you.  And that just -- I just have a lot of
8   trouble accepting that as something that courts should
9   be involved in doing.
10          MR. POWERS:  I hear you and I understand, I
11  think well, the Court's concern.  But another way of
12  looking at it, which I think is at least equally valid,
13  is that the Court is merely forcing Motorola to do what
14  its commitment to the standards body said it would do.
15  Let me just say hypothetically, let's say -- let's take
16  out the negotiation of the uncertainty.  Let's assume
17  that the standard-setting body said a FRAND rate is $1 a
18  phone.  You have to make that offer.  Everything else is
19  the same.  Motorola comes to us and says we want $12 a
20  phone, and we say that's not a FRAND offer.  And they
21  say well, we think that's what we're worth.  And we come
22  to you and say -- and that's holding up the negotiations
23  and we have -- we're unable to negotiate based on that.
24  And we come to you and say please make them do what
25  their contract ordered them to do.

1        Here the contract is clear.  It must be $1 a phone.

2   At that point, if Your Honor ordered them to make that

3   agreement, yes, you would be influencing that

4   negotiation.  Yes, you would be doing -- having all the

5   same effects.  The only difference is the discomfort you

6   have in setting the dollar.  And that's based on

7   evidence you haven't heard.  Once you hear the evidence,

8   obviously Motorola disagrees.  You might disagree.  Our

9   view is all roads lead to a dollar or less, and when you

10  analyze that evidence, that's where the evidence will

11  be.

12       I think that hypothetical addresses the concern

13  that Your Honor is making because if you strip out the

14  perceived difficulty in getting to the number, which is

15  based on not having heard the evidence yet, if you strip

16  that away, I don't think Your Honor would have the same

17  discomfort ordering them to offer a dollar because it's

18  exactly what they said they would do.  It's merely

19  completing the contract.  And in that case, yes, that

20  would give us finally an ability to negotiate a sensible

21  agreement because we would have "the power" to negotiate

22  from the point of them only being able to charge a

23  dollar.  But that hypothetical really isn't any

24  different at all from the set of facts we have here

25  other than there's nothing that says in advance it's a

1   dollar.

2       But that level of complication --

3           THE COURT:  But that would be something that

4   Motorola would have known when it went into that

5   contract with ETSI or IEEE.

6           MR. POWERS:  Motorola knew that it was getting

7   less than a dollar from us through Chi Mei.  It knew

8   that when they came and demanded $12.35.  The timing is

9   square.

10          THE COURT:  But they're a third party -- you

11  are a third-party beneficiary of this contract between

12  ETSI and Motorola.

13          MR. POWERS:  True.

14          THE COURT:  Motorola and ETSI did not agree on

15  a 93 cent, 97 cent, 98 cent, one dollar --

16          MR. POWERS:  True.

17          THE COURT:  -- rate.  So coming in to enforce

18  that contract price is a lot different from asking --

19  and I don't think that determining a rate is all that

20  difficult.  I mean it will take some time, and you

21  certainly might not agree with what I determined, but I

22  don't think it's -- I don't think it's very difficult.

23  I just wonder, as you can tell from this whole

24  discussion, whether that is something that a court

25  should be doing in this situation.

1          MR. SWEDLOW:  Your Honor --

2          MR. POWERS:  And in our view, Your Honor, in

3   our view there's no other, as Judge Robart in Washington

4   observed, there's no other place to get it resolved.

5   ETSI didn't say what the FRAND rate should be.

6   Obviously a licensor can't decide it unilaterally.

7   That's apparent, I think, to everyone.  And if you have

8   a licensor, a putative licensor who says -- who uses a

9   demand for putative competitive purposes, which is what

10  we think is happening here -- I mean the whole purpose

11  of a standard-setting body is that anyone who wants to

12  produce a cellphone can, and what Motorola is doing, in

13  our view, is adopting a deliberately unreasonable

14  licensing approach, as to Apple, because it is uniquely

15  concerned about Apple's competition in the smartphone

16  space and it would rather try to keep an injunctive

17  threat from its patents as a way of trying to compete

18  with Apple in exactly the way the standard-setting body

19  is designed to preclude.  That's exactly what the

20  standard-setting body was trying to prevent.  Everybody

21  gets to produce a cellphone.  That's the whole point of

22  it.  But if you have one party that has a lot of patents

23  that unilaterally says all right, we're willing to do a

24  deal with all of these other competitors because we've

25  been able to compete effectively with them, but all of a

1  sudden our lunch is getting eaten by Apple and we can't
2  compete.  So instead of licensing Apple on terms that
3  are as reasonable as what we've done with others, we're
4  not going to license Apple.  We're not going to change
5  our terms the way we did with everybody else.  We're not
6  going to discount heavily the way we did with everybody
7  else.  We're going to stand on our -- basically our
8  original number, and at that point we know a deal won't
9  get done and then we're going to use our patents.
10  That's exactly what the standards bodies are designed to
11  prevent.  And nobody, nobody can stop that other than a
12  court.
13      This claim is brought before you.  You acknowledge
14  it's a contract.  You've held it's a contract to which
15  we're a third-party beneficiary.  All that's left is to
16  say make them perform the second half of that contract.
17  And all that's left from that is the evaluation of what
18  their FRAND rate is, which as Your Honor said, takes
19  time and effort, but is doable.  That is all we're
20  asking.  That is option one.
21      At this point, this was sort of a long-winded
22  answer to Your Honor's question which is at this point
23  where are we and the answer is there's three options in
24  our mind.  That was option one.  We believe that option
25  is still right.  You have the power to order specific

1   performance of them.  You have the power to do that

2   because it's completing the contract, not just advisory.

3   But option two is the first option that we discussed at

4   some length this morning where we continue to have the

5   trial, but both sides agree to be bound by the

6   methodology you choose because it ought to be equal

7   playing fields.

8        The third approach, which I haven't heard Motorola

9   respond to, is the one where we said all right, defer

10  the trial for a short period.  Let Motorola provide the

11  evidence it's now said three or four times it wants to

12  provide about Apple's patents, whatever that is, and

13  have one proceeding in front of Your Honor where you

14  have both sides of the equation and you decide what

15  FRAND rate Apple should pay Motorola, what FRAND rate

16  Motorola should pay Apple, and both are bound by that.

17       So I think we've responded to Your Honor's concerns

18  about having a procedure that's effective.  We've

19  proposed three.  We're heard no response from Motorola

20  really as to the third, which seems to address each

21  concern it raises.  On any of those three we're prepared

22  to go forward because the first -- and one of the points

23  that Your Honor made as to the first proposal, which was

24  the original one, is that it doesn't accomplish

25  everything.  And that's true.  But the fact that a

1  decision in a case doesn't accomplish everything doesn't

2  mean that it accomplishes nothing.

3      By setting the FRAND rate that Apple should pay to

4  Motorola for its patents would break the logjam.  Apple

5  has been very transparent, by the way, to Motorola.  We

6  have sent Motorola a letter saying here is how we would

7  compute FRAND for our patents to you.  We're willing to

8  live by the same standard back and forth.  Here is the

9  standard that everybody ought to adopt.  We have been

10  very transparent and upfront about that.  So the idea

11  that they have no idea what ours is worth, we sent that

12  to them long ago.

13      So all of that is available.  Any of those three

14  options in our view is appropriate jurisdictionally.  It

15  solves varying degrees of the problem, and each one has

16  different strengths and weaknesses.  So the shorter

17  answer to Your Honor's question is we believe all three

18  of those options are viable.  We believe the third

19  addresses everybody's concern, and we've not yet heard a

20  response to that.

21      The second, we believe, addresses clearly Your

22  Honor's concern about whether you're doing something

23  that's effective.  It will be effective.  Both sides

24  will agree to be bound by it.  If Motorola does not

25  agree to be bound, then obviously we can't force them to

1   be bound, but I think it starts to make clear what their

2   real motivations are.  They want it one way.

3           THE COURT:  Thank you.

4           MR. SWEDLOW:  Can I briefly respond?

5           THE COURT:  Um-hmm.

6           MR. SWEDLOW:  The problem -- let me start with

7   the third and come up to the first.  Like we have said,

8   Motorola is interested in resolving this dispute

9   completely.  If that would be in the form of binding

10  arbitration with a mutually selected arbitrator or panel

11  of arbitrators who have licensing experience that may be

12  relevant to that and both portfolios are placed at issue

13  and that arbitration leads to a cross-license with both

14  parties being bound to either pay or collect and the

15  geography is defined and all the terms are in there so

16  that somebody will pay somebody, we would love that.

17      The problem is where we are now before you on this

18  breach of contract claim is not the hypothetical where

19  ETSI said it's a dollar.  Because if ETSI said --

20  obviously Apple would accept a dollar because it's

21  ridiculously low.  But let's say they said it was $10 or

22  let's say they said it was 2.25% in value or whatever

23  ETSI had said to set a rate, you know from your orders

24  that ETSI has said that is a -- the rate is a commercial

25  term to be negotiated between the parties and we're not

1   setting any rates.  That's what the ETSI entity as a

2   party to this contract has said.

3        If the rate was $10 and that was our contract with

4   ETSI, we get $10, and Apple came into this court and

5   sued you to get specific performance for $10, then they

6   would have to pay when they win the case.  They'd have

7   to give us $10.  And Apple doesn't want to be bound to

8   pay unless we agree to something else or the rate is a

9   dollar, and then of course they would pay because that's

10  so low they'd be a fool not to pay.

11       So option one is where we were on Friday -- it

12  seems like a long time ago -- but where we were on

13  Friday where if Apple won't agree to pay, then specific

14  performance isn't a discretionary remedy that leads to a

15  resolution.

16       Option two.  We don't have -- we can't and won't

17  agree to a methodology without Apple's patents being

18  part of the process for deciding that methodology.  You

19  heard a lot about a lot of different kinds of

20  methodologies that could be used to both value and pay

21  on the portfolio:  Lump sum; patent counting; looking at

22  the actual technology; looking at comparable licenses

23  for Motorola's portfolios; looking at licenses that two

24  parties have with each other that somehow relate to

25  Motorola's portfolio.  If the methodologies consider

1  everything you could possibly consider, we'll agree to

2  that.  But that's not a methodology, that's just

3  deciding what a portfolio is worth.

4      So if what we're really talking about is option

5  three, then we would agree to -- this Court on the

6  current complaint doesn't have before it the right

7  posture to set a cross-license for patents that aren't

8  at issue and patents that are only at issue in a breach

9  of contract context.  But we would be willing to go

10  somewhere and have it be binding that all of Motorola's

11  standards-essential patents and all of Apple's

12  standards-essential patents would be cross-licensed and

13  a net payment would be determined.  We would love that.

14      THE COURT:  When you say you would be willing

15  to go somewhere, what are you talking about?  Going to

16  binding arbitration or trying this case in six months?

17      MR. SWEDLOW:  Either.  You don't have that case

18  before you so we have to construct something that

19  becomes that case and putting it before you.

20      THE COURT:  And that's definitely a problem in

21  my mind.  Apple had -- has had 20 months to construct a

22  case and here we are gathered for trial and it's trying

23  to expand that case.

24      MR. SWEDLOW:  The complaint you have now is a

25  breach of contract claim, and if we didn't breach that

1  contract, then there's no breach and there wouldn't have

2  to be a remedy of specific performance with a

3  cross-license and all the other stuff.  So the current

4  complaint that you have is not the right complaint to do

5  that.  The question would be if we're going to do that

6  in binding arbitration, which we would agree to, or

7  before Your Honor, we have to place what it is, option

8  three is that Apple has described before you.  There

9  were three conditions with respect to that which we can

10  address.  I think we can probably figure out how to

11  solve those conditions so we could agree, but that's not

12  -- that's not this case.  That would be a different case

13  that you could resolve.

14        THE COURT:  That's exactly --

15        MR. POWERS:  May I respond briefly, Your Honor?

16        THE COURT:  Um-hmm.

17        MR. POWERS:  It sounds as if we've finally

18  gotten Motorola to agree it would agree to option three.

19  And then the only question --

20        THE COURT:  But not necessarily in this case.

21        MR. POWERS:  Well, that's what I was just about

22  to address.  I think that's the simplest thing we have

23  before us.  That would just involve a motion to amend by

24  both sides the claims before you slightly to add that

25  half of the equation to it.  That mechanically is quite

1  simple.

2          THE COURT:  And what about the proposal for

3  binding arbitration?

4          MR. POWERS:  That hasn't been raised before, at

5  least with me.  We'd obviously have to talk about it.

6  Our suggestion is that we follow option three, if that

7  is, in fact, the option that Motorola will agree to and

8  if Your Honor would agree to it.  As I say, mechanically

9  that's a simple amendment to the complaint and

10 counterclaim.

11         THE COURT:  Well, it is, but I have some real

12 reluctance to let you amend a complaint at this point.

13 You've had a chance to make a case on the claims that

14 you raised and that you amended and I don't think that

15 you've made that case.

16         MR. POWERS:  Well, with respect, Your Honor, I

17 believe we've made the case in spades with regard to

18 whether there's a breach, and I think the dispute that

19 came up on Thursday -- Wednesday was what scope of

20 relief would be permitted, and that was an issue raised

21 for the very first time by Motorola at that time.

22         THE COURT:  I assume you mean that you have --

23 you have at least alleged a case for breach of contract.

24         MR. POWERS:  Certainly.

25         THE COURT:  You certainly haven't made the

1    case; right?

2         MR. POWERS:  We've stated what the case would

3    be in the trial brief, for example.  We've obviously not

4    put in any evidence.  Of course you're correct.  But I

5    believe the case as laid out in the trial brief and in

6    the expert reports and as has been prepared and ready

7    for trial, would, when you heard the evidence, make the

8    case in spades.  And what's been debated for the last

9    three days is not that, but what scope of relief

10   ultimately should be given.  And where all this arose

11   was not a last minute request from Apple, but a last

12   minute change from Motorola where it was asking for

13   affirmative relief that it had not pled.  It was asking

14   that on a claim where Apple was saying make specific

15   performance to order them to make an offer, which was

16   completing their contract with ETSI, Motorola then asked

17   for an order from the Court affirmatively ordering Apple

18   to accept that order, which is outside the pleadings and

19   outside the contract.

20        THE COURT:  And I explained why I didn't think

21   that that -- as I now understand the request, that that

22   was something that a court should do.  And I'm thinking

23   about that a lot, and perhaps thinking about it in the

24   sense that I could say yes, this offer was within FRAND

25   terms; no, it wasn't, and just leave it at that.  But

1  what offer would I be considering?  There's the initial

2  offer in two thousand whenever that Motorola refused to

3  accept.  But if there's ongoing negotiation and there

4  are offers made along the way, that would be within

5  FRAND terms.

6          MR. POWERS:  Those are all things that Your

7  Honor would have to consider, but --

8          THE COURT:  So you're not -- all right.

9          MR. POWERS:  If I may.

10          THE COURT:  Yes.

11          MR. POWERS:  From our point of view where we

12  are is as follows:  The debate hasn't been on whether

13  there's a breach -- there would be a debate at trial of

14  course.  But as to the debate in the last three days has

15  been the extent of remedy Your Honor would order if a

16  breach were found.  In our view, undeniably if a breach

17  were found, we would be entitled to a declaration that

18  there's breach, and a finding that there's breach.

19      Now whether Your Honor would order specific

20  performance, that goes into the issues we've been

21  debating back and forth.  Our view is you can order

22  specific performance of an option contract without that

23  affirmatively requiring that person to take it because

24  that's not part of the contract.  And that's not

25  advisory, that is completing the circle of the agreement

1   that the option contract created.  That is exactly

2   what's happening here.

3       But in our view, the issue isn't whether Apple has

4   changed the claim, the claim is the same.  We're asking

5   for this relief we're asking for.  There's been a debate

6   about whether the ultimate relief that we've asked for

7   would be given by Your Honor.  In our view, you really

8   can't decide that until you've heard the evidence.  But

9   at a minimum --

10      THE COURT:  You're saying the ultimate relief

11  would be a declaration that the rate offered by Motorola

12  was outside the bounds.

13      MR. POWERS:  The ultimate relief would either

14  be specific performance of an offer at a rate that you

15  decided was FRAND or a declaration that the rate would

16  be FRAND.  Lesser-included relief would be a declaration

17  that their -- a finding of breach because their rate

18  wasn't FRAND or a finding, a declaration that their rate

19  wasn't FRAND.  Those are all lesser-included findings

20  that would be appropriate from a finding of breach.

21      All this other -- we talking about the

22  nondisclosure portion, which is entirely separate from

23  this and a separate claim which also should be tried.

24      THE COURT:  No, that will not be tried.  I will

25  not change my mind from the Friday order.

1        MR. POWERS:  Then let's stay with the FRAND

2  point.

3        THE COURT:  All right.

4        MR. POWERS:  On the FRAND point, with respect,

5  I don't think it's fair to say that Apple hasn't made

6  its case.  We haven't had a chance yet to make our case.

7  But we will establish breach, and we should, under

8  normal rules of procedure, be entitled to findings

9  resulting from that.  Whether we're entitled to all of

10 the relief we seek or only some of it is something that

11 you can and presumably would decide after you've heard

12 all the evidence and decided what relief is appropriate.

13 But the fact that that relief would not accomplish

14 everything the Court may wish to try to accomplish

15 doesn't mean that that relief is inappropriate.  That's

16 our view as to where we are here.

17     Now, we're long past that at some level because

18 Your Honor's order has invited a broader discussion, and

19 our proposal made some -- yesterday at noon was an

20 attempt to respond both to the broader discussion that

21 Your Honor raised about trying to solve the whole

22 problem and to some of the concerns that Motorola had

23 raised.  And what I'm now hearing is that Motorola would

24 agree to option three, which does address completely, I

25 think, the issues that Your Honor raised about whether

1   you would be doing something useful.  This would even be

2   more useful than what had been proposed and it solves

3   Motorola's concerns, as Motorola has agreed, to allow it

4   to put in the record about Apple's patents and for Your

5   Honor to hear a balanced even side from both sides.  And

6   if all it requires is a simple amendment to the

7   pleadings and we move on and schedule a trial on your

8   court's calendar at an appropriate time, that seems like

9   the appropriate resolution of everyone's concerns.

10          THE COURT:  And what is your response to the

11  offer to enter binding arbitration that Motorola has

12  just made?

13          MR. POWERS:  I would need to discuss it with my

14  client and consider it.

15          MR. SWEDLOW:  Your Honor --

16          THE COURT:  I would ask that -- then we'll take

17  a break.

18          MR. SWEDLOW:  The problem with simple amendment

19  to the complaint is we didn't breach.  And so when you

20  find there is no breach, then we can't get paid because

21  this complaint doesn't have a mechanism where when we're

22  not in breach, Apple still has to pay.  So it's not that

23  you have or don't have jurisdiction.  We have to give

24  you a new case, just like we would be giving to an

25  arbitrator and say even if 2.25% in net value, which is

1   what Motorola actually gets, is what we offered them and

2   we gave them all of these other options which you will

3   see, if we ever do a trial on this, we never breached.

4   They never paid.  We want to get paid now and they want

5   to cross-license.  We have to be found to have breached

6   in order for you to say as a breach, I'm going to order

7   specific performance and this is the number or rate or

8   whatever term that I'm going to enforce against both

9   parties.

10          But if we look back at what this complaint was,

11  this was a complaint for a breach and damages, and Apple

12  dropped its claim -- first changed and then dropped its

13  claim for damages and sought nominal damages.  But Judge

14  Posner, I'm going to call it a *related case*, the other

15  case related to some patents at issue here, said, and

16  I'm quoting from our brief:  "You can't go into federal

17  court and say you had an contract with 'X' and 'X' broke

18  it and you're really annoyed, even though you sustained

19  no injury of any sort.  So please give me a judgment for

20  one dollar that I can pin on my wall."

21          You can't do that.  And when they dropped their

22  claim for damages, they aren't entitled under Article

23  III or the practical means of this court to say you

24  still can declare that they breached even if there's no

25  remedy that actually resolves the dispute.  They're

1   not -- Apple is not entitled to that once it drops its

2   claim for damages.  If Apple was seeking damages, then

3   there would be some justiciable issue if we breached.

4   But if we breached, and all you can do is say you

5   breached, as you pointed out in your order, that doesn't

6   resolve anything.  That says we breached.

7        But if you set a rate, as if ETSI had set a rate,

8   then that is the rate that has to be paid.  That's the

9   entire dispute, is your discretionary grant of

10  declaratory relief should mean something or it's a

11  useless thing because there are no damages at issue in

12  the case other than nominal -- so if you insert $20 for

13  $1, in this context, it's the same.  Apple reduced its

14  claim from damages to no damages.  If all that's left is

15  your discretionary relief and it doesn't mean anything,

16  then there's nothing for the Court to do.

17       THE COURT:  Would your argument apply if I set

18  a rate -- if I said it was going to be $3.10?

19       MR. SWEDLOW:  Frankly, you'll see that that's

20  too low also.  Let's -- if you set a rate that we liked,

21  we can't collect, because what's our mechanism to

22  collect?  If we breached and you set a rate, Apple is

23  not going to pay it.  So you just set a rate.  That's

24  all that happened.  It doesn't do anything.  Where do we

25  go to get that money?

1    We have to go file 500 patent infringement patent

2  lawsuits to collect on all 500 patents?  Because in a

3  patent infringement case, the current law is you can't

4  collect on patents that aren't actually in the case.  So

5  we have to put all our patents into a case.  Apple has

6  said if you set a rate of, let's say, $10, we're not

7  going to pay.  But if you set a rate at $1, you still

8  can't make us pay, but we'll voluntary pay.  That's why

9  we wound up here.  Because Apple dropped its claim for

10  damages.  Any number you would select is an option, as

11  they said, but that isn't -- in your discretion for

12  declaratory relief giving Apple an option to take or

13  leave a rate, even if it's $1, they only said they would

14  voluntary do it.  They're not actually agreeing to be

15  bound.

16    It isn't before you.  So if we amend the complaint,

17  it would have to be something totally new where the

18  parties say Judge Crabb is going to be able to decide a

19  rate, whether or not Apple -- whether or not Motorola

20  breached, and we're going to show you all of Apple's

21  patents and figure out what the net value of the two

22  portfolios would be, and whatever number you determine

23  and however we're supposed to pay it, whoever pays it

24  has to pay it.  That's not an amendment of the

25  complaint.  It's for sure something we would like to do

1   in binding arbitration or here, but it isn't the context

2   of just changing the complaint so this complaint adds

3   another claim.

4            THE COURT:  Okay.  We'll take 15 minutes.

5        (Recess          10:30-11:10 a.m.)

6            THE CLERK:  This Honorable Court is again in

7   session.  Please be seated and come to order.

8            THE COURT:  Now I've said several times that I

9   really can't figure out any way that Apple has been

10  injured that could be redressed by the request that

11  Apple has made for relief in this case.

12       Mr. Powers, we've gone over this a lot, but just

13  how would an order declaring that Motorola breached its

14  contract with ETSI by its initial FRAND offer help you?

15  What specific help would it give you other than a

16  bargaining chip or an affirmative defense against

17  infringement cases?

18           MR. POWERS:  I guess I would have two answers,

19  Your Honor.  First is that it would be appropriate

20  relief for the claim that's been brought.  And I would

21  reiterate --

22           THE COURT:  What's the injury and what would be

23  the redress?

24           MR. POWERS:  Well, okay.  Injury is a separate

25  question.  The injury that we've suffered is that we've

1   been subjected to litigations all over the world and

2   threats of additional litigations all over the world

3   that we should not have been subjected to, if, in fact,

4   they had made a FRAND offer back in 2007 or 2010.  And

5   if we had accepted that offer, we would have been

6   licensed.  All of those litigations and all of those

7   threats of litigations would not have occurred.  The

8   fact that we have decided not to seek damages for that

9   does not mean that we haven't been injured.  So those,

10  you obviously have to keep those as separate categories.

11      And the injuries I think have been clear.  We've

12  been subjected to litigation and threats of litigation

13  that are improper.  They are improper because a party to

14  a standard-setting body agrees to make an offer that is

15  FRAND so that anyone practicing the standard can

16  practice without fear of litigation or exclusion.  That

17  is the whole purpose of a standard-setting body.  And if

18  we're right about breach, then in our view your

19  declaration of what is FRAND, if that's the only relief

20  you grant -- obviously if you order a specific

21  performance or if you go further as the way we've asked,

22  your relief is then more effective.  But if all that you

23  do is to declare that their breach was FRAND and if you

24  don't declare what FRAND is, then that is obviously less

25  effective than declaring what FRAND is.  But the measure

1  of whether a case should go forward, in our view, isn't

2  determined in how effective that relief is in resolving

3  various geopolitical disputes.  If you want to be

4  completely effective, you adopt option two or three.

5  The relief we've sought is, as we explained on Thursday,

6  effective in the sense that it will change -- it will

7  preclude Motorola from being able to do what it has done

8  to date which has precluded, in our view, an agreement.

9      Now Your Honor asked me on Thursday whether I could

10 guarantee that an agreement would result should you

11 grant us the relief we've sought, and obviously I can't.

12 But that doesn't mean that the relief you would be

13 granting would be ineffective.  It merely means it's

14 uncertain as to that particular forward course.

15     But the idea that -- and Motorola has attempted to

16 position this that the Court is merely being used as a

17 pawn in a negotiation strategy.  That's not it at all.

18 What's happening is we are asking the Court's assistance

19 to have the negotiation proceed according to rules that

20 ETSI set.  That's all.

21         THE COURT:  And how does the inability to get

22 the offer injure you in any real way if you're not

23 prepared to accept it?

24         MR. POWERS:  We have not said we're not

25 prepared to accept it.  We've said that we are prepared

1   to accept many offers.  We just aren't going to write a

2   blank check for an unknown offer.  And ETSI rules don't

3   require that.

4        So in terms of the specific relief sought by the

5   specific claims in the case, which merely asks the Court

6   to complete the ETSI contract, not to complete a

7   contract between Apple and Motorola that is a license

8   agreement, that's not the agreement that's being

9   breached here yet.  We're asking you to complete the

10  contract between ETSI and Motorola under which, as I

11  said earlier, Motorola has already received its

12  consideration and yet has failed to live up to its half

13  of the bargain which is making the offer.  That's all we

14  want.  And if they make that offer, and if that offer is

15  in the range that we said we think it would be, we've

16  told the Court we'll accept it.

17       What we can't do is do a blank check for accepting

18  the result of a methodology here that might produce a

19  number that we think is wrong unless that same

20  methodology, and that was option two that we proposed,

21  is applied bilaterally.  And that again, I think,

22  addresses both your concern and Motorola's concern.

23  Motorola is not willing to do that.

24       If the same methodology is applied to both sides,

25  then I've said we're willing to accept that in a binding

1  way.

2          THE COURT:  If I were to just decide whether

3  Motorola had breached its contract with ETSI, that would

4  mean that I would be deciding first of all was the

5  initial offer within the FRAND guidelines as an initial

6  offer.  And then if I decide that it was, then I'd have

7  to look at what else happened.  It's pretty hard to say

8  that any one offer would have to comply with FRAND

9  guidelines if there's an ongoing negotiating posture.

10          MR. POWERS:  Our view on that, Your Honor, is

11  that the decision on FRAND, as we said before on

12  Thursday and elsewhere, the decision on FRAND is not

13  driven by whether their initial offer was or was not

14  FRAND.  We don't think it was.  But that's not what

15  decides the question of breach.

16          And we think that Your Honor put it well in your

17  motion in limine ruling where you said the question at

18  that point is really whether -- what the state of

19  negotiation was at the time they filed suit in late

20  2010.  Because at that point, we're past the initial

21  offer; the parties have had numerous back and forths;

22  and there is a clear offer on the table at that point,

23  at the point at which they initiated suit.  And the

24  reason that's a good line is because of exactly the

25  reason that Your Honor put in the motion in limine order

1  which is, well, if at that point Apple had done what it

2  was supposed to do, which is offer a cross-license of

3  its essential standard patents which it had, and if at

4  that point Motorola's demand was still two-and-a-quarter

5  percent of the full ASP, which it was, then that -- then

6  at that point you can measure whether they had complied

7  with FRAND before they did something that is

8  inconsistent with FRAND, which is suing.

9       So I don't think either side says you have to make

10  26 FRAND determinations based on what the parties said

11  on September 10 versus September 15.

12            THE COURT: So it would just be that last one.

13  I did want to explain a couple of things. One is I

14  can't accept the argument that Apple made that the trial

15  should proceed on a breach of contract claim because

16  it's entitled to nominal damages. I haven't found any

17  case in which a court allowed that to happen. There

18  certainly are plenty of cases in which courts have said

19  after the party was unable to prove its damages or it

20  came up short or the calculation was just so complicated

21  that it couldn't be decided by a court or jury. But the

22  idea that anyone starts out in the beginning by asking

23  for nominal damages and then wants to proceed, it seems

24  to me, and particularly in this case, this is just

25  another way of asking for declaratory relief.

1      Also, you had asked for reconsideration of the
2   October 29th order on the ground that the Court did not
3   consider the implied covenant of good faith and fair
4   dealing, but you never raised that.  You mentioned it in
5   one footnote, but you didn't develop any argument on it.
6      And then finally, on the claim for declaratory
7   relief on the '898 patent, I can't find any persuasive
8   reasons for granting Apple that kind of relief.  First
9   of all, there's no likelihood that Motorola can or will
10  sue Apple on the '898 patent because Judge Posner
11  dismissed Motorola's claims of prejudice after it was
12  unable to prove damages.  And yes, the ruling could be
13  overturned on appeal, but until then, Motorola cannot
14  maintain a suit against Apple on the '898 patent.  And
15  if the ruling is overturned and the issue is remanded to
16  the court in Illinois, then that issue can be litigated
17  there.
18      Also, I haven't found any case and Apple has not
19  identified anyone that would support an order of
20  exclusion if Motorola were found to have breached its
21  obligation to disclose patents to ETSI when it failed to
22  disclose the '898 patent.  And even if it were, the
23  remedy that Apple is seeking is so far out of proportion
24  to any harm that Apple has suffered or is likely to
25  suffer that I would not impose such an order.

1      So that -- in any event, if we went forward, it

2    would only be on the issue of this alleged breach of

3    contract as to the failure to set -- to offer a FRAND

4    rate.

5      And Mr. Swedlow, anything further on that matter?

6           MR. SWEDLOW:  Yes, Your Honor.  You didn't hold

7    in your motion in limine ruling that the critical

8    question is the day before we filed the lawsuit.  But

9    even if you had, the question is whether or not the

10   negotiations leading up to that moment and at that

11   moment were consistent with FRAND.  The determination

12   that Apple -- the determination that Motorola breached

13   its FRAND obligation doesn't lead to any resolution and

14   it's within the Court's discretion as to whether or not

15   to grant declaratory relief.

16      The posting on the wall that Motorola has breached

17   is not considered -- it's generally not considered

18   something the Court should do in terms of specific

19   performance.  And if a number is set, I haven't heard

20   and don't know of any argument why -- we're not saying

21   the Court is a pawn, but what the Court has done is

22   established at least a ceiling with what Apple might pay

23   with no way for the dispute to actually be resolved.  So

24   the result of that would have to be that Motorola --

25   unless Apple wins and gets the number it wants and then

1   voluntarily pays, if Apple wins that we breached but

2   doesn't win the number they want, then Motorola is left

3   with having to file some number, I'm saying 500, not

4   that it would be 500 lawsuits, but some number of patent

5   infringement lawsuits to collect a ceiling of whatever

6   this number you set was.

7       So it won't resolve anything.  We won't agree to

8   the establishing of a methodology for Apple's patents

9   when they're not in the case.

10      With respect to whether or not we could present to

11  you the entirety of a cross-license with everyone's

12  patents included and you could determine the rate,

13  there's no complaint we can give you other than to just

14  give you that case that would constitute that as an

15  outcome.  Because, for example, if we win on the current

16  breach of contract claim, we don't get paid.  So you

17  haven't set a license or a cross-license.  We don't have

18  any way to sue Apple on this counterclaim they say we

19  should file; and if Apple won that, there's no way for

20  Apple to make us pay them on the cross-license for their

21  patents.

22      So it isn't -- it can't be pled in the form of a

23  complaint, but it could be resolved in the context of

24  binding arbitration.  You could be the arbitrator, but

25  we can't make a complaint that gives this court the

1  ability to set a rate no matter what, breach or no; and

2  set a rate for Apple' patents, no matter what, breach or

3  no.  Because you have to bring a claim that can be pled

4  and we don't have a claim to plead against Apple that

5  would require them to license their patents to us at a

6  rate that we would then have to pay.

7          MR. POWERS:  May I respond very briefly, Your

8  Honor?

9          THE COURT:  Did you want to say one more thing?

10         MR. SWEDLOW:  I guess I did.  That's the reason

11 that we proposed binding arbitration, because the courts

12 can present, in the context of arbitration, this is the

13 dispute that we're going to allow whoever that

14 decision-maker is, an arbitrator to decide.  We both

15 have portfolios.  We both want a license.  We both

16 believe ours are valuable and the other side's aren't

17 valuable.  So set a rate for us and both parties will

18 agree to pay it and be bound by the geography or caps or

19 lump sums or whatever other term the arbitrator or that

20 decision-maker feels is the correct decision.  But that

21 doesn't make it part of this case.  It just makes it

22 something we're willing to do and it appears Apple is

23 willing to do, but only if it was somehow an amendment

24 to this complaint.

25         THE COURT:  Thank you.  Mr. Powers.

1  MR. POWERS:  Thank you.  I think there's two

2  points there that need to be addressed.  The first is

3  the comment that the Court has jurisdiction or the

4  ability to decline to exercise declaratory judgment

5  jurisdiction.  And while technically that's true of

6  course, the law on that is typically that one would

7  decline to exercise declaratory jurisdiction at the

8  beginning of the case out of reasons of judicial

9  economy.  And if you read all of the cases about

10  declining the exercise of declaratory judgment

11  jurisdiction, all the ones I'm familiar with are at the

12  beginning of that process.  I am not aware of one, and

13  certainly one has not been cited, where the Court is

14  asked to decline to exercise declaratory jurisdiction

15  the day the trial is supposed to start.  That obviously

16  is not very judicially economical.

17  THE COURT:  No.  It definitely is not.

18  MR. POWERS:  And so our view is that law not

19  only does not support the decision -- a decision to

20  decline to exercise it now, but it goes the other way.

21  That's the first point.  I think it's quite clear we've

22  pled declaratory relief for all of these claims and that

23  declaratory relief is appropriate and concerns about

24  whether declaratory relief would accomplish everything

25  everyone might possibly wish to be accomplished isn't

1   really the point.  If it would accomplish something, and

2   it's within the scope of the pleadings, it should be

3   decided is our view, particularly now that we're at the

4   first day of trial.

5        The second point I wanted to respond to is the

6   argument made that there's nothing in the complaint that

7   could be possibly be used to order payment.  Well, that

8   argument would have been equally true on last Wednesday

9   when -- and Thursday when Motorola asked for an order

10  basically saying Apple has to pay whatever you order.

11  And while some may wish that to have been a condition of

12  what we're discussing to make the process more

13  effective, there was not a pleading that remotely

14  supported that request.  Remotely.  So Motorola's

15  concern about the effectiveness of the pleading that

16  would order the parties to pay is not one that's being

17  made consistently.

18       The reality is the parties could construct a

19  pleading that would result in exactly what I've outlined

20  as option three.  It would not be the current pleading,

21  but it would be a pleading that would say the Court

22  would set a rate for both and each would pay it, and the

23  parties would agree to it and we could move forward.

24       So the niceties of what that amendment looks like I

25  don't think is the problem.  I think that's an

73

1  accomplishable solvable question.

2          THE COURT:  And Mr. Powers, I certainly agree

3  with you that it would have been nice to make this

4  decision at the outset.  But this is an area that none

5  of us has been in before, and you can just look at the

6  evolving nature of the briefs, both sides; orders from

7  the Court trying to find the path through this swamp of

8  not knowing what's out there; what we're talking about.

9  None of us could have realized that we would be getting

10 to the point where we'd be saying wait a minute.

11 There's nothing here.  This is a situation in which one

12 side wants what will be nothing more than a bargaining

13 chip.

14     I certainly don't criticize the lawyers on either

15 side.  I think you've done a magnificent job of trying

16 to help the Court get to a position of understanding

17 what's involved.  But I reach the point where I say this

18 is not what courts should be doing.  They should not be

19 in a situation in which they're saying you don't have to

20 offer more than such and such, and you can bargain your

21 way down from that.

22     I would much prefer, not because I don't want to

23 hear the evidence, but because I don't think hearing the

24 evidence is going to make any difference to the outcome

25 of the case, I would much prefer to have you go to

1  binding arbitration because that is a remedy.  The
2  arbitrator, the panel of arbitrators, whatever you get,
3  that is a remedy that can be expanded to fit the issues
4  that are involved in this case.  You don't have to have
5  a perfect pleading.  If you want to get credit for
6  Apple's patents in the discussion of the rate that
7  you're going to pay for licensing, that can all be
8  included.
9       The arbitrator can talk about rates, but he can do
10 it in a way that isn't just picking one out of the air
11 and just saying okay, this is where -- this is it.  You
12 want six, you want five, let's go five fifty.  All of
13 that is possible for an arbitrator and it's just not
14 possible for the Court.  The Court is in a position
15 where it has to say yes, no.  Binary kinds of decisions.
16 And in this case I don't think a binary decision is
17 appropriate because it's not going to move this case,
18 this dispute to resolution.
19       MR. POWERS:  May I offer one more comment on
20 that, if I may?
21       THE COURT:  Um-hmm.
22       MR. POWERS:  Let me modify my option
23 hypothetical which in a way that I think will, at least
24 for me, help on this point.  If Mr. Swedlow and I had an
25 options contract where I paid him $50 for the option

1  over the course of a year to buy his old iPhone that he

2  had to give up when he took this case and the agreement

3  said that he had to sell it to me at fair market value

4  at the time -- because I can exercise it over the course

5  of a year and we both understood that that fair market

6  value might change.  That's the agreement.  I give him

7  my $50.  I then go to him and say "Hi, I'd like to buy

8  your iPhone," and he says "The price is $1,000 because I

9  think it's that special.  I think that's the fair market

10 value for a Swedlow cellphone."  And I say "Wow, that

11 sounds a little steep.  I don't think that's fair market

12 value.  I don't think you've complied with your

13 obligation for which I've paid to offer me your iPhone

14 at fair market value."

15     So I sue here, assuming jurisdiction is complied

16 with, and I say make him offer me his iPhone.  Make him

17 do what I paid him for.  Now that requires the Court to

18 decide the fair market value of the iPhone at the time

19 that I asked for it and there would be evidence on that.

20 There would be eBay evidence put before you.  There

21 would be various arguments about what that iPhone was

22 worth.  Both sides would put in their evidence.  You

23 would then decide that the price, the fair market value

24 of the iPhone at the time I asked for it was $150.

25     THE COURT:  The great thing is there would be

1   no jurisdiction for that case.

2          MR. POWERS:  I specifically assumed

3   jurisdiction, but yes, I understand.

4          MR. SWEDLOW:  I just want to point out I have

5   an Android phone, not an iPhone.

6          MR. POWERS:  At that point, if you decided that

7   the fair market value of that phone was $150, that

8   doesn't -- that's not a bargaining chip.  That's the

9   offer I get.  I accept it or I don't.  If I thought the

10  fair market value of that was $50 and it's not worth

11  $150, I don't buy it.  But you have done what the law,

12  in my view, would require, which is to force Mr. Swedlow

13  to make an offer at an amount and then I accept or not.

14  That's completing the contract.  I then --

15         THE COURT:  You're not going to walk away from

16  this, Mr. Powers.  If I tell you that the amount is

17  $10.12, you're not going to accept it, but you're not

18  going to walk away.  That's not the end of the matter.

19  You still want a licensing agreement with Motorola, and

20  you've got all kinds of reasons for that.  It's just one

21  step.

22         If I tell you that your option is your telephone or

23  your option or whatever is $150, that's the end.  Yes,

24  you walk away.  You pay it.  Whichever.  But that's not

25  what we're talking about here.  We're talking about

1  something that is still very fluid, very much in

2  dispute.  It's going to go on and on and on.

3      My giving you one number out of a whole mass of

4  other things that have to be decided is not going to get

5  you -- that's not going to resolve this case.

6          MR. POWERS:  None of us knows that for sure.

7  Your Honor is clearly correct that there are a number of

8  factors at issue.  But it is our view, the reason we

9  brought this case -- we didn't bring this case because

10 none of us had anything else to do.  We brought this

11 case because we believed setting that number would do

12 something meaningful to resolve the dispute.

13         THE COURT:  And --

14         MR. POWERS:  That's why we did it.

15         THE COURT:  -- I disagree with you.  I am going

16 to dismiss it.  Now the Court of Appeals may have an

17 entirely different view of it, and that's fine.

18         MR. POWERS:  I assume it's dismissed without

19 prejudice.

20         THE COURT:  Oh, no.  It's dismissed with

21 prejudice.

22         MR. POWERS:  We have a bench memo to give you

23 on that subject because the law, particularly --

24         THE COURT:  I'll certainly -- and I will issue

25 a written opinion and then if you want to make motions

1  for reconsideration of any aspect of it, if you want to,

2  I will look at your bench memo on prejudice or no

3  prejudice.

4          MR. POWERS:  May I approach?

5          THE COURT:  Certainly.  Thank you.  This is not

6  the resolution that I would have thought we would --

7  where we would be months ago when this case was under --

8  was being developed and when I decided the motion for

9  summary judgment and all the others, but I simply cannot

10  see my way to spending court resources to reach the

11  result that Apple wants.  I still have not been

12  convinced that there is any injury that will be

13  redressed by the request that Apple has made for relief.

14      So I will get a written opinion out promptly.  Of

15  course you can always file motions for reconsideration.

16  And of course you may take an appeal.  Thank you all.

17      (Proceedings concluded at 11:36 a.m.)

18

19                  *  *  *  *  *

20

21

22

23

24

25

1        I, LYNETTE SWENSON, Certified Realtime and Merit

2    Reporter in and for the State of Wisconsin, certify that

3    the foregoing is a true and accurate record of the

4    proceedings held on the 5th day of November 2012 before

5    the Honorable Barbara B. Crabb, District Judge for the

6    Western District of Wisconsin, in my presence and

7    reduced to writing in accordance with my stenographic

8    notes made at said time and place.

9    Dated this 6th day of November 2012.

10

11

12

13                   /s/_____

14                     Lynette Swenson, RMR, CRR, CBC
                          Federal Court Reporter

15

16

17

18

19

20

21   The foregoing certification of this transcript does not
     apply to any reproduction of the same by any means
22   unless under the direct control and/or direction of the
     certifying reporter.

23

24

25