IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPLE INC.,

                                                 OPINION AND ORDER

                Plaintiff,

                                                    11-cv-178-bbc

     v.

MOTOROLA MOBILITY, INC.,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

      In a statement from the bench on November 5, 2012, following a hearing with the parties, I advised them in general terms why I was dismissing plaintiff Apple Inc.'s remaining claims against defendant Motorola Mobility, Inc. This order is intended to explain in more detail why I have determined that Apple's claims for relief in the form of nominal damages, specific performance and declaratory judgment cannot succeed. Apple has not shown either that it has a right to the relief that it is seeking or because that the discretionary relief it requests would have any practical effect.

      Some background may be helpful to non-parties' understanding of the dispute and the reasons for its dismissal. Apple and Motorola are competitors in the wireless communications industry. Motorola owns a number of patents that it has declared to be patents essential to various technological standards set by international standard setting organizations relevant to wireless communication devices. The standard setting

1

organizations consist of technology representatives from companies interested in determining standards for a particular aspect of technology; their purpose is to agree on common technological standards to enable all compliant products to work together. Often the agreed upon standard will cover technology that is the subject of a patent; in that case, the patent becomes an "essential patent." The standard setting organizations have developed policies for this situation in an effort to prevent patent holders from abusing the market power that flows from owning technology that has become a standard. They encourage members to make known to the organization patents essential to a proposed standard and to agree to license those patents on fair, reasonable and non-discriminatory terms to anyone who asks for a license. (Such terms are referred to in the industry as "FRAND" terms.) Motorola has many patents in the cellular communication industry, some of which it has disclosed to various standard setting organizations. It has assured the organizations that these patents will be made available to competitors under "reasonable terms and conditions that are demonstrably free of any unfair discrimination."

This suit began as part of an infringement action that Motorola filed against Apple in the International Trade Commission. After the case had been pending for a few months, Apple filed counterclaims against Motorola and removed the counterclaims to this court on March 11, 2011. It sought preliminary injunctive relief against Motorola; that motion was denied. Dkt. #85. Motorola sought dismissal of the action; that motion was denied as well, with one inconsequential exception. Dkt. #93. On September 16, 2011, Apple filed an amended complaint, alleging ten claims for relief, dkt. #110, all variants of its primary

claims that Motorola was bound by its contracts with these standard setting organizations. Under those contracts, it had an obligation both to disclose to the organizations any patents it owned that would be covered by standards adopted by the organizations and to offer licenses to those patents to competitors under terms that were fair, reasonable and non-discriminatory. Apple contended that it was a third party beneficiary of these contracts and thus entitled to damages for Motorola's breach of contract and inequitable conduct; specific performance of Motorola's contractual commitment to license its standards-essential patents on FRAND terms; and declaratory relief, specifically, judgments declaring that Motorola had breached its contracts, that the terms it had offered Apple to license patents were not FRAND terms and that Motorola was not entitled to seek injunctive relief preventing Apple from practicing certain standards. Apple alleged other claims on which it sought injunctive relief and damages but those claims were dismissed earlier and are no longer before the court.

In deciding the parties' cross motions for summary judgment, I found in favor of Apple on its claims that it was a third party beneficiary of the contracts between Motorola and the standards setting organizations, that the contracts bound Motorola to disclose its intellectual property rights in a timely manner and that Motorola had failed to make the disclosures before the adoption of the standards incorporating its patents. Order, dkt. #194, at 3. I found also that Motorola had failed to show that Apple's breach of contract or estoppel claims should be dismissed for Apple's failure to prove that it had suffered any compensable damages. Id.

On September 24, 2012, Apple dropped its claim for money damages on any

3

remaining claims, asking only for nominal damages of less than $20. With only its claims for specific performance and declaratory relief remaining, it requested a court trial. Dkt. #255. The request was granted.

In preparation for a November 5, 2012 trial, the parties filed motions in limine that revealed considerable disagreement about the scope of the trial. Apple anticipated that the trial would result in a determination of a specific rate or range that would qualify as a fair, reasonable and non-discriminatory rate for a license to Motorola's essential patents and an order requiring Motorola to offer that license. Motorola argued for a determination limited to the question whether its initial royalty offer of 2.25% was fair, reasonable and non-discriminatory and whether it had failed to negotiate in good faith. It pointed out that a victory for Apple would mean nothing more than nominal damages and possibly an order from the court to negotiate a license. At the time, Motorola's argument did not seem persuasive. It appeared possible that specific performance would be an appropriate remedy if Apple proved that Motorola had breached its contracts with the standard setting organizations. I anticipated that the court would decide, first, whether Motorola had breached its contractual obligation by failing to offer a fair, reasonable and non-discriminatory rate for a license, which would require determining just what such rate would be or at least what the proper range of such a rate would be, and second, whether Motorola should be required to license its patents to Apple on those terms.

An order to this effect issued on October 29, 2012. The next day, Motorola moved for clarification, arguing that if the court determined a fair, reasonable and non-

discriminatory rate, Apple should be required to accept a license to Motorola's essential patents and pay the license fee for all accused devices. Dkt. #444. Apple responded on October 31, making clear its opposition to the suggestion that it agree to be bound by any rate determined by the court. Apple's Br., dkt. #448, at 1 ("Motorola's commitment to standard-setting organizations to offer a FRAND rate does not bind Apple to write a blank check and accept that offer.") Although Apple wanted the court to determine a fair, reasonable and non-discriminatory rate that Motorola must offer to Apple, it maintained that Motorola had never asked the court for an order requiring Apple to accept this rate. Rather, Apple argued, the case had always focused on Motorola's obligation to offer a fair, reasonable and non-discriminatory license to Apple. Id. at 4. It added, however, that it would be willing to pay a rate of no more than $1 for each Apple device going forward, while it retained the right to appeal any award higher than $1, as well as to refuse any such rate and proceed to further infringement litigation. Id. at 5.

Perhaps it should have been evident earlier in the case that Apple was seeking only a ceiling on the potential license rate that it could use for negotiating purposes, but it was not. This became clear only when Apple informed the court in its October 31 response that it did not intend to be bound by any rate that the court determined. This meant that the court would determine what it believed to be a fair, reasonable and non-discriminatory rate for a license with Motorola, but Apple would pay that rate only if it was the rate Apple wanted. Even then, it was only volunteering to pay the rate. If Apple succeeded in showing that a breach occurred but did not win the rate it wanted, it could walk away, leaving

5

Motorola without a mechanism for obtaining compensation from Apple for the use of its patents except by filing infringement suits. The court would be resolving all of the issues raised in this case without necessarily bringing the parties any closer to a license agreement. In effect, Apple was asking the court to assist it in negotiating, not in putting the parties' dispute to rest.

At the final pretrial conference on November 1, 2012, I advised the parties that it was doubtful whether the case would proceed to trial on November 5, as scheduled, because of the court's uncertainty over the propriety of engaging in the complex task of determining a FRAND rate if the end result would not resolve the parties' disputes over licensing and infringement. In an order entered the next day, November 2, I elaborated on these questions, asking in effect whether the relief sought by Apple would actually resolve any dispute between the parties. The parties were given until Sunday to file briefs in response, with a hearing to follow on Monday morning and the trial continued until 1:00 p.m.

Apple came back with three suggestions: First, the trial could proceed as previously scheduled and on the same terms as the court had determined in the order deciding the motions in limine. Second, the trial could go forward as scheduled on the understanding that the court would determine a FRAND rate under a method the court would construct for determining patent value and both parties would agree that the method would be binding on them. In other words, Motorola would have to agree that any valuation method the court determined would apply to Motorola's and Apple's patents. Presumably, it would follow that Apple would be entitled to credit or compensation on the license fee for this value

because Motorola would be gaining a cross-license to Apple's patents. Third, if Motorola would not agree to be bound by a valuation method adopted by the court, the trial would be continued for six to nine months to allow the development of a record as to both parties' essential patents so that the court could determine in one proceeding what the FRAND rate would be, with both parties agreeing to be bound by the court's determination. Apple's Resp., dkt. #497, at 2-3. Apple told the court that if it adopted this third proposal and agreed to determine the value of Apple's patents as well as Motorola's, Apple would agree to be bound by the determination. Id.

The parties discussed these options at the Monday hearing. As for option one, Apple made no persuasive arguments about why the case should proceed under its original conception of the trial, with the court determining a non-binding FRAND rate for Motorola's standard-essential patents. With respect to its breach of contract claim, the only relief to which Apple would be entitled if it prevailed would be damages, which it has foresworn, or specific performance, which it has not shown is warranted in these circumstances. As I explained in the November 2 order, not only has Apple failed to show that it can satisfy the four-factor test for equitable relief set forth in eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006), it makes no sense for Apple to ask for this relief when it is obvious that there can be no real performance by either side until all of the terms of the contract are negotiated.

Apple argued at the hearing that the trial could proceed under option one because it is asking the court simply to order specific performance that would "complete the circle" of

the contract that Motorola entered into with the standard setting organizations. However, Apple has not cited any authority for this proposition and it has never explained why an order that did no more than "complete a circle" would justify an order of specific performance.

Additionally, Apple has made the argument that the trial should proceed under option one on its breach of contract claims because it is entitled to nominal damages, but it has not cited a case in which a court allowed a party to proceed to trial on a claim for nominal damages. The cases it has cited all arose in situations in which the party seeking damages had failed to prove damages at trial or the court had concluded that the determination of damages was too difficult. Olympia Hotels Corp. v. Johnson Wax Development Corp., 908 F.2d 1363, 1372 (7th Cir. 1990); Felton v. Teel Plastics, 724 F. Supp. 2d 941, 954 (W.D. Wis. 2010). The fact is that the request for nominal damages in this case is just another way of asking for declaratory relief and, as explained in the November 1, 2012 order, dkt. #487, it is improper to order declaratory relief when it would have no practical effect.

Apple attempted to address the problems with option one through its two new proposals. Under option two, the trial would go forward as scheduled with the court determining a method for valuing each party's standards essential patents and assessing a fair, reasonable and non-discriminatory rate for a license or an offer of one. Motorola expressed strong resistance to option two, making the obvious objection that the question of the value of Apple's patents had never come up before because Motorola had never asserted a claim involving these patents. Therefore, Apple was asking the court to construct

a method for determining the value of both parties' patents to each other, except that the court would not know anything about Apple's patents. Not only was Apple expecting the court to create an evaluation method without all of the information it needed, but it was asking the court to create a one-size-fits-all-evaluation method that might bind other patent holders who have nothing in common with either Apple or Motorola.

In response, Apple argued that a patent-by-patent analysis of all of the standard-essential patents was not necessary to because the court could rely on a "percentage of intellectual property rights" approach. Each party would identify the number of patents it has declared to be essential to the relevant standards. The court would then compute a percentage derived from the number of the party's own patents to the number that have been declared essential and apply that percentage to the cost of the chip or to the board, depending on which part the court determined was the smallest saleable unit that used the technology providing all the cellular functionality covered by the patents.

Alternatively, Apple argued, the court could determine a FRAND rate by looking at the licensor's own licensing history, but it acknowledged that this approach would not carry over to a determination of a FRAND rate for any other patent holder's portfolio. As a third alternative, it suggested that the court could rely simply on Motorola's history with a Chinese company to which it had licensed its technology in the past. Again, this alternative would not assist the court in deciding the value of Apple's own patents. As Motorola noted, the proposals are a good illustration of the idiosyncratic variances of negotiations over patent valuation. Hrg. trans., dkt. #500, at 21-22.

From the arguments that Apple made, it is not realistic to think that a court could construct a "method" into which the parties could insert numbers to produce a fair valuation of a company's patent portfolio in a given area of technology. It is no more realistic to think that this court could arrive at a fair valuation of the Apple patents simply by applying the percentage of intellectual property rights approach that Apple has suggested. Each proposal exposes more of the difficulties inherent in trying to pick a particular monetary rate for an agreement as complex as a licencing fee for rapidly changing technology. Apple has not explained how it is possible to determine a rate without knowing the answers to such questions as how a cross-license to the other party's patents may affect that rate or what the scope of the license is (a worldwide license will be more valuable than a license to sell in only one country or only a few countries); what guarantees are incorporated into the agreement; the length of the agreement; or the frequency of payments. In effect, Apple is asking the court to assess one part of a complex contract that has yet to be negotiated.

This leaves option three, which was Apple's request to continue the trial for six to nine months. Even if option three were adopted and the trial were continued to allow the parties to litigate the value of Apple's patents, the trial would not resolve all of the matters that have to be considered before the parties can agree upon a license fee. There is no guarantee that the parties will complete the negotiation and actually enter into a licensing agreement under which Apple will pay Motorola for the use of its technology. In these circumstances, I am not persuaded that the case should proceed.

Apple asserted claims for declaratory relief for Motorola's violation of its disclosure

10

obligations to the standard setting organization ETSI and engaged in patent misuse, but it has not explained why monetary damages would be inadequate relief if Motorola were to sue it for infringement and seek an exclusionary order against it in the future. Certainly there is no need to address Apple's claim for declaratory relief as it relates to Motorola's '898 patent. There is no likelihood that Motorola will (or can) sue Apple on the '898 patent after Judge Posner dismissed Motorola's claims with prejudice when Motorola was unable to prove the damages it alleged had been caused by Apple. Of course, it is possible that this ruling will be overturned on appeal, but until it is, Motorola cannot maintain a suit against Apple based on the '898 patent. If the ruling is overturned and the issue is remanded to the court in Illinois, Apple and Motorola can litigate the matter there.

Moreover, Apple has not identified any case that would support an order of exclusion if Motorola were found to have breached its obligation to disclose patents to ETSI when it failed to disclose the '898 patent. In any event, the remedy that Apple is seeking (an order of unenforceability) is so far out of proportion to any harm that Apple has suffered or is likely to suffer in the future that it is unlikely that any court would impose such an order. This is an example of what Judge Posner noted in the Illinois case: the requested injunctive relief "would impose costs disproportionate to the harm to the patentee" <u>Apple Inc. v. Motorola Mobility</u>, 2012 WL 2362630, *1 (June 7, 2012).

Apple has asked that if the case is dismissed it be without prejudice. A decision on that question will be made once the parties have completed the briefing.

At the November 5 hearing, Motorola suggested that the parties engage in binding arbitration to resolve their dispute. If the parties really wish to resolve this licensing dispute, this is the obvious solution. It would have many advantages to the parties. It would be conducted in private; the parties would not be bound by their pleadings; they would be able to negotiate any and all of the many aspects of their licensing agreement on which they disagree; and they would finish the process with an agreement that would determine once and for all what amount of licensing fees Apple is required to pay Motorola. In the end, this seems to be the best way, if not the only way, for the parties to negotiate a rate that takes into account the many elements of a licensing fee that are not part of this case but are critical to the determination of a fair, reasonable and non-discriminatory rate.

ORDER

IT IS ORDERED that

1. Plaintiff Apple's motion, dkt. #488, for reconsideration of the denial of its motion in limine to preclude defendant Motorola from introducing evidence that it was entitled to seek injunctions and exclusion orders to enforce its declared standards-essential patents and that doing so was not a violation of its obligations to the standard setting organizations and its motion to exclude Motorola's newly disclosed FRAND theories, dkt. #489, are DENIED as moot;

2. Apple's claim for declaratory relief is DENIED.

3. Apple's motion to enforce the court's determination at summary judgment that

ETSI's intellectual property rights policy unambiguously requires pre-adoption disclosure where a party submits a technical proposal, dkt. #491, is DENIED as moot; and

 4. This case is DISMISSED.

 5. The court will decide whether the dismissal is with or without prejudice after the parties have completed briefing on the issue.

 Entered this 8th day of November, 2012.

        BY THE COURT:
        /s/
        BARBARA B. CRABB
        District Judge